UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| BRIAN BELL, | |
| Plaintiff, | |
| v. | Civil Action No. |
| O'REILLY AUTO ENTERPRISES, LLC d/b/a O'REILLY AUTO PARTS, | |
| Defendant. | |

**COMPLAINT**
**JURY TRIAL REQUESTED**
**INJUNCTIVE RELIEF REQUESTED**

NOW COMES the Plaintiff, Brian Bell ("Plaintiff or "Bell"), by and through undersigned

counsel, and complains against the Defendant, O'Reilly Auto Enterprises, LLC d/b/a O'Reilly Auto

Parts ("Defendant" or "O'Reilly"), as follows:

INTRODUCTION

1.      This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551

*et seq.* and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*

2.      O'Reilly violated the ADA and the MHRA by denying Bell a reasonable

accommodation (45 hour per week work schedule), by excluding Bell from work because of Bell's

disability and/or request for reasonable accommodation, and by attempting to demote Bell from

Store Manager to Assistant Manager or Shift Manager at a discriminatory rate of pay because of

Bell's disability and because Bell requested reasonable accommodation.

PARTIES

3.      Bell is a United States citizen residing in Monroe, Maine.

1

4.      O'Reilly is a retail distributor of automobile parts headquartered in Springfield, Missouri. O'Reilly operates stores at about 33 locations in Maine, including Belfast.

JURISDICTION

5.      O'Reilly had 15 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

6.      O'Reilly had admitted that it employed 40,938 team members as of December 17, 2015.

7.      The amount in controversy in this matter exceeds $75,000.

8.      This Court has subject matter jurisdiction over Bell's federal and state claims pursuant to 28 U.S.C. §§ 1331, 1332 and 1367.

9.      On or about October 18, 2015, Bell filed a timely Charge/Complaint of Discrimination against O'Reilly alleging unlawful disability discrimination and retaliation with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC").

10.      On or about _____, the MHRC issued a Notice of Right to Sue with respect to Bell's state law claims.

11.      On or about September 8, 2016, the EEOC issued a Notice of Right to Sue with respect to Bell's federal law claims.

12.      Bell has exhausted his administrative remedies with respect to all claims set forth in this Complaint.

FACTUAL ALLEGATIONS

13.      Bell has ADHD, Tourette's syndrome, and Major Depressive Disorder.

14.      Bell takes medications to alleviate the symptoms of his disabilities.

2

15.     Bell was hired by O'Reilly in August 2014.

16.     Starting in early September 2014, Bell was Store Manager of the O'Reilly store in Belfast.

17.     At the time, Bell lived in Northport, Maine. The Belfast store was about seven miles from Bell's home.

18.     Bell's annual salary was $42,000.

19.     Bell reported to District Manager Chris Watters.

20.     Watters was aware of Bell's disabilities and that he took medications to control the symptoms.

21.     In May 2015, the Belfast store was down two "key holders" only one of whom was replaced within a short time period.

22.     As a result, Bell's store was short staffed as a whole and specifically in management coverage.

23.     The extra hours of work that Bell had to perform as a result of the staff shortage led Bell to need and request a reasonable accommodation.

24.     To cover the staffing needs of the store, Bell worked from Wednesday, May 27 to Wednesday, June 3, 2015, from open to close with relatively little break with the exception of Saturday, May 30.

25.     Watters would not let Bell schedule overtime for other employees to cover the extra work.

26.     Watters was in the store on June 3 and witnessed that Bell was overworked and having problems with his health.

27.     On Thursday, June 4, 2015, Bell was exhausted, dizzy and trembling because of his disabilities and his medications.

28.     Once the store opened and coverage arrived, Bell took a short break and went to his truck to collect himself and regulate the reaction he was having.

29.     There were two employees in the store when Bell left on break.

30.     VIP Tires and Services, a separate company from O'Reilly, operated a store at the same location as O'Reilly in Belfast (35 Starrett Drive).

31.     When the VIP Store Manager saw Bell leave on break, he called and told Watters that Bell was not in the store even though there was no legitimate cause for concern.

32.     When Watters heard that Bell had taken a break from work, he knew or should have known that Bell needed to rest because of symptoms related to his disability.

33.     Watters called Bell on his personal cell phone, told Bell that he had other managers who were working the same hours and that it was "outrageous" that Bell would leave the store at that point in the day. Watters ordered Bell to "get your ass back in the store now."

