## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| BRIAN BELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 1:16-cv-00501-JDL |
| v. ) | |
| ) | |
| O'REILLY AUTO ENTERPRISES, LLC, ) | |
| d/b/a O'REILLY AUTO PARTS, ) | |
| ) | |
| Defendant. ) | |

## STATEMENT OF UNDISPUTED MATERIAL FACTS

NOW COMES the Defendant O'Reilly Auto Enterprises, LLC d/b/a O'Reilly Auto Parts (hereinafter "O'Reilly"), by and through undersigned counsel, and submits this Statement of Undisputed Material Facts pursuant to Local Rule 56(b).

1. On August 1, 2014, Bell submitted to O'Reilly an Employment Application in which he applied for the position of "Store Management" and represented that he was able to work evenings, weekends, holidays, and overtime.  **Bell Depo. at 10:4-23**.

2. O'Reilly hired Bell in August 2014 as a "Store Manager in Training."  **Amended Complaint ¶15; Bell Depo. at 5:18-6:3.**

3. During his training Bell was informed by O'Reilly that as a Store Manager he would be required to work Monday through Friday or Monday through Saturday in alternating weeks, with the understanding that if the demands of the store permitted he would be able to take part of a mid-week day off during his six-day workweeks.  **Bell Depo. at 5:18-7:10.**

4. Bell's typical workday was from 6:30 a.m. until 5:00 p.m.  **Thomas Depo. at 22:22-26:18.**

5. Bell understood and agreed that as a matter of course he could expect to work as much as 55 hours in alternate weeks. **Bell Depo. at 9:18-23.**

6. The Job Description for the position of Store Manager provided, under the heading "General Summary":

    > Responsible for the sales, profitability, appearance, and overall operations of the store. Objectives are to show consistent sales growth, ensure store projects proper O'Reilly image, operates as a profit center, and follows policies and procedures to ensure company is operating as economically and efficiently as possible.

    **O'Reilly Depo. Exhibit 17**.

7. The Job Description for the position of Store Manager provided that the "Essential Job Functions" of Bell's position included being responsible for maximizing sales by directing team members in a manner that provides walk-in and installer customers with prompt, courteous, and professional service; Soliciting orders, maintaining the customer base; increasing sale volume at assigned accounts; and reviewing customer needs to gain market share. **O'Reilly Depo. Exhibit 17.**

8. The Job Description for the position of Store Manager provided that the "Essential Job Functions" of Bell's position included being responsible for supervising work performed by all team members assigned to his/her store and working jointly with the district manager in recruiting, testing, hiring, evaluating, promoting, disciplining, and discharging team members under his/her supervision. **O'Reilly Depo. Exhibit 17.**

9. The Job Description for the position of Store Manager provided that the "Essential Job Functions" of Bell's position included being responsible for working with the Sales and Pricing Departments, with the assistance of the district manager, in establishing pricing levels for installers and appropriate walk-in pricing. **O'Reilly Depo. Exhibit 17.**

-3-

10. The Job Description for the position of Store Manager provided that the "Essential Job Functions" of Bell's position included being responsible for scheduling the proper amount of help to ensure that customers receive the best service, store appearance is maintained, and the store is profitable.  **O'Reilly Depo. Exhibit 17.**

11. The Job Description for the position of Store Manager provided that the "Essential Job Functions" of Bell's position included being responsible for reviewing and approving all store employees' hours every day, and transmitting accurate hours for all employees so paychecks and deposits could be completed.  **O'Reilly Depo. Exhibit 17.**

12. The Job Description for the position of Store Manager provided that the "Essential Job Functions" of Bell's position included being responsible for ensuring all employees under his supervision continually improved their skills through training on company policies and procedures, customer service, computer operations, catalogs, sales and safety.  **O'Reilly Depo. Exhibit 17.**

13. The Job Description for the position of Store Manager provided that the "Essential Job Functions" of Bell's position included being responsible for completing employee performance evaluations and determining pay increases as appropriate to the store's sales growth and payroll figures.  **O'Reilly Depo. Exhibit 17.**

14. The Job Description for the position of Store Manager provided that the "Essential Job Functions" of Bell's position included being responsible for ensuring the store was organized and operating according to all company policies and procedures. **O'Reilly Depo. Exhibit 17.**

15. The Job Description for the position of Store Manager provided that the "Essential Job Functions" of Bell's position included being responsible for ensuring that all necessary information was promptly communicated to store employees.  **O'Reilly Depo. Exhibit 17.**

