## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| **BRIAN BELL**, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) **1:16-cv-00501-JDL** |
| **O'REILLY AUTO ENTERPRISES,** | ) |
| **LLC d/b/a O'REILLY AUTO** | ) |
| **PARTS,** | ) |
| | ) |
| **Defendant.** | ) |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Brian Bell was the manager of O'Reilly Auto Enterprises, LLC's ("O'Reilly Auto") store in Belfast, Maine for approximately one year. Bell has been diagnosed with Attention Deficit Hyperactivity Disorder, Tourette Syndrome, and Major Depressive Disorder. To help alleviate his symptoms, Bell's healthcare provider proposed a scheduling accommodation in June 2015 that would limit Bell's work schedule to 45 hours per week, but also permit him to occasionally work additional unscheduled hours. In his Amended Complaint, Bell contends that O'Reilly Auto, in the course of processing and denying his accommodation request, violated the Americans with Disabilities Act (the "ADA"), 42 U.S.C.A. § 12101, *et seq.* (2018) and the Maine Human Rights Act (the "MHRA"), 5 M.R.S.A. § 4551, *et seq.* (2017).

Specifically, Bell claims that O'Reilly Auto discriminated against him based on his disability (Counts I and II); retaliated against him based on his request for accommodation (Counts III and IV); and unlawfully failed to accommodate his

request for accommodation (Counts V and VI).[1]  *See* ECF No. 4 at 12.  O'Reilly Auto disputes Bell's claims and has moved for summary judgment on all counts pursuant to Rule 56 of the Federal Rules of Civil Procedure (ECF No. 37).

I address the facts as developed in the summary judgment record, as well as the summary judgment standards, and then turn to Bell's contention that O'Reilly Auto (1) unlawfully failed to accommodate his scheduling request; (2) discriminated against him; and (3) retaliated against him.

## I.  FACTUAL BACKGROUND

### A.    The Store Manager Position

The following facts are construed in the light most favorable to Bell as the non-moving party and any reasonable inferences have been resolved in his favor.  *See Whitlock v. Mac-Gray, Inc.*, 345 F.3d 44, 45 (1st Cir. 2003).  The job description for the Store Manager position at O'Reilly Auto states, under the heading "General Summary," that a Store Manager is:

> Responsible for the sales, profitability, appearance, and overall operations of the store. Objectives are to show consistent sales growth, ensure store projects proper O'Reilly image, operates as a profit center, and follows policies and procedures to ensure company is operating as economically and efficiently as possible.

ECF No. 41 at 2 ¶ 6; *see also* 36-13.  With respect to scheduling, the job description states in relevant part that the manager is "[r]esponsible for scheduling the proper amount of help (neither too much, nor too little) to ensure that customers receive the

---

[1]   The Amended Complaint states: "COUNT IV: MHRA – Failure to Accommodate."  ECF No. 4 at 12.  The context, however, indicates that this title is in error and Count VI sets forth the MHRA failure-to-accommodate claim.

best service, store appearance is maintained, and the store is profitable." ECF No. 36-13 at 1; *see also* ECF No. 41 at 3 ¶ 10. The job description does not state the required or expected work hours. ECF No. 43 at 6 ¶ 24; *see also* ECF No. 36-13.

Bell applied for a Store Manager position at O'Reilly Auto in August 2014. ECF No. 41 at 1 ¶ 1. On his application, Bell represented that he was able to work evenings, weekends, holidays, and overtime. *Id.*; *see also* ECF No. 36-22 at 3. Bell was told during the interview process that if he was hired, he would be responsible for the overall financial and operational health of his store. ECF No. 41 at 6 ¶ 23.

O'Reilly Auto initially hired Bell as a "Store Manager in Training." *Id.* at 1 ¶ 2. From the outset Bell understood that he was responsible for responding to unexpected developments in the workplace, which might require him to work unpredictable and long hours from week-to-week. *Id.* at 14 ¶ 36. Bell claims that, in practice, he was scheduled to work an average of 46 hours per week as a Store Manager.

After Bell completed his training in September 2014, he became the Store Manager at O'Reilly Auto's Belfast store. *Id.* at 7 ¶ 25. Early in his tenure, Bell's immediate supervisor, Division Manager Chris Watters, told Bell that he was to manage the store as though his name was on the front door, and used the terms "ownership" and "owning the business" when discussing O'Reilly Auto's expectations of a Store Manager. *Id.* at 7 ¶¶ 26, 27.

Every O'Reilly Auto store is its own profit center. *Id.* at 38 ¶ 85. Accordingly, employee compensation across the company is not uniform, and compensation at each store is determined by a variety of factors including the overall success of the store

and the employee's experience and tenure. *Id.* at 38 ¶ 86. As the Store Manager at the Belfast store, Bell was paid 42,000 dollars annually. ECF No. 43 at 38 ¶ 164. It is undisputed that O'Reilly Auto found Bell's job performance to be satisfactory. ECF No. 43 at 10, 14 ¶ 45, 61; *see also* ECF No. 41-5.