34.     Bell was too sick to work.

35.     At 9:48 AM, Bell called Regional Manager Nick Thomas to let him know that Bell planned to make a complaint against Watters for the way Watters mistreated him including but not limited to Watters' disregard for his disability-related need for a rest break.

36.     Bell also went to his healthcare provider, Judy Weitzel PMHNP-BC. She completed an O'Reilly Fitness for Duty Form and wrote a letter explaining Bell's disabilities and need for reasonable accommodation. The letter and form listed Bell's disabilities, stated that Bell could not return to work until June 9, 2015, and that when Bell returned, he should not be scheduled for more than nine hours per day, five days per week.

4

37. In other words, the accommodations requested were for a short medical leave of absence and for a minor adjustment in Bell's scheduled hours of work.

38. Up to that point in his employment, Bell's average work week was about 46 hours per week.

39. Bell faxed the documents to Watters and Human Resources.

40. Watters responded with hostility. He expressed no concerns about Bell's health and only demanded to know who was going to close his store.

41. On June 5, 2015, Watters made arrangements to staff the Belfast store because Bell was taken out of work from June 4 through June 9, 2015.

42. On Monday, June 8, 2015, at 6:48 PM, Watters called and told Bell not to come to work the following day even though Bell was deemed ready to return to work by his healthcare provider.

43. Watters told Bell that O'Reilly had to determine if the accommodation he requested and needed was approved.

44. On Tuesday, June 9, 2015, O'Reilly unlawfully excluded Bell from work due to disability discrimination and due to Bell's request and need for reasonable accommodation.

45. There is no reason why Bell could not have returned to work while O'Reilly considered whether his schedule adjustment posed an undue administrative or financial hardship.

46. Indeed, O'Reilly could have avoided administrative hardship by having Bell do his job instead of reassigning his duties to someone else.

47. On Wednesday, June 10, 2015, at 11:41 AM, Watters called and told Bell that he could be demoted to Assistant Manager at a store in Ellsworth, which was about 45 miles from Bell's home. Bell told Watters that the offer was not reasonable given the reduction in pay and

increase in travel. Bell also told Watters that his healthcare provider had reassured him that it would be okay for Bell to occasionally work beyond the scheduled 45 hours per week as long as his usual schedule was limited to 45 hours. Watters was not interested in discussing how Bell could return to his Store Manager position or about any alternatives other than the demotion and relocation to a distant store.

48.     Later that day, at 3:06 PM, Bell spoke to someone at corporate headquarters about returning to his Store Manager position in Belfast or some other satisfactory alternatives. Bell made it clear that he did not accept the demotion to Assistant Manager in Ellsworth. Bell offered to step down to an Assistant Manager position in Belfast if that was the only way that O'Reilly could limit his scheduled hours to 45 per week.

49.     Soon thereafter, Bell submitted an internal complaint about mistreatment and discrimination.

50.     Bell had conversations with the corporate office on June 22, 2015 (23 minutes) and on June 29, 2015 (28 minutes) discussing his concerns.

51.     Upon information and belief, Stephanie Kepler in Human Resources and Regional Manager Nick Thomas were aware of Bell's complaint.

52.     Bell never received any response to his complaint from O'Reilly during or after his employment.

53.     On July 9, 2015, Watters offered Bell a job as a Parts Specialist ("RSS") in Belfast making $10.00 per hour. That offer was a significant cut in pay from Bell's $42,000 annual salary and a significant step down in responsibility and prestige from his Store Manager position. Bell told Watters that the offer was unacceptable.

54.     Through his contacts at the Belfast store, Bell heard that a new Assistant Manager was being hired at that location. No one contacted Bell to offer him that position.

55.     On July 13, 2015, Bell sent an email to HR, Watters and Thomas reiterating that he believed that his request for a schedule adjustment as Store Manager was reasonable. He also reminded management that he had offered to step down to an Assistant Manager position in Belfast and wondered why O'Reilly was seeking to hire someone for a position that he could perform.

56.     On August 5, 2015, Watters contacted Bell and offered him the Assistant Manager position in Belfast. However, Watters told Bell that the pay rate for the position would be $10 per hour, the same rate of pay as the RSS position. Bell was told that the only alternative left was termination. Watters told Bell to make a decision by Friday, August 7, 2015.

57.     The offer to pay Bell $10.00 per hour to be an Assistant Manager was another form of disability discrimination. When Bell managed the Belfast store, his non-disabled Assistant Managers were paid $11 to $13 per hour.