16. The Job Description for the position of Store Manager provided that the "Essential Job Functions" of Bell's position included being responsible for implementing all planogram changes and merchandising plans, including sale preparations, seasonal displays, price updates, and inventory adjustments. **O'Reilly Depo. Exhibit 17.**

17. The Job Description for the position of Store Manager provided that the "Essential Job Functions" of Bell's position included being responsible for controlling and monitoring store inventory. **O'Reilly Depo. Exhibit 17.**

18. The Job Description for the position of Store Manager provided that the "Essential Job Functions" of Bell's position included being responsible for properly handling all daily store accounting functions – including sales reports, bank deposits, cash drawers, store accounts, and check acceptance – to ensure maximum store, corporate and distribution center efficiency. **O'Reilly Depo. Exhibit 17.**

19. The Job Description for the position of Store Manager provided that the "Essential Job Functions" of Bell's position included being responsible for monitoring all charge accounts in his territory, promptly taking care of any past due situations and communicating regularly with appropriate territory sales manager and credit department on the status of problem accounts. **O'Reilly Depo. Exhibit 17.**

20. The Job Description for the position of Store Manager provided that the "Essential Job Functions" of Bell's position included being responsible for implementing loss prevention procedures in the areas of invoice accountability; billing, cash refund, credit and stock transfer procedures; inventory accuracy and control; pricing, including non-competitive price overrides and price matches; warranty procedures; cash accountability; safe

combination/alarm codes; team member purchases; and shoplifting prevention. **O'Reilly Depo. Exhibit 17.**

21. The Job Description for the position of Store Manager provided that the "Essential Job Functions" of Bell's position included being responsible for truck, building, and shop equipment maintenance. **O'Reilly Depo. Exhibit 17.**

22. The Job Description for the position of Store Manager provided, under the heading "Scope/Authority of the Job": "Responsible for all team members, sales, profits, expenses, and customer service at assigned store." **O'Reilly Depo. Exhibit 17.**

23. Bell was informed during the interview process that as a Store Manager he would be responsible for the overall financial and operational health of his store, and that the job would include mentoring employees, ensuring profitability, and actively trying to grow and improve the store. **Bell Depo. at 15:2-16**.

24. When Bell was hired by O'Reilly he expected that he would be able to work evenings, weekends, holidays, and overtime. **Bell Depo. at 10:18-23.**

25. In September 2014 Bell assumed the position of Store Manager at O'Reilly's Belfast Store after training and "shadowing" another Store Manager for a total of approximately three to four weeks. **Amended Complaint ¶15; Bell Depo. at 7:16-8:10.**

26. Early on in his tenure with O'Reilly, Bell was instructed by his immediate superior, Chris Watters, that the store should be managed as though his "name was on front door" and his money was "on the line." **Bell Depo. at 15:17 – 16:7.**

27. Watters used the terms "ownership" and "owning the business" when talking with Bell about what was expected of him as a Store Manager. **Bell Depo. at 15:17-16:1.**

28. O'Reilly views Store Managers as "business owners" who are responsible for every aspect of the operations of the stores they manage. **Thomas Depo. at 31:21-32:7; Watters Depo. at 94:2-23.**

29. The overarching obligation of a Store Manager is to drive sales and grow profit. **Thomas Depo. at 34:20-24.**

30. O'Reilly views it as critical that a Store Manager be available whenever he or she is needed. **Beck Depo. at 38:15-39:2 & 50:10-52:13; Thomas Depo. at 34:8-19; Watters Depo. at 94:2-23.**

31. O'Reilly Store Managers are expected to be able and available to stand in for employees who are unexpectedly absent, or to make arrangements for other employees to fill in for the absent employees if possible. **Thomas Depo. at 28:10-29:1; Watters Depo. at 100:3-101:7.**

32. When O'Reilly store employees are absent from work, the "default" response is for the Store Manager to fill in, because filling the hole in the schedule with a salaried employee rather than an hourly employee allows O'Reilly to minimize the circumstances in which it pays overtime. **Thomas Depo. at 31:6-32:7.**

33. Whenever possible, O'Reilly hires for positions above the store level, including divisional and regional managers, from within the company in order to ensure that those individuals know and behave in a way that is consistent with the O'Reilly culture. **Thomas Depo. at 211:6-212:4.**