Throughout his tenure, Bell clashed with Watters due in part to Watters' management style, which Bell perceived as being "authoritarian." ECF No. 41 at 14 ¶ 37. Additionally, during the time Bell was working at O'Reilly Auto, he experienced some-related stress because his wife wanted to move out of state. *Id.* at 15 ¶ 38; *see also* ECF No. 36-24 at 44.

## B. The Accommodation Request

Things took a turn for the worst in May and June 2015. In the two weeks immediately preceding June 4, Bell worked abnormally long hours because he was required to fill in for two employees who had been terminated. ECF No. 4 at ¶ 24; ECF No. 41 at 15 ¶ 42. Bell alleges, though O'Reilly Auto disputes, that O'Reilly Auto knew he had previously been diagnosed with Attention Deficit Hyperactivity Disorder, Tourette Syndrome, and Major Depressive Disorder. ECF No. 43 at 2 ¶ 8.

At the end of the two-week period, Bell began experiencing dizziness, severe headaches, increased frequency of his pre-existing tics, and fatigue. ECF No. 41 at 16 ¶ 45. On June 4, Bell had what O'Reilly Auto characterizes as (and Bell admits was) a "meltdown," during which he experienced a number of new symptoms, including an inability to concentrate. *Id.* at 16 ¶ 46; *see also* ECF No. 36-24 at 62-63. The meltdown was caused, at least in part, by the long hours he had been working. ECF No. 41 at 16 ¶ 48.

On the day of the meltdown, Bell sought treatment from his healthcare provider, Judy Weitzel, a psychiatric nurse practitioner. *Id.* at 16 ¶ 49. Weitzel completed a "Fitness for Duty" (FFD) form, which Bell subsequently submitted to O'Reilly Auto. *Id.* at 17 ¶ 50; *see also* ECF No. 36-2. The FFD is an O'Reilly Auto form, and it contains a "Note to Health Care Provider[s]" which explains that the "form is required by O'Reilly to determine the team member's (employee's) fitness for job duty," and instructs healthcare providers to "complete the form and return the form to the patient." ECF No. 36-2. Weitzel wrote in Bell's FFD form that because of "his mental health issues[, Bell] should not be scheduled for more than 9 hours 5 days a week." *Id.*; *see also* ECF No. 41 at 17 ¶ 50. She also indicated that he should not return to work until June 9, giving Bell a five-day reprieve. ECF No. 36-2; *see also* ECF No. 41 at 18 ¶ 54. On the same day (June 4), Weitzel also wrote a letter on Penobscot Bay Medical Center letterhead, which stated that Bell was being treated for Attention Deficit Hyperactivity Disorder, Tourette Syndrome, and Major Depressive Disorder. ECF No. 36-3. The letter went on to explain that "[h]is present mental health issues are stable with medication, however he would benefit from having accommodations such as a regular work week." *Id.* The letter also included a phone number at which Weitzel could be contacted with any questions. *Id.*

## C. The Response

During the relevant time period, Watters reported to the Regional Manager, Nick Thomas. O'Reilly Auto claims that when Thomas received Weitzel's communications, he believed that allowing Bell to return to work would constitute a tacit acceptance of the requested accommodation. ECF No. 41 at 18 ¶ 56.

Accordingly, Thomas decided that Bell should not be permitted to return to work until the outcome of the accommodation request was determined. *Id.* at 18 ¶ 55.

Initially, Thomas and Watters believed that the accommodation request proposed in Weitzel's FFD form strictly limited Bell's work schedule to nine hours per day, five days per week (a forty-five hour work week). *Id.* at 18 ¶ 57. Watters did not interpret the completed form to suggest that Bell would be able to occasionally work unscheduled hours that may exceed nine hours per day, or five days per week. *Id.* at 19 ¶ 58.

On June 8, 2015, Watters sent an e-mail to O'Reilly Auto's leave of absence coordinator in which he expressed his opinion that the accommodation request was incompatible with Bell's duties as a store manager.[2] *See* ECF No. 36-5 at 3-5. When Watters sent the e-mail, he interpreted the FFD form completed by Weitzel as limiting Bell's weekly work schedule to nine hours per day, five days per week, without exception. It is undisputed that Watters misinterpreted the accommodation request. ECF No. 43 at 25 ¶ 111.

---

[2] Watters wrote that:

> The schedule restriction (time and dates) are not conducive to a typical SM schedule, there in the Store Manager is required to be on call on a regular basis to assist the store albeit by the phone or in person. Should an issue arise at the store it is up to the SM to react and in many cases respond to support his store. Should someone call out sick, he would not be able to respond based on the hours he is eligible to work. Should he respond, he will not be able to carry out his daily managerial obligations in the store each morning due to his limited availability. Furthermore, if a TM terminates from the store, as the Store Manager he would not have sufficient time allowed to recruit, hire, and staff the store based on his restrictions. Additionally, he would not always have the ability to self-staff by supporting the store himself. As a Store Manager it is necessary to be able to step up and do what it takes to operate and grow the business. I feel that this restriction would prohibit Brian for [*sic*] being able to fulfill his obligation to the store and the opportunities to grow a successful operation. I feel that Brian would be better suited in a position where his time may not always be so demanding and we could better manage and control his new restrictions.