58.     On August 7, 2015, Bell told Watters that $10.00 per hour was unacceptable. Watters asked Bell to tell him, for informational purposes, what Bell felt he was worth. Bell told Watters that other Assistant Managers and comparable jobs in the market are paid $15.00 per hour which he thought was fair but that he needed at least $13.00 per hour.

59.     After that conversation, Bell heard nothing from O'Reilly's about employment opportunities and he filed complaints with the MHRC and EEOC.

60.     Bell was formally separated from employment with O'Reilly on October 5, 2015.

61.    The schedule Bell requested (a nine hour day, five days per week with some flexibility to work more hours than that) did not eliminate an essential function of the job of Store Manager.

62.    The schedule that Bell requested did not impose an undue administrative or financial burden on O'Reilly.

63.    O'Reilly's job description for Store Manager says nothing about the minimum (or maximum) number of hours that a Store Manager must work.

64.    The core job duties and responsibilities of Store Manager include responsibility for the sales, profitability, appearance and overall operations of the store, showing consistent sales growth, ensuring the store projects O'Reilly's image, operates as a profit center, and follows policies and procedures to ensure O'Reilly's is operating as economically and efficiently as possible.

65.    Bell performed all of these duties and performed them while employed as a Store Manager for O'Reilly.

66.    O'Reilly did not assert to the MHRC, nor did it provide any evidence, nor can it provide any evidence, that Bell was unable to perform the essential job duties of Store Manager while working a 45 hour per week schedule.

67.    O'Reilly asserted to the MHRC that Store Managers are responsible for ensuring that his or her store is properly staffed and Bell does not disagree.

68.    O'Reilly went on to state that if a team member failed to report for their scheduled shift, or if the store is short staffed because a team member is terminated or resigns, the Store Manager must cover that absence/staff shortage. With this, Bell strongly disagrees.

69.     The job description for Store Manager reads, "Responsible for scheduling the proper amount of help…" not, for example, "Store Manager must personally work when other employees are absent or there is a staff shortage."

70.     To accommodate Bell's minor schedule adjustment, O'Reilly could authorize Bell to pay overtime to other staff to cover for staff absences or shortages, and/or authorize Bell to employ more keyholders, and/or authorize Bell to move quickly to fill staff vacancies.

71.     O'Reilly asserted to the MHRC that when a store alarm goes off, the Store Manager must respond to the alarm. Bell disagrees.

72.     When a Store Manager is unable, there is a phone tree of Assistant Managers and RSS who are also able to respond to alarms.  Responding to store alarms is not an essential function of the Store Manager position.

73.     Responding to store alarms is not in the job description for Store Manager;

74.     In the nine months that Bell worked as a Store Manager, he was asked to respond to alarms on only a handful of occasions.

75.     The Store Manager who replaced Bell does not have a cell phone, so the task of being a first responder to store alarms was delegated to an Assistant Manager.

76.     O'Reilly suggested to the MHRC that Bell would not be able to respond to alarms if/when one went off after he had worked 45 hours during a particular week. Bell disagrees.

77.     Bell's medical provider told Bell that he was able to work more than 45 hours per week as long as his average work week did not exceed that limit.

78.      O'Reilly's failure and refusal to accommodate Bell in his job as Store Manager, O'Reilly's exclusion of Bell from employment from July 9, 2015 through October 5, 2015, and

the ultimate decision to terminate Bell's employment on October 5, 2015, are all adverse employment actions that constitutes unlawful disability discrimination and retaliation.

79.    O'Reilly asserted to the MHRC that its offer of alternative employment to Bell shields the company from liability, which is untrue.

80.    Although O'Reilly offered Bell alternative employment in the form of lower paid, less prestigious jobs, the fact remains that O'Reilly discriminated and retaliated against Bell.

81.     It is true that regulations interpreting the ADA and federal case law indicate that employers have some latitude in choosing among effective accommodations, but an employer may not choose an accommodation that involves placing an employee outside of his or her own job if there is an effective accommodation that will permit the employee to return to work in his or her own job.  *Warren v. United Parcel Service, Inc.*, 518 F.3d 93, 100 (1st Cir. 2008) (upholding jury instruction stating, "Although an employer is not required to offer the best possible accommodation or the precise accommodation the employee requests, reassignment is a reasonable accommodation only if there are no effective accommodations that will enable the employee to perform the essential functions of the foreclosed position."); *Williams v. HealthReach Network*, F.Supp.2d, 2000 WL 760742 at Fn. 12 (D.Me. 2000), citing to EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act (dated March 1, 1999).