34. O'Reilly regards the dependable presence and availability of Store Managers as an important factor in its business model, insofar the development of store-level employees for advancement within the company is concerned, and the company regards the absence of the

-7-

Store Manager as an impediment to the training of store employees, which negatively affects the trajectory of their growth and advancement.  **Thomas Depo. at 212:5-213:11.**

35. O'Reilly believes that having a Store Manager work a limited schedule would have a negative impact on the morale of team members within the manager's store, who would be "short-changed" by having a leader who is not available to guide and develop them professionally.  **Thomas Depo. at 212:5-214:9.**

36. When Bell was hired he understood that he would be expected to respond to unexpected developments in the workplace that might require him to work unpredictable, long hours from week to week.  **Bell Depo. at 16:15-24.**

37. In the months between Bell's hiring by O'Reilly and June 2015, he experienced conflict with his direct supervisor, Division Manager Chris Watters, because of what Bell perceived as Watters' "authoritarian" style, micromanagement, and undue focus on detail.  **Weitzel Depo. at 27:13-36:9**.

38. During this same period Bell was experiencing stress as a result of some problems with his wife.  **Weitzel Depo. at 43:3-44:23.**

39. Before the last two weeks of May 2015, Bell had occasionally experienced difficulty working the schedule O'Reilly expected of him, "depending on the week, the amount of exception scenarios where [he] might be on [his] own time driving to another store to pick up a part so [he] could have it delivered the next day."  **Bell Depo. at 21:14-23:1**.

40. Whether or not Bell experienced difficulty working "would really depend on how the store was doing on that week, whether or not [his] staffing was set to expectation, other employees' schedules or conflicts, for that matter."  **Bell Depo. at 22:3-7.**

41. In retail it is very hard to generalize what is going to happen from one week to the next. **Bell Depo. at 22:24-23:1.**

42. In the two weeks immediately preceding June 4, 2015 Bell worked abnormally long hours because he was required to fill in for two employees whose employment had been terminated. **Amended Complaint ¶¶21-24; Bell Depo. at 27:14-23 & 30:20-31:6**.

43. The number of employees working under Bell while he was employed by O'Reilly varied between eight and twelve. **Bell Depo. at 16:25-17:5.**

44. The hours Bell worked in the two weeks immediately preceding June 4, 2015 were the longest he had been scheduled to work in a "client-facing" environment since he was hired by O'Reilly. **Bell Depo. at 31:7-22**.

45. On June 4, 2015, and in the immediately-preceding days, Bell was having severe headaches, he was becoming dizzy at times, his tics were becoming very frequent, and he was fatigued. **Amended Complaint ¶27; Bell Depo. at 27:10-30:19.**

46. Bell had a "meltdown" on June 4, 2015. **Weitzel Depo. at 62:2-14.**

47. On June 4, 2015 Bell was overwhelmed and was "not in any shape to be at work." **Weitzel Depo. at 62:15-24.**

48. Bell's symptoms on June 4, 2015 were the result of the long hours he had been working. **Bell Depo. at 27:10-30:19.**

49. On June 4, 2015, Bell consulted with Judy Weitzel, a psychiatric nurse practitioner with whom he had been treating. **Amended Complaint ¶36.**

50. On June 4, 2015, after seeing Weitzel, Bell presented O'Reilly with a "fitness for duty" (FFD) form that had been completed by Weitzel, stating: "Mr. Bell because of his mental

health issues should not be scheduled for more than 9 hours 5 days a week." **Amended Complaint ¶36; Thomas Depo. at 84:17-85:10 & O'Reilly Deposition Exhibit 1**.

51. On June 4, 2015 Weitzel also wrote a letter stating that due to Bell's ADHD, Tourette's Syndrome and Major Depressive Disorder, "he would benefit from having accommodations such as a regular work week." **O'Reilly Deposition Exhibit 2.**

52. The reason Weitzel imposed the restriction in the Fitness for Duty form was that Bell's physical condition, the difficulties he was having at home with his wife, and his conflict with Chris Watters put a lot of pressure on him emotionally, and Weitzel thought it would be better for him to have less of that pressure over the course of a week. **Weitzel Depo. at 43:3-46:21.**

53. Weitzel intended the Fitness for Duty form she completed to convey that Bell should have some flexibility to work up to an additional hour or two per day, but only if he felt "able" or "up to it." **Weitzel Depo. at 46:23 - 47:7. 54:16-55:18; Bell Depo. at 40:6-22.**