ECF No. 36-5 at 3-4.

When Watters told Bell that he interpreted the FFD form as limiting Bell's work to nine hours per day, five days per week, without exception, Bell met with Weitzel again and asked her to the clarify the form. ECF No. 41 at 26 ¶ 72. Weitzel told Bell that she did not need to clarify the form because she believed that it clearly indicated that he should be scheduled for a maximum of nine hours per day, five days per week, but he could be scheduled for more hours on occasion. *Id.* at 26 ¶ 73.

In an e-mail dated July 13, Bell informed Watters and Thomas, among others, that Weitzel believed he could "work some hours beyond the scheduled 45 hours on occasion . . . so long as [his] scheduled hours [were] limited to 45 hours per week." ECF No. 36-8; *see also* ECF No. 41 at 26 ¶ 74. Bell went on to write, "I am still hopeful that O'Reilly Auto Parts will accommodate me by permitting my return to work at the Belfast store as a store manager or Assistant Manager. Feel free to contact me or Ms. Weitzel to discuss my need for accommodation further." ECF No. 36-8.

Bell's accommodation request, as characterized in his July 13 e-mail, did not indicate how many hours beyond the scheduled 45 hours he could work. ECF No. 41 at 27, 28 ¶ 75, 76. No official from O'Reilly Auto subsequently contacted Weitzel or Bell to further discuss Weitzel's statement that Bell was able to work additional unscheduled hours "occasionally." ECF No. 43 at 33 ¶ 144.

Bell asserts, and O'Reilly Auto disputes, that if he had been permitted to return to work after Weitzel provided her recommended restrictions, he would have been able to self-staff the store – i.e., cover the shifts of absent co-workers – as necessary. *Id.* at 26 ¶ 114. He also asserts, and O'Reilly Auto disputes, that if he had

been permitted to return to work, his medication would have enabled him to work extra hours. *Id.* at 28 ¶ 120.

In contrast, O'Reilly Auto asserts, and Bell disputes, that the restrictions intended by Weitzel and proposed in Bell's July 13 email rendered him incapable of fulfilling the responsibilities of a Store Manager. The core of O'Reilly Auto's concerns is their understanding that with the scheduling restrictions in place, if Bell was unexpectedly required to work a lengthy shift (up to 16 hours), he might be unavailable to work the next day. ECF No. 41 at 34-35 at ¶ 81. Overall, O'Reilly Auto contends, and Bell disputes, that the restrictions proposed in Bell's July 13 email were incompatible with a Store Manager's responsibilities because if the accommodation request had been granted, O'Reilly Auto would have been unable to predict with any confidence or consistency when Bell would be able to work. *Id.* at 32-33 ¶ 80.

## D.  The Assistant Manager Position

In response to Bell's request for an accommodation, Watters – on behalf of O'Reilly Auto – offered Bell a position as an Assistant Manager in the Belfast store. *Id.* at 39 ¶ 92. The parties dispute whether Watters offered Bell an hourly rate of ten or eleven dollars per hour. *Compare id. with* ECF No. 43 at 37 ¶ 163. O'Reilly Auto also offered Bell another position at its store in Ellsworth, Maine – which is 45 miles from Bell's home – although the parties dispute the nature of the position. ECF No. 43 at 37 ¶¶ 161, 162. It is undisputed that each offer involved a significant cut in pay from Bell's 42,000 dollar annual salary as a Store Manager, as well as a significant step down in responsibility and prestige. *Id.* at 38 ¶ 164. Bell eventually told Watters

that ten dollars per hour was unacceptable to him, that Assistant Managers in comparable job markets were paid fifteen dollars per hour (which Bell thought was reasonable), and that he needed at least thirteen dollars per hour. *Id.* at 39 ¶ 170. When Bell refused Watters' employment offers he viewed himself as having been fired, while O'Reilly Auto viewed Bell as having voluntarily resigned.[3] *Id.* at 39 ¶ 172.

## II. LEGAL ANALYSIS

### A. Summary Judgment Standard

Summary judgment is granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if "its existence or nonexistence has the potential to change the outcome of the suit." *Rando v. Leonard*, 826 F.3d 553, 556 (1st Cir. 2016) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)). Issues are considered genuine "if the evidence of record permits a rational factfinder to resolve [the issue] in favor of either party. . . ." *Id.* (quoting *Borges*, 605 F.3d at 4.) The facts in the record are construed in the light most favorable to the nonmoving party and all reasonable inferences are resolved in the

---

[3] There is a dispute as to whether Bell was involuntarily terminated or resigned. O'Reilly Auto claims that Bell resigned, but Bell argues that when he was offered an alternate position with a significant salary cut he considered himself terminated. As it is undisputed that he was offered alternate positions with significant decreases in salary and prestige, *see* ECF No. 43 at 38 ¶ 164, Watters' offer to Bell may be fairly characterized as a demotion. For purposes of this Order, the summary judgment record is viewed in the light most favorable to Bell, thus I accept Bell's characterization of the events as a termination. Regardless of whether Bell was terminated or demoted, offering him an alternate position with a significant reduction in salary and prestige constituted an adverse employment action. *See Cherkaoui v. City of Quincy*, 877 F.3d 14, 25 (1st Cir. 2017) ("To determine if an employment action is in fact 'adverse,' we look for whether it has materially changed the conditions of plaintiff's employ.") (internal quotation marks and alteration marks omitted); *see also Valle-Arce v. P.R. Ports Auth.*, 651 F.3d 190, 198 (1st Cir. 2011) ("[T]ermination of employment obviously is an adverse employment action . . . .").

nonmoving party's favor. *See Braga v. Genlyte Group, Inc.*, 420 F.3d 35, 38 (1st Cir. 2005).