82.    The only alternatives O'Reilly offered to Bell involved employment in positions that were not substantially equivalent to his Store Manager position in the Belfast store.

83.    Plaintiff has disabilities as defined by the ADA and MHRA.

84.    Plaintiff is a qualified individual with a disability under the ADA and MHRA.

85.     Plaintiff needed, and asked for, a 45 hour per week schedule to accommodate his disability.

86.     Plaintiff's request for accommodation was reasonable.

87.     Defendant refused to provide Plaintiff with the accommodation requested.

88.     Defendant discriminated against Plaintiff on the basis of disability by excluding Plaintiff from work and not allowing Plaintiff to work after Plaintiff requested a reasonable accommodation.

89.     Defendant retaliated against Plaintiff for requesting a reasonable accommodation by excluding him from work and not allowing him to work.

90.     Defendant is not able to show that the accommodation proposed by Plaintiff was unreasonable.

91.     Defendant is not able to show that the accommodation proposed by Plaintiff would have caused an undue financial or administrative burden or hardship.

92.     Defendant is not able to show that no alternative reasonable accommodation existed that would have allowed Plaintiff to continue in his Store Manager position at the Belfast store.

93.     Defendant discriminated against Plaintiff on the basis of disability and retaliated against him for requesting a reasonable accommodation by offering him an RSS or Assistant Manager position instead of accommodating his disability.

94.     Defendant engaged in pay discrimination and retaliation by offering to pay Plaintiff $10.00 per hour as an Assistant Manager when non-disabled Assistant Managers with Plaintiff's skill level are paid $11 to $13 per hour.

<u>COUNT I: ADA – Disability Discrimination</u>

95.     Paragraphs 1-94 are incorporated by reference.

96.     Defendant's conduct violates the ADA's prohibition against disability

discrimination.

<u>COUNT II: MHRA – Disability Discrimination</u>

97.     Paragraphs 1-96 are incorporated by reference.

98.     Defendant's conduct violates the MHRA's prohibition against disability

discrimination and Defendant's obligation under the MHRA to provide Plaintiff with reasonable

accommodations.

<u>COUNT III: ADA – Retaliation</u>

99.     Paragraphs 1-98 are incorporated by reference.

100.    Defendant's conduct violates the ADA's prohibition against retaliation.

<u>COUNT IV: MHRA – Retaliation</u>

101.    Paragraphs 1-99 are incorporated by reference.

102.    Defendant's conduct violates the MHRA's prohibition against retaliation.

<u>COUNT V: ADA – Failure to Accommodate</u>

103.    Paragraphs 1-102 are incorporated by reference.

104.    Defendant failed to meet its obligation under the ADA to provide Plaintiff with

reasonable accommodations.

<u>COUNT IV: MHRA – Failure to Accommodate</u>

105.    Paragraphs 1-104 are incorporated by reference.

106.    Defendant failed to meet its obligation under the MHRA to provide Plaintiff with

reasonable accommodations.

PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A.      Declare the conduct engaged in by Defendant to be in violation of his rights;

B.      Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

C.      Order Defendant to reinstate Plaintiff or award front pay to Plaintiff;

D.      Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination;

E.      Award equitable-relief for back pay, benefits and prejudgment interest;

F.      Award compensatory damages in an amount to be determined at trial;

G.      Award punitive damages in an amount to be determined at trial;

H.      Award nominal damages;

I.      Award attorney's fees, including legal expenses, and costs;

J.      Award prejudgment interest;

K.      Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of disability or age;

L.      Require  Defendant's CEO to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate discrimination in the future;

M.      Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

N.      Require that Defendant train all management level employees on the protections afforded by the MHRA and ADA;

13

O.      Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant failed to provide him with reasonable accommodations and unlawfully terminated him because of disability discrimination and retaliation; and

P.      Grant to Plaintiff such other and further relief as may be just and proper.


Dated:  September 29, 2016                    /s/ Chad T. Hansen                                   

                                              Chad T. Hansen
                                              Peter L. Thompson

                                              Attorneys for the Plaintiff

                                              MAINE EMPLOYEE RIGHTS GROUP
                                              92 Exchange Street 2nd floor
                                              Portland, Maine 04101
                                              Tel. (207) 874-0905
                                              Fax (207) 874-0343
                                              chansen@maineemployeerights.com

14