54. In the Fitness for Duty form Weitzel also indicated that Bell should remain out of work until June 9, 2015. **O'Reilly Depo. Exhibit 1.**

55. Nick Thomas decided that unless and until a decision was made to accommodate Bell's scheduling restrictions in the Store Manager position, he should not return to work. **Thomas Depo. at 84:17-85:24.**

56. Thomas's rationale for the decision that Bell should not return to work until a final determination was made regarding his accommodation request was Thomas's belief that if Bell did return, O'Reilly would be deemed to have accepted the accommodations he had requested. **Thomas Depo. at 87:13-88:15.**

57. Thomas and Watters initially interpreted the Fitness for Duty form as limiting Bell's work capacity to no more than nine hours per day, no more than five days per week. **Thomas Depo. at 105:17-22 & 106:5-11; Bell Depo. at 49:9-50:21.**

58. Thomas and Watters did not initially interpret the FFD form as allowing Bell to work more than nine hours per day or more than five days per week on occasion as necessary, as long as he was not scheduled for more hours. **Thomas Depo. at 105:23-106:4; Bell Depo. at 49:9-50:21.**

59. On June 8, 2015, Watters provided the following input with respect to Bell's request for a limited schedule, as he then understood it:

> The schedule restriction (time and dates) are not conducive to a typical SM schedule, there in the Store Manager is required to be on call on a regular basis to assist the store albeit by the phone or in person. Should an issue arise at the store it is up to the SM to react and in many cases respond to support his store. Should someone call out sick, he would not be able to respond based on the hours he is eligible to work. Should he respond, he will not be able to carry out his daily managerial obligations in the store each morning due to his limited availability. Furthermore, if a TM terminates from the store, as the Store Manager he would not have sufficient time allowed to recruit, hire, and staff the store based on his restrictions. Additionally, he would not always have the ability to self-staff by supporting the store himself. As a Store Manager it is necessary to be able to step up and do what it takes to operate and grow the business. I feel that this restriction would prohibit Brian for being able to fulfill his obligation to the store and the opportunities to grow a successful operation. I feel that Brian would be better suited in a position where his time may not always be so demanding and we could better manage and control his new restrictions.

**Watters Depo. at 92:6-94:8 & O'Reilly Depo. Exhibit 4**.

60. Examples of the calls a Store Manager might receive include calls pertaining to "customer related issues" that required making exceptions to policy; calls informing him that an employee was missing a shift, which would require the Store Manager to either cover the shift himself or arrange for coverage by another employee; and calls informing him that the

-10-

store's burglar alarm had gone off, which would require the Store Manager to check on the store, and disarm and rearm the alarm.  **Watters Depo. at 95:11-98:5**

61. Watters regarded Bell as the "owner of the store" who "need[ed] to be the one . . . to receive the phone calls if there [was] something going on when he [was] not there or report to the store if need be."  **Watters Depo. at 94:9-23.**

62. Watters did not believe Bell would be able to satisfactorily perform the duties of a Store Manager, which included hiring staff, training employees, and soliciting business, if his availability was limited.  **Watters Depo. at 101:8-102:11**

63. Thomas shared Watters' concerns.  **Thomas Depo. at 101:14-107:4**.

64. The kinds of situations that occur in an O'Reilly store and require the attention of a Store Manager are not predictable.  **Thomas Depo. at 210:4-211:5.**

65. It is common for unexpected events to occur, requiring the Store Manager to divert his attention to issues he could not have planned for.  **Thomas Depo. at 210:4-211:5.**

66. During Chris Watters' tenure as an O'Reilly District Manager, which began in January 2013, he had never before had a Store Manager request a permanent scheduling accommodation.  **Watters Depo. at 10:24-11:5 & 136:23-137:14.**

67. In the seven years Nick Thomas had worked as a District Manager and Regional manager for O'Reilly, he only recalls one request by a Store Manager (other than Brian Bell) for a scheduling accommodation, which was temporary in nature.  **Thomas Depo. at 47:5-48:15**.

68. In the roughly three years Allison Rush worked as a "Leave of Absence Lead" for O'Reilly, in which job she had responsibility for responding to and coordinating responses to employees' accommodation requests, Brian Bell's case is the only one she is aware of where

-11-

a Store Manager requested a permanent scheduling accommodation. **Rush Depo. at 6:12-8:6, 13:7-23, 21:25-23:10 & 25:10-19.**

69. Bell agrees with Watters' statement that as a Store Manager he was required to be on call on a regular basis to assist the store, either by phone or in person. **Bell Depo. at 115:1-5**.