## B.     Failure-to-Accommodate Claim

Bell contends, in Counts V and VI of his Amended Complaint, that O'Reilly Auto failed to reasonably accommodate his disabilities in violation of the ADA and the MHRA.  The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[4]  42 U.S.C.A. § 12112(a).  Discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  *Id.* § 12112(b)(5)(A).

For Bell's failure-to-accommodate claim to survive summary judgment, Bell must produce sufficient evidence for a reasonable jury to find that (1) he was disabled within the meaning of the ADA; (2) he was able to perform the essential functions of his job with or without a reasonable accommodation; and (3) O'Reilly Auto knew about his disability and did not reasonably accommodate it.  *See Ortiz-Martínez v. Fresenius Health Partners, PR, LLC*, 853 F.3d 599, 604 (1st Cir. 2017); *see also*

---

[4]  "Because the MHRA generally tracks federal anti-discrimination statutes, it is appropriate to look to federal precedent for guidance in interpreting the MHRA."  *Doyle v. Dep't of Human Servs.*, 824 A.2d 48, 54 n.7 (Me. 2003) (internal alteration marks omitted); *see also Carnicella v. Mercy Hosp.*, 168 A.3d 768, 773 n.3 (Me. 2017), *cert. denied*, No. 17-987, 2018 WL 1037600.  Throughout this Order, the analyses with respect to federal claims brought pursuant to the ADA apply to the state law claims brought pursuant to the MHRA.

*Rocafort v. IBM Corp.*, 334 F.3d 115, 119 (1st Cir. 2003). Solely for the purposes of its Summary Judgment Motion, O'Reilly Auto concedes that Bell was disabled during the relevant time period. ECF No. 37 at 3. For reasons I will explain, I conclude that it is undisputed that the ability to work extended, unpredictable hours was an essential function of Bell's Store Manager position. There are, however, genuine disputes of material fact as to whether Bell's requested accommodation was reasonable and whether O'Reilly Auto participated, in good faith, in the interactive process required for it to determine whether it could reasonably accommodate Bell's disabilities.

### 1.  Essential Job Function

O'Reilly Auto contends, and Bell disputes, that the summary judgment record establishes that an essential function of the Store Manager position was "the ability to work long hours on short notice, including the ability to respond to unexpected problems at unpredictable times." ECF No. 37 at 1. O'Reilly Auto further claims that it made clear from the start of Bell's hiring process that working extended hours, oftentimes on short notice, was an inescapable aspect of the manager's position. *See* ECF No. 41 at 1-2, 14 ¶¶ 3, 5, 36. This is important because "[i]t is well established that . . . the law does not require an employer to accommodate a disability by foregoing an essential function of the position . . . ." *Mulloy v. Acushnet Co.*, 460 F.3d 141, 153 (1st Cir. 2006) (internal quotation marks, citation, and alteration marks omitted).

An "essential function" is "one that is fundamental to a position rather than marginal." *Jones v. Walgreen Co.*, 679 F.3d 9, 14 (1st Cir. 2012) (internal quotation marks omitted). Determining what constitutes an essential job function is a complex

and fact-sensitive consideration that varies case-by-case. *Richardson v. Friendly Ice Cream Corp.*, 594 F.3d 69, 75 (1st Cir. 2010). Potentially relevant evidence of whether a particular function is essential includes, among other things, "[t]he employer's judgment as to which functions are essential . . . [and w]ritten job descriptions prepared before advertising or interviewing applicants for the job." 29 C.F.R. §§ 1630.2(n)(3)(i), 1630.2(n)(3)(ii) (2018). While the "employer's good-faith view of what a job entails . . . is not dispositive," courts give a "significant degree" of deference to an employer's business judgment regarding the necessities of a job when determining what constitutes an essential function. *Jones*, 679 F.3d at 14.

Bell asserts that O'Reilly Auto's position is contradicted by the fact that a manager's ability to be available on short notice during unscheduled hours is not mentioned as an "essential function" in the written job description for the Store Manager position. *See* ECF No. 36-12. Bell also asserts that while he managed the Belfast store, on average he was scheduled for 46 hours per week, and it was "unusual for him to need to address things outside of scheduled hours." ECF No. 43 at 10, 11 ¶¶ 46, 47. However, Bell admits that he understood from the outset that he was responsible for responding to unexpected developments in the workplace, which might require him to work unpredictable and long hours from week-to-week. *See* ECF No. 41 at 1-2, 14 ¶¶ 1, 3, 36. Consistent with O'Reilly Auto's contention, during the two-week period that preceded the June 4 incident, Bell was required to fill in for two employees whose employment had been terminated, which necessitated that he work abnormally long hours. *See id.* at 15 ¶ 42.