70. Bell agrees with Watters' statement that should an issue arise with his store, it would be up to him to react and in many cases respond to support the store. **Bell Depo. at 115:6-10.**

71. A firm work restriction of nine hours per day, five days per week, which was the limitation O'Reilly initially believed Bell was asking for, would be incompatible with a Store Manager's responsibilities for building relationships with customers; for coaching, teaching, training, and developing his team members for advancement within the company; for making sales calls and "driving" sales; for managing payroll; for taking "ownership" of the store when employees are on vacation, when they "call out," or when other unexpected situations require prompt attention; and, more generally, for exercising the "leadership" required to operate a store successfully. **Thomas Depo. at 101:14-108:12, 208:1-211:5 & O'Reilly Deposition Exhibits 4 & 17.**

72. Because Watters told Bell that he interpreted the Fitness for Duty form as limiting Bell to nine hours of work per day, five days per week, without exception, Bell returned to Weitzel to ask her to clarify the form. **Bell Depo. at 49:9-52:21; Weitzel Depo. at 49:2-18.**

73. Weitzel told Bell she did not need to clarify the form because it clearly informed O'Reilly that he should only be scheduled for nine hours per day, five days per week, at a maximum, but that he could work more than that on occasion. **Bell Depo. at 49:9-52:21; Weitzel Depo. at 49:2-18.**

74. By email dated July 13, 2015, Bell informed O'Reilly that Weitzel's intent was to limit his scheduled hours to no more than nine hours per day, five days per week, but that it would be "okay" for him, "if necessary[,] . . . to work some hours beyond the scheduled 45 hours on occasion." **Thomas Depo. at 171:4-172:4 & O'Reilly Depo. Exhibit 7**.

75. The restriction proposed in Bell's July 13, 2015 email did not tell O'Reilly how frequently Bell would be able to work more than 45 hours in a week. **Thomas Depo. at 217:13-17 & O'Reilly Depo. Exhibit 7.**

76. The restriction proposed in Bell's July 13, 2015 email did not inform O'Reilly how many "hours beyond the scheduled 45" Bell would be able to work – whether it would be 47 hours or 60 hours. **Thomas Depo. at 217:18-23 & O'Reilly Depo. Exhibit 7.**

77. Store Managers are sometimes required to be available to work from store opening to closing, which could be 16 hours in a day. **Beck Depo. at 50:10-52:13.**

78. Store Managers are sometimes required to work as much as 60 hours in a week. **Thomas Depo. at 217:24-218:8.**

79. Store Managers are sometimes required to work seven days a week. **Beck Depo. at 50:10-52:13.**

80. The restriction intended by Weitzel, and proposed in Bell's July 13, 2015 email, would be incompatible with a Store Manager's responsibilities because it would be impossible for O'Reilly to predict with any confidence or consistency when he would be able to work and when he would not be able to work. **Thomas Depo. at 218:9-219:14.**

81. The restriction intended by Weitzel, and proposed in Bell's July 13, 2015 email, would be incompatible with a Store Manager's responsibilities because if Bell was required to work a

lengthy shift, up to 16 hours, on a particular day, that could cause him to be unavailable the next day. **Beck Depo. at 50:10-51:22**.

82. Under the restriction intended by Weitzel, and proposed in Bell's July 13, 2015 email, Bell's ability to work more than nine hours on any given day or more than 45 hours in any given week would be unpredictable. **Robinson Depo. at 75:3-13.**

83. Under the restriction intended by Weitzel, and proposed in Bell's July 13, 2015 email, Bell's ability to work more than nine hours on any given day could not be determined until he was at hour nine of a particular work day. **Bell Depo. at 41:20-25**.