12

Although the need to work long unscheduled hours was not mentioned in the written description of the Store Manager's position, it is undisputed that Bell understood from the outset that his willingness and ability to do so was expected by O'Reilly Auto and was necessary due to the Store Manager's responsibility to respond to unanticipated employee absences. The ability to work such hours was thus an essential function of Bell's Store Manager position. On the record before me, there is no genuine dispute of material fact that the ability to work long hours on short notice at unpredictable times was an essential function of Bell's Store Manager position at O'Reilly Auto.

### 2. Ability to Perform Essential Job Functions

The failure-to-accommodate analysis does not end with the conclusion that the ability to work long hours on short notice was an essential job function for O'Reilly Auto Store Managers during the relevant time period. I proceed to the third element of the failure-to-accommodate claim, which asks whether O'Reilly Auto, despite its knowledge of Bell's disability, failed to offer him a reasonable accommodation. *See Enica v. Principi*, 544 F.3d 328, 338 (1st Cir. 2008). To survive summary judgment, Bell must show that: (1) his proposed accommodation was feasible and would have enabled him to perform the essential functions of his job; and (2) the accommodation request was sufficiently direct and specific to put O'Reilly Auto on notice of the need for an accommodation. *Id.* at 338. Although the employer bears the burden of presenting evidence that a particular job function is essential, the employee bears the ultimate burden of proving that he or she is a qualified individual, i.e., someone who

is able to perform the essential functions of his or her position with or without an accommodation. *See Richardson*, 594 F.3d at 72, 76.

O'Reilly Auto contends that if it had granted Bell's accommodation request, Bell would not have been able to work long unscheduled hours on short notice, which was an essential function of his job. This contention, however, mischaracterizes the requested accommodation. It is undisputed that Weitzel, Bell's healthcare provider, believed that it was clearly stated on the FFD form that Bell was able to work unscheduled hours on occasion. *See* ECF No. 41 at 26 ¶ 73. Bell conveyed that interpretation of the FFD to Watters and Thomas in his February 13 e-mail, explaining that Weitzel indicated that he was able to "work some hours beyond the scheduled 45 hours on occasion . . . so long as [his] scheduled hours [were] limited to 45 hours per week." ECF No. 36-8; *see also* ECF No. 41 at 26 ¶ 74.

The portion of Bell's request indicating that he was able to work "some hours beyond the scheduled 45 hours on occasion" left the frequency of the occasions undefined. Bell contends, and O'Reilly Auto disputes, that up until mid-May, Bell worked, on average, 46 hours per week, and only worked far greater hours during the two-week period in late May and early June 2015. Thus, considering the record in the light most favorable to Bell, the request to work "some hours beyond the scheduled 45 hours on occasion" can reasonably be interpreted as proposing an extra-hours schedule slightly reduced from the schedule he had worked from the time he was hired. Accordingly, Bell has articulated sufficient facts for a reasonable jury to conclude that he was capable of performing the essential functions of the Store Manager position with the aid of the scheduling accommodation requested by his

healthcare provider. *See Richardson*, 594 F.3d at 76, 79 (employing the standard requiring the summary judgment record to establish facts sufficient for a reasonable jury to conclude what was an essential job function). Additionally, because the FFD form and accompanying letter sparked an exchange of e-mails between Watters, Thomas, and an HR representative at O'Reilly Auto, it was sufficiently direct and specific to put Bell's employer on notice of the need for an accommodation. *See generally* ECF No. 36-5.

In short, the ability to work unscheduled hours at unpredictable times was an essential function of the Store Manager position, and Bell has articulated facts from which a reasonable jury could conclude that his requested scheduling accommodation would have permitted him to work those hours if necessary. Accordingly, O'Reilly Auto is not entitled to summary judgment with respect to the failure-to-accommodate claim alleged in Counts V and VI of Bell's Amended Complaint.

### 3. Interactive process

Bell's failure-to-accommodate claim also survives summary judgment because he has asserted facts showing that O'Reilly Auto failed to engage, in good faith, in the interactive process of determining whether a reasonable accommodation was feasible. "In some cases, an employee's request for an accommodation may trigger a duty on the part of the employer to engage in an interactive process." *Enica*, 544 F.3d at 338. The logistics of the interactive process vary by case, but generally employers must engage in a meaningful dialogue, in good faith, when determining whether a requested accommodation is reasonable and exploring alternative means of accommodating an employee's disability. *See Ortiz-Martínez*, 853 F.3d at 605; *see*

*also Enica*, 544 F.3d at 338-39. "Once a breakdown in the process has been identified, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." *Ortiz-Martínez*, 853 F.3d. at 605 (internal quotation marks omitted).