84. After June 4, 2015, when Bell went out on leave, O'Reilly staffed the Belfast store by having the Assistant Manager of that store, Eric Hustus, act as de facto Store Manager; assigning Jonathan Dow, who had been hired to start work in the Bangor market, to serve as interim Assistant Manager of the Belfast store; and having Chris Watters fill some of the shifts that otherwise would have been filled by Bell. **Thomas Depo. at 117:18-119:9; Watters Depo. at 134:2-135:3.**

85. Every O'Reilly store is its own profit center. **Watters Depo. at 126:14-18**.

86. The compensation O'Reilly store employees are paid is determined by the success of the store and the income coming into the store, as well as the employee's experience. **Watters Depo. at 126:14-21.**

87. The compensation paid to Store Managers and Assistant Managers varies according to what store they are in, as well as their experience. **Watters Depo. at 127:9-16.**

88. Overall "top line sales" is the most important factor in determining the pay scale at a particular store. **Watters Depo. at 127:23-128:1.**

89. Because the Belfast store is not profitable the compensation paid to employees at that store is generally lower than it is at other stores. **Watters Depo. at 127:17-22.**

90. O'Reilly Assistant Managers in Maine were paid at varying rates, some lower and some higher than $11.00 per hour. **Objections and Answers to Plaintiff's Interrogatories Propounded Upon Defendant O'Reilly Auto Enterprises, LLC, d/b/a O'Reilly Auto Parts, No. 10.**

91. Eric Hustus had been paid less than $11.00 per hour as Assistant Manager of the Belfast store. **Watters Depo. at 129:14-23; Bell Depo. at 67:11-13.**

92. Chris Watters on behalf of O'Reilly offered Bell the position of Assistant Manager of the Belfast store at the rate of $11.00 per hour. **Watters Depo. at 129:14-16; Bell Depo. at 69:3-17.**

93. When Bell declined the offer, and in response to Watters asking him what he thought a reasonable wage would be for the job of Assistant Manager at the Belfast store, Bell said he thought a fair wage would be $13.00 to $15.00 per hour. **Bell Depo. at 68:17-69:2**.

94. At the time O'Reilly offered Bell the position of Assistant Manager of the Belfast store at the rate of $11.00 per hour, it had been paying Jonathan Dow $12.00 per hour to act as interim Assistant Manager of that store. **Thomas Depo. at 140:8-10.**

95. The compensation Dow was paid to act as interim Assistant Manager of the Belfast store was above the market rate for that job. **Watters Depo. at 131:18-22.**

96. O'Reilly intended to have Dow work in the Belfast store solely as a fill-in, and not to have him remain there as an Assistant Store Manager on a permanent basis. **Thomas Depo. at 140:21-141:23**.

97. Because Dow had been hired with the understanding that he would work in the Bangor market, which had higher volume stores that could support a higher payroll, his rate of pay was $12.00 per hour.  **Thomas Depo. at 140:8-20; Watters Depo. at 129:10-132:2.**

98. Although Dow actually worked in Belfast, rather than the Bangor market, O'Reilly continued to pay him $12.00 per hour because that was the rate of pay he had been promised when he was hired.  **Watters Depo. at 129:14-132:2.**

99. O'Reilly did not offer Bell $12.00 per hour to take the position of Assistant Manager of the Belfast store because that store's volume would not support a $12.00 per hour Assistant Manager on a permanent basis.  **Thomas Depo. at 147:11-20.**

100. In late 2015 or early 2016 Eric Hustus, after having been elevated to the position of Store Manager for a time, stepped down to the position of Assistant Manager at the Belfast store. **Thomas Depo. at 142:12-17**.

101. After Hustus returned to the position of Assistant Manager of the Belfast store he was again paid less than $11.00 per hour.  **Objections and Answers to Plaintiff's Interrogatories Propounded Upon Defendant O'Reilly Auto Enterprises, LLC, d/b/a O'Reilly Auto Parts, No. 10.**

102. After Bell declined the position of Assistant Manager of the Belfast store, which he had been offered as an accommodation, his employment was terminated.  **Thomas Depo. at 145:12-146:8.**

-17-

Dated at Portland, Maine this 6th day of October, 2017.

                NORMAN, HANSON & DETROY, LLC

                /s/ Christopher C. Taintor, Esq.

                /s/ Robert W. Bower, Esq.

                Attorneys for Defendant O'Reilly Auto
                Enterprises, LLC, d/b/a O'Reilly Auto Parts

Norman, Hanson & DeTroy, LLC
Two Canal Plaza
P.O. Box 4600
Portland, ME  04112-4600
(207) 774-7000

## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

### Certificate of Service

I hereby certify that on October 6, 2017, I electronically filed Defendant O'Reilly Auto Enterprises, LLC, d/b/a O'Reilly Auto Parts' Statement of Undisputed Material Facts with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Christopher C. Taintor, Esq.
Attorney for Defendant


Norman, Hanson & DeTroy, LLC
Two Canal Plaza, P.O. Box 4600
Portland, ME  04112-4600
(207) 774-7000