Here, it is undisputed that O'Reilly Auto leaves decisions regarding employee accommodations to managers in the field. ECF No. 43 at 29 ¶ 123. O'Reilly Auto admits that Watters initially misinterpreted the requested accommodation when evaluating its feasibility. ECF No. 43 at 24-25 ¶¶ 106, 108-111. O'Reilly Auto also admits that none of its employees, including Regional Manager Thomas and District Manager Watters, contacted Weitzel, Bell's healthcare provider, to clarify the requested scheduling accommodation, despite the fact that Weitzel's letter accompanying the FFD form stated that she was willing to discuss the request. *See* ECF No. 43 at 33 ¶ 144; *see also* ECF No. 36-3 ("If you have any questions please do not hesitate to contact me at [Weitzel's phone number]."). Moreover, upon receiving Bell's July 13 e-mail – which explained that he was able to occasionally work beyond his scheduled hours and stated that he was "still hopeful that O'Reilly Auto Parts [would] accommodate [him] by permitting [his] return to work at the Belfast store as a store manager or Assistant Manager," ECF No. 36-8 – Thomas conducted no further analysis of Bell's request. ECF No. 43 at 33 ¶ 145.

Thus, Bell has articulated facts that would permit a reasonable jury to find that O'Reilly Auto did not participate in a meaningful interactive process regarding Bell's requested accommodation. This further supports the conclusion that O'Reilly

Auto is not entitled to summary judgment on the failure-to-accommodate claim in Counts V and VI of Bell's Amended Complaint.[5]

## C. Discrimination Claim

In Counts I and II of the Amended Complaint, Bell alleges that O'Reilly Auto discriminated against him in violation of the ADA and the MHRA. *See* ECF No. 4 at 12. O'Reilly Auto, in its Motion for Summary Judgment, makes a single argument to rebut Bell's allegation of discrimination: that its offer of an Assistant Manager position with a lower rate of pay than what other Assistant Managers in Maine were being paid was not discriminatory. *See* ECF No. 37 at 17. O'Reilly Auto's argument with respect to the discrimination claim fails, however, because there is a genuine dispute of material fact as to whether it engaged in discrimination when it excluded and then terminated Bell from his Store Manager position. *See Rando*, 826 F.3d at 556.

A Plaintiff may establish discrimination by either circumstantial or direct evidence. *See Patten v. Wal-Mart Stores E., Inc.*, 300 F.3d 21, 24-25 (1st Cir. 2002). Generally, circumstantial proof requires the application of the *McDonnell Douglas* burden-shifting analysis. *Id.* But if a plaintiff produces direct evidence of discrimination, then he or she can bypass the burden-shifting analysis in favor of a mixed-motive analysis. *Id.* at 25. In a mixed-motive analysis the "plaintiff's burden is tempered so that she need prove only that the discriminatory action was *a*

---

[5] A failure to engage in the interactive process is not always conclusive; "the omission of an interactive process is of no moment if the record forecloses a finding that the employee could do the essential duties of the job, with or without reasonable accommodation . . . ." *Lang v. Wal-Mart Stores E., L.P.*, 813 F.3d 447, 456 (1st Cir. 2016) (internal quotation marks omitted). However, in this instance there is sufficient evidence in the summary judgment record to permit a finding that Bell could perform the essential duties of his job with a reasonable accommodation. *See supra*, at 14-16.

*motivating factor* in an adverse employment decision." *Id.* (emphasis in original). Then, the defendant takes on "the burdens of production and persuasion [in showing] that it would have taken the same action in the absence of the impermissible motivating factor." *Id.* (internal quotation marks omitted). Here, Bell's discrimination claim withstands summary judgment under either mode of analysis.

### 1. Direct Evidence of Disability Discrimination

There is a triable issue of disability discrimination based on direct evidence – i.e., "evidence that unambiguously implicates a disability discrimination motive" – arising from Bell's exclusion and termination from his employment at O'Reilly Auto. *Id.* Direct evidence is a "'smoking gun' showing that the decision-maker *relied upon* a protected characteristic in taking an employment action." *LaFlamme v. Rumford Hosp.*, No. 2:13-cv-460-JDL, 2015 WL 4139478, at *16 (D. Me. July 9, 2015) (quoting *PowerComm, LLC v. Holyoke Gas & Elec. Dep't*, 657 F.3d 31, 35 (1st Cir. 2011), *reh'g denied*, 662 F.3d 41 (1st Cir. 2011) (emphasis in original)).

Bell alleges that he was excluded from employment at O'Reilly Auto beginning when Watters and Thomas told him not to return to work until his accommodation request was resolved, and he was effectively terminated when he was offered alternate positions with lower pay. Regional Manager Thomas' admitted that he did not permit Bell to return to work after receiving the FFD form because he believed that permitting Bell to return to work would be a tacit admission of his willingness to grant the accommodation request. This admission could be viewed by a factfinder as direct evidence of discrimination. ECF No. 41 at 18 ¶¶ 55-56. Thomas' response is akin to those considered in absenteeism cases, such as *Criado v. IBM*, in which an

employee requested an absence as an accommodation, and the employer responded by firing the employee for absenteeism. 145 F.3d 437, 444 (1st Cir. 1998). In *Criado,* the court determined that where an employee is terminated for the conduct requested in her accommodation, there is a triable issue with respect to whether the termination constituted evidence of discrimination. *Id.* at 444-45 ("Asserting that the termination was based on [the employee's] absenteeism rather than her disability does not justify [the employer's] action where the absence was the requested accommodation. . . . Considering these facts the jury could have found that [the employer] terminated [the employee] because of her disability."); *see also LaFlamme*, 2015 WL 4139478, at *17. The situation here is similar: O'Reilly Auto admits that it excluded Bell from work because of his requested scheduling accommodation. ECF No. 41 at 18 ¶¶ 55-56. Thus, there is a triable issue as to whether O'Reilly Auto's decision to exclude Bell from work, and then terminate his employment in response to his accommodation request, constituted discrimination under the ADA and the MHRA.

## 2.    Circumstantial Evidence of Disability Discrimination

Even if Bell did not proffer direct evidence of discrimination, he has also presented sufficient circumstantial evidence to satisfy the *McDonnell Douglas* burden-shifting analysis. *See Patten*, 300 F.3d at 24-25. The *McDonnell Douglas* analysis contains three parts: First, Bell must establish a *prima facie* case of discrimination by showing that (a) he was disabled as defined by the ADA; (b) he was qualified to perform the essential functions of his job with or without an accommodation; and (c) he was subject to an adverse employment action due, in whole or in part, to his disability. *Lang*, 813 F.3d at 458. Second, O'Reilly Auto must offer

a legitimate, non-discriminatory reason for its complained-about action. *Id.* at 457. Third, Bell must show that the proffered nondiscriminatory reason is pretextual. *Id.*

Bell has made out a *prima facie* case of discrimination. Viewing the record in the light most favorable to Bell as the non-moving party, Bell can establish that (1) he is disabled; (2) with an accommodation, he was qualified to perform the essential qualifications of his job; and (3) he was subject to an adverse employment action. *See supra*, at 10 n.5, 12, 16. Thus, Bell satisfies the first part of the three-part analysis.

Second, O'Reilly Auto has proffered a non-discriminatory reason for refusing to offer Bell the same rate of pay as another Assistant Manager at the Belfast store. It is undisputed that when O'Reilly Auto offered Bell the Belfast Store Assistant Manager position at a rate of ten or eleven dollars per hour (Bell alleges it was ten dollars per hour, while O'Reilly Auto alleges it was eleven dollars per hour) it was then paying another employee twelve dollars per hour to perform the Belfast Store's Assistant Manager's duties. ECF No. 43 at 39 ¶ 171. O'Reilly Auto justifies this discrepancy by noting that the other employee was originally hired to work at the Bangor store – which is more profitable and therefore pays higher wages – and the other employee was working at the Belfast location on a temporary basis. *Id.* at 40-41 ¶¶ 94-98. O'Reilly Auto claims that the amount offered to Bell was consistent with the amount a permanent Assistant Manager would make at the Belfast store. *Id.* at 39, 41 ¶¶ 89, 99. Although Bell disputes these facts, O'Reilly Auto has met its burden for the second part of the *McDonnell Douglas* analysis.

Turning to the third part, "[p]retext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Gomez-González*, 626 F.2d at 662-663 (internal quotation marks omitted). Although O'Reilly Auto argues that the temporary Assistant Manager in Belfast was technically a Bangor employee, Bell responds that the employee was working at the Belfast store when Bell was offered the Assistant Manager position. ECF No. 41 at 40 ¶ 94. In addition, O'Reilly Auto admits that employee compensation is determined, in part, by tenure and Bell has shown that although the temporary Assistant Manager was paid twelve dollars per hour as a relatively new hire, Bell was offered either ten or eleven dollars despite having already worked at O'Reilly Auto for over a year. *See* ECF No. 41 at 38, 40 ¶¶ 86, 87, 94, 97; ECF No. 43 at 39 ¶ 171. Bell alleges, and O'Reilly Auto denies, that while Bell was the Store Manager at the Belfast store, the Assistant Managers were paid between eleven and thirteen dollars per hour, and Watters authorized him to offer an applicant for the Assistant Manager position as much as thirteen dollars and fifty cents per hour. ECF No. 43 at 38 ¶¶ 166, 167.

"[D]isbelief of [an employee's proffered non-discriminatory] reason may, along with the prima facie case, on appropriate facts, permit the trier of fact to conclude that the employer [] discriminated." *Zapata-Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40, 45 (1st Cir. 2002). On the evidence in the summary judgment record, a reasonable factfinder could infer that Bell was offered a lower rate of pay for the Assistant Manager position than another employee, and that the proffered non-discriminatory reason for the discrepancy is pretextual. Accordingly, O'Reilly Auto

is not entitled to summary judgment with respect to the disability discrimination claim alleged in Counts I and II of the Amended Complaint.

## D.    Retaliation Claim

Bell further alleges, in Counts III and IV of the Amended Complaint, that his exclusion and termination from employment at O'Reilly Auto constituted retaliation in violation of the ADA and the MHRA.  ECF No. 4 at 12.  O'Reilly Auto denies the retaliation claim, arguing that (1) it had a legitimate, non-discriminatory reason for excluding and terminating Bell, and (2) the retaliation claim merely duplicates the failure-to-accommodate claim.  I address each argument, in turn.

ADA retaliation claims, like ADA discrimination claims, are analyzed under the "familiar burden-shifting framework drawn from cases arising under Title VII." *Kelley v. Corr. Med. Servs., Inc.*, 707 F.3d 108, 115 (1st Cir. 2013) (internal quotation marks omitted).  First, Bell must make a *prima facie* showing that (1) he engaged in conduct that is protected by the ADA; (2) he was subject to an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action.  *Id.*  After Bell has made that *prima facie* showing of retaliation, the burden shifts to O'Reilly Auto to "articulate a legitimate, non-retaliatory reason for its employment decision."  *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 26 (1st Cir. 2004).  If O'Reilly Auto meets that burden, then Bell must demonstrate that the proffered legitimate reason is mere pretext and the alleged adverse employment action was based on retaliatory animus.  *Id*.

Bell contends that his exclusion and termination from employment at O'Reilly Auto constituted retaliation for requesting a permanent scheduling accommodation.

As for the first two prongs of the *prima facie* retaliation case, "[r]equesting an accommodation is protected conduct under the ADA's retaliation provision," *Kelley*, 707 F.3d at 115, and, as stated and reiterated above, Bell was subject to an adverse employment action. *See supra*, at 10 n.3, 21.

The third prong is likewise satisfied. "For causality to be established, the plaintiff must show a nexus between the protected conduct and the alleged retaliatory act." *Colón-Fontánez v. Municipality of San Juan*, 660 F.3d 17, 37 (1st Cir. 2011). Bell alleges, and O'Reilly Auto does not dispute, that although he was prepared to return to work on June 9 – five days after submitting his scheduling accommodation request – O'Reilly Auto did not permit him to return, explaining that he could not resume working until his accommodation request was resolved. ECF No. 43 at 20 ¶ 90; ECF No. 41 at 18 ¶ 54. Bell further alleges, and O'Reilly Auto does not dispute, that the positions it eventually offered Bell in response to his accommodation request came with a significant step down in responsibility and prestige, as well as a nearly fifty percent decrease in pay. ECF No. 43 at 38 ¶¶ 164-165.

O'Reilly Auto admits that offering Bell an Assistant Manager position at a rate of pay lower than that of another employee "[o]n its face . . . suggests unequal treatment." ECF No. 37 at 17. O'Reilly Auto maintains, however, that it had a legitimate, non-retaliatory purpose for the discrepancy. *See id.* Specifically, as explained above, O'Reilly Auto contends that employee compensation varies based on store location and profitability, and that the employee who was paid more than what Bell had been offered was technically an employee of the Bangor store; the position

at the Belfast store was a temporary measure.  *See* ECF No. 37 at 17-18; *see also supra*, at 21-22.

With O'Reilly Auto's proffered non-discriminatory reason asserted, the burden returns to Bell, who must allege facts sufficient for a reasonable jury to find that O'Reilly Auto's proffered reason is mere pretext.  *See Kelley*, 707 F.3d at 115.  Bell succeeds in this endeavor for the same reason he succeeded in the discrimination context above.  *See supra*, at 18-23.  The summary judgment record supports a finding that O'Reilly Auto was willing to – and actually did – pay more than ten or eleven dollars per hour to hire the temporary Assistant Manager for the Belfast store.  *See* ECF No. 43 at 38, 39 ¶¶ 166, 171.  Thus, a reasonable fact-finder could infer that Bell was offered a lower rate of pay than his co-worker because of his disability. Accordingly, O'Reilly Auto is not entitled to summary judgment with respect to the retaliation claim alleged in Counts III and IV of the Amended Complaint.

O'Reilly Auto also argues that it is entitled to summary judgment because Bell's retaliation claim is a repackaging of the failure-to-accommodate claim, and should fail for the same reason that the failure-to-accommodate claim should fail.  *See* ECF No. 37 at 15-17.  O'Reilly Auto cites two decisions as legal authority for this proposition – one by the Eleventh Circuit Court of Appeals and the other by the Eastern District of Pennsylvania.  *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001); *Garner v. Sch. Dist. of Philadelphia*, 63 F. Supp. 3d 483, 500 (E.D. Pa. 2014).  In each of the cited cases, the court granted summary judgment in favor of the employer and against the employee with respect to the employee's failure-to-accommodate claim, which informed the court's decision to also grant summary

24

judgment for the employer on the employee's retaliation claim based on the same conduct. *See Lucas*, 257 F.3d at 1261; *Garner*, 63 F. Supp. 3d at 500. Here, summary judgment is not being awarded to O'Reilly Auto on Bell's failure-to-accommodate claim. Thus, O'Reilly Auto's argument is not persuasive.

### III. CONCLUSION

For the foregoing reasons, O'Reilly Auto's Motion for Summary Judgment (ECF No. 37) is **DENIED**.

**SO ORDERED.**

**Dated this the 19th day of April, 2018**

**/s/ JON D. LEVY**
**U.S. DISTRICT JUDGE**