UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

BRIAN BELL,

       Plaintiff

v.

O'REILLY AUTO ENTERPRISES, LLC
d/b/a O'REILLY AUTO PARTS,

       Defendant

**CASE NO.: 1:16-CV-00501-JDL**

## DEFENDANT'S MOTION FOR NEW TRIAL OR FOR REMITTITUR

NOW COMES the Defendant O'Reilly Auto Enterprises, LLC d/b/a O'Reilly Auto Parts, ("O'Reilly"), by and through undersigned counsel, and pursuant to Fed. R. Civ. P. 59(e) and District of Maine Local Rule 7, moves for a new trial or, in the alternative, to set aside or reduce the jury's punitive damage award for the reasons set forth below.

## INTRODUCTION

Following a three-day trial, the jury in this matter found that O'Reilly failed to provide the Plaintiff, Brian Bell ("Bell") with a reasonable accommodation, in violation of the Americans with Disabilities Act ("ADA") and the Maine Human Rights Act ("MHRA"). ECF 341-1 at #3489. After finding that reasonably accommodating Bell would not have constituted an undue hardship, ECF 234-1 at #3489, the jury awarded him $75,000 in compensatory damages. ECF 234-2 at #3490. Thereafter, the jury determined that O'Reilly violated Bell's rights under the ADA and MHRA with "malice or reckless indifference," ECF 235-1 at #3493, and awarded him $750,000 in punitive damages, ECF 235-2 at #3494.

By this motion, O'Reilly requests that the Court order a new trial for the following reasons:

*1*

First, the Court's instructions to the jury did not fairly and adequately inform the jury of the deference due O'Reilly's judgment that a duty of Bell's position was an "essential function." Second, the Court's instructions to the jury did not fairly and adequately delineate the limitations on O'Reilly's obligation to accommodate Bell by providing a modified schedule. Third, the Court's instructions to the jury did not fairly and adequately delineate the parties' respective obligations in the interactive process. Fourth, O'Reilly was unfairly prejudiced by Bell's improper "uncalled witness" argument. Fifth, O'Reilly was unfairly prejudiced by Bell's improper argument that it engaged in misconduct in its defense of the action. Sixth, O'Reilly was unfairly prejudiced by misrepresentations of the evidence in the Plaintiff's closing argument. Seventh, whether or not the erroneous instructions and improper arguments, considered separately, were of sufficient severity to warrant a new trial, their cumulative impact deprived O'Reilly of a fair trial. Eighth, the jury's finding that O'Reilly breached its duty to accommodate Bell was against the weight of the evidence. Ninth, the jury's award of punitive damages was against the weight of the evidence. Tenth, the punitive damage award was excessive and violates the Due Process Clause of the Fourteenth Amendment. Alternatively, should the Court find the award of punitive damages grossly excessive, but the other grounds set forth above insufficient to warrant a new trial, O'Reilly submits that the Plaintiff should be required to remit punitive damages in excess of $75,000.00.

## Motion for New Trial

**1.      Standards of Review**

     A.      The ordinary standards of review

         i.      Review based on the weight of the evidence

"A court may grant a new trial under Rule 59 when the jury's verdict is 'against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice.'"

*Fine v. Sovereign Bank,* 671 F. Supp. 2d 219, 224 (D. Mass. 2009) (quoting *Johnson v. Spencer Press of Maine, Inc.,* 364 F.3d 368, 375 (1st Cir.2004)).  "'[O]n a motion for a new trial—unlike a motion for a judgment as a matter of law—the judge may set aside the verdict even though there is substantial evidence to support it.'"  *Id.* (quotation marks omitted).  "Likewise, in a new trial motion, a court is not required to take that view of the evidence most favorable to the verdict-winner, as in motions for judgment as a matter of law."  *Id.* (quotation marks omitted).  "While the court, of course, should give due respect to the collective wisdom of the jury,' if after reviewing all of the evidence the court 'is left with the definite and firm conviction that a mistake has been committed,' it should grant a request for a new trial."  *Id.* (quotation marks omitted).

   ii.  Review based on jury instructions

  A court "may allow a new trial when the verdict . . .  resulted from some trial error and amounts to a clear miscarriage of justice."  *Steinhilber v. McCarthy,* 26 F. Supp. 2d 265, 277-78 (D. Mass. 1998) (quotation marks omitted). A party is entitled to a new trial based upon alleged deficiencies in the jury instructions if "the instructions, taken as a whole, are misleading or give an inadequate understanding of the law."  *Id*. at 278 (quotation marks omitted).

   iii.  Review based on improper argument

  Where a party timely objects to improper closing argument, a court assessing its effect "must examine the totality of the circumstances, including (1) the nature of the comments; (2) their frequency; (3) their possible relevance to the real issues before the jury; (4) the manner in which the parties and the court treated the comments; (5) the strength of the case; and (6) the verdict itself." *Granfield v. CSX Transp., Inc.*, 597 F.3d 474, 490 (1st Cir. 2010).  "On the other hand, untimely objections, which a party fails to make immediately after closing arguments, are reviewed for plain error."  *Id*.  A party complaining of unpreserved error "must establish that (1) an error

was committed; (2) the error was 'plain' (i.e. obvious and clear under current law); (3) the error was prejudicial (i.e. affected substantial rights); and (4) review is needed to prevent a miscarriage of justice or [if the error has] seriously affected the fairness, integrity or public reputation of the judicial proceedings.'" *Id*. at 491 (quotation marks omitted).

     B.     <u>Review in cases of cumulative error and improper argument</u>

"Individual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect." *United States v. Sepulveda*, 15 F.3d 1161, 1195-96 (1st Cir. 1993). Thus, a jury's verdict may be set aside where numerous minor errors or instances of misconduct have "an aggregate effect that impugns the fairness of the proceedings and thus undermines the trustworthiness of the verdict." *Williams v. Drake,* 146 F.3d 44, 49 (1st Cir. 1998). In other words, "[a court] will order a new trial on the basis of cumulative error . . . if multiple errors synergistically achieve the critical mass necessary to cast a shadow upon the integrity of the verdict." *Id.* (quotation marks omitted); *see also Gomez v. Rivera-Rodriguez*, 344 F.3d 103, 118 (1st Cir. 2003) (to determine whether challenged rulings had "a substantial and injurious effect or influence upon the jury's verdict," a court "must scrutinize the record as a whole and aggregate the collective effects of multiple errors"). For a jury verdict to stand after a trial containing numerous errors, "the court must be able to say with a fair degree of assurance that error(s) did not skew the verdict." *Gomez*, 344 F.3d at 118.

     C.     <u>Review of Punitive Damage Awards</u>

Although a jury's assessment of compensatory damages "is essentially a factual determination . . . its imposition of punitive damages is an expression of its moral condemnation." *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432 (2001). Thus, because a jury's award of punitive damages does not represent a finding of fact, the Seventh Amendment's

prohibition against the reexamination of "fact" is not implicated, and a court "may reduce an excessive award of punitive damages without giving the plaintiff an option for a new trial." *Bisbal-Ramos v. City of Mayaguez*, 467 F.3d 16, 23 (1st Cir. 2006).

2.      **Grounds for a New Trial**

A.      <u>The Court's instructions did not fairly and adequately inform the jury of the deference due O'Reilly's judgment that Bell's availability to work long, unpredictable hours on short notice was an "essential function" of his position.</u>

The most fundamental error in the Court's instruction was the permission it implicitly gave the jury to second-guess O'Reilly's judgment regarding the essential functions of the Store Manager position. O'Reilly recognizes that "[a]s long as the judge's instruction properly apprises the jury of the applicable law, failure to give the exact instruction requested does not prejudice the objecting party.'" *Sullivan v. N.F.L.*, 34 F.3d 1091, 1107 (1st Cir. 1994) (quotation marks omitted). "A party, however, is entitled to have its legal theories on controlling issues, which are supported by the law and by the evidence, presented to the jury." *Id.* Here, a theory of central importance to the case, supported by both the facts and the law—O'Reilly's contention that the jury should, except in extraordinary cases, defer to an employer's judgment concerning which functions of a job are essential—should have been presented to the jury, but was not.

Throughout this litigation, O'Reilly has consistently taken the position that the Plaintiff's ability to work long hours on short notice at unpredictable times was an essential function of his position. In ruling on O'Reilly's Motion for Summary Judgment, the Court found that that was, indisputably, an essential function of Mr. Bell's job. ECF 44 at ##768, 770. The Court denied summary judgment, however, in part because it concluded that the Plaintiff might have been able to perform that essential function with a reasonable accommodation. *Id.* at ##771-72.

At trial, a significant element of the Plaintiff's strategy was to persuade the jury that he did

*not* need to have the ability to work the long, unpredictable hours O'Reilly expected of him, because (1) the demands of the job were not as great as O'Reilly believed, and (2) other people *could have* performed some of the tasks O'Reilly expected him to perform.  Essentially, he invited the jury to find that the ability to work long, unpredictable hours on short notice was *not* an essential function of his job, thus creating a whole new position: an O'Reilly Store Manager who worked fewer hours, and had fewer responsibilities, than any other Store Manager in the country.

O'Reilly asked the Court to clarify this point by giving the jury the following instruction:

> The inquiry into essential functions is not intended to second-guess an employer's business judgment with regard to production standards. An employer is not required to make an accommodation which would have the effect of lowering its standards, insofar as the quality and quantity of the work of its employees is concerned.

ECF 209 at #3363.

In support of the first sentence of the proposed instruction, O'Reilly cited *Gudava v. Northeast Hosp. Corp.*, 440 F. Supp. 3d 49, 58 (D. Mass. 2020), ECF 209 at #3364, which in turn discussed *Laurin v. Providence Hospital,* 150 F.3d 52 (1st Cir. 1998), and cited *Ward v. Mass. Health Research Inst., Inc.*, 209 F. 3d 29, 34 (1st Cir. 2000), for the proposition that "[i]n evaluating the essential functions of a position, an employer's determination that a job requirement is essential, while not definitive, is afforded 'substantial weight.'"  To support the second sentence, O'Reilly cited *Mulloy v. Acushnet Co.,* 460 F.3d 141, 147 (1st Cir. 2006), and *Richardson v. Mabus*, 203 F.Supp.3d 86, 156 (D. Me. 2016).  ECF 209 at #3364.

The Court declined O'Reilly's request, reasoning that the "additional commentary . . . would add unnecessary complexity in the matter," and that the point was "adequately covered and could be argued from the instruction that [the Court] otherwise provided."  Tr. at 630:9-20.

O'Reilly respectfully submits that the Court's ruling was error.  The employer's judgment as to what duties are an "essential" part of any job is not just one factor that a jury should consider

along with eight others of equal weight. To be clear, O'Reilly does not mean to argue that an employer's judgment is always conclusive on this point. A court must consider "whether the employer actually enforces this requirement of its employees or merely pays it lip service during litigation." *Benson v. Wal-Mart Stores E., L.P,* 14 F.4th 13, 27 (1st Cir. 2021). But once an employer "articulate[s] a legitimate reason" for identifying a function as "essential," a plaintiff must "adduce specific evidence to debunk the [employer's] rationale; in other words, to support a reasonable inference that the articulated rationale was pretextual." *Laurin*, 150 F.3d at 61.

Here, the evidence introduced at trial established beyond doubt that O'Reilly did not just "pay [the scheduling requirement] lip service during litigation." *Benson*, 14 F.4th at 27. It was not, therefore, a "pretext" for discrimination. *Laurin*, 150 F.3d at 61. There was no evidence that the company has *ever* employed a store manager whose schedule was limited in the way Bell wanted his to be. See Tr. at 182:17-183:11, 478:18-479:10, 488:3-489:5, 493:13-494:19.

That evidence, we contend, justified the instruction O'Reilly requested on its "legal theory," which was both correct and relevant to a "controlling issue." The jury should have been told that as long as O'Reilly uniformly required that all store managers fulfill a function the company (and this Court) regarded as "essential," the jury should not "second guess" that judgment. Instead, the Court's charge erroneously left it to the jury to consider "the employer's judgment" as just one of several equally-weighted factors. The jury was effectively permitted to substitute its judgment for O'Reilly's—to say, in essence: "We don't like the way O'Reilly has configured its business model and its work force, and we think it would be better if store managers worked fewer hours and had less responsibility."

The instructional error was critical because the jury could easily have concluded that Brian Bell was incapable of fulfilling this function. Chris Watters, an O'Reilly store manager, testified

without contradiction that in the course of his duties he has had occasion to work "open to close," from 6:30 a.m. until 9:00 p.m., multiple days running. Tr. at 189:10-18. Similarly, Don Beck testified that "there is oftentimes [sic] where managers are working from open in the morning until closing at night so they're doing 15, 16 hours a day simply because they're short staffed, simply because they have lost people, terminations, people call in sick. On a regular basis they have to fill that gap or find somebody to fill that gap, that's part of their responsibilities." Tr. at 573:4-24. Although Judy Weitzel and Mr. Bell testified that he could have worked a few extra minutes or hours here and there, neither of them suggested that he could work "open to close" as needed. In fact, the only evidence was to the contrary: the very first time he encountered that situation, he found it overwhelming and intolerable.

   B.   <u>The jury instructions were insufficient and misleading because they informed the jury that a schedule modification may be a reasonable accommodation, while failing to clarify that an open-ended schedule is not a reasonable accommodation.</u>

O'Reilly asked the Court to give the jury the following instruction regarding the reasonableness of a scheduling accommodation:

> Under some circumstances, a reasonable accommodation may include a part-time or modified work schedule. A change to an employee's work schedule may be a reasonable accommodation if it is specific and well-defined. However, a scheduling modification which makes an employee's attendance at work erratic and unpredictable is not a reasonable accommodation.

In support of this request, O'Reilly cited *Crowell v. Denver Health and Hospital Auth.,* 572 Fed. App'x 650, 659 (10th Cir 2014); *Doak v. Johnson*, 19 F. Supp. 3d 259 (D.D.C. 2014); and *E.E.O.C. v. Yellow Freight Sys., Inc.,* 253 F.3d 943, 949 (7th Cir. 2001). ECF 209 at #3362.

The Court instructed the jury only that "a 'reasonable accommodation' may include . . . . part-time or modified work schedules," but declined to clarify that "a scheduling modification which makes an employee's attendance at work erratic and unpredictable is not a reasonable

accommodation."  Tr. at 700:7-25—8:1-7.  The Court did not say that the requested instruction was inaccurate, and there is no First Circuit authority contrary to the Seventh and Tenth Circuit decisions cited by O'Reilly.

Because the requested instruction (1) was supported by the evidence, (2) was legally accurate, and (3) bore directly on O'Reilly's "legal theory" relevant to a "controlling issue," *Sullivan*, 34 F.3d at 1107, we respectfully submit that the failure to give it was error.  Again, this was a central issue in the case. The parties' dispute revolved entirely around the question of whether Bell could predictably be available to meet his store's *un*predictable needs.  Mr. Bell conceded that he understood he needed to be "on call on a regular basis . . . by the phone or in person" and that "should an issue arise with the store it's up to the store manager to react and in many cases respond to support his store."  Tr. at 443:18-445:14.  He contended, though, that he did not actually need to have the ability to work exceptionally long, unpredictable hours because in the ten months he had been with O'Reilly—up until May of 2015—the occasion to do that had not arisen.  Tr. at 365:20-366:8, 368:11-369:11.  When it did arise, however, he was so medically and emotionally overwhelmed that, in his words, he "almost went to the hospital from the adverse effects of [his] drugs."  Tr. at 468:1-11.

The evidence, then, is that (1) O'Reilly *did* invariably require that its store managers be available to work, on occasion, as long as 15 to 16 hours per day; (2) Brian Bell was *not* capable of doing that; (3) his mental health provider *never* told him what the maximum number of hours was that she would permit, or even confirmed that she would clear him to work "a few more hours . . . than 45." Tr. at 470:7-19.  Thus, if O'Reilly had accepted Judy Weitzel's recommendation, the company's ability to insist on Bell fulfilling his responsibility as a store manager would have been "erratic and unpredictable."  Indeed, although Bell contends that he *always* would have done what

he needed to do, regardless of how he felt or how much time it took, Tr. at 467:3-22 – which, again, begs the question of whether he needed an accommodation at all – the mere act of asking Bell to violate his medically-prescribed work limitations could have exposed O'Reilly to liability.

C.      The Court's instructions did not fairly and adequately delineate the parties' respective obligations in the interactive process.

The Court gave the jury the following instruction concerning the interactive process:

Once an employer becomes aware of an employee's disability and an accommodation has been requested, the employer may have a duty to engage in a dialogue with the employee to identify a reasonable accommodation. This is referred to as an interactive process. The interactive process is a means of uncovering potential reasonable accommodations.

An employer has a duty to engage in an interactive process if, under all of the circumstances, a reasonable employer would have engaged in an interactive process with its employee. Both the employee and the employer must cooperate in the process in good faith.

Accordingly, if you find that Mr. Bell's requested accommodation was unreasonable or would have caused an undue hardship to O'Reilly, but find that Mr. Bell has otherwise proved all of the elements of his failure to accommodate claim, you may return a verdict for Mr. Bell on his claim if he has also proven by a preponderance of the evidence that, one, O'Reilly Auto had a duty to engage with Mr. Bell in an interactive process; two, Mr. Bell engaged in the interactive process in good faith but O'Reilly Auto did not engage in the interactive process in good faith; and, three, the parties could have discovered and implemented through good faith efforts a reasonable accommodation supported by the evidence in this case. However, in keeping with my earlier instruction, Mr. Bell cannot prevail based on the existence of an unrequested but reasonable accommodation if O'Reilly Auto proves by the preponderance of the evidence that such an accommodation would have created an undue hardship.

Tr. at 701:18-702:23.

Before the jury was charged, O'Reilly proffered a definition of good faith, which it asked the Court to incorporate into an instruction that would further delineate both parties' responsibilities in the interactive process:

"Once an accommodation is properly requested, the responsibility for fashioning a reasonable accommodation is shared between the employee and employer."

*Jacques v. Clean-Up Group, Inc.*, 96 F.3d 506, 514 (1st Cir. 1996). . . .  Once the employer has determined that the disabled employee may be accommodated, the "employee's request for reasonable accommodation requires a great deal of communication." *Tobin v. Liberty Mutual Ins. Co.*, 433 F.3d 100, 109 (1st Cir. 2005).

However, "this does not mean that the employer has the unreasonable burden of raising and discussing every conceivable accommodation with the disabled employee." *Id.* Rather, the interactive process "requires open communication by both parties, and an employer will not be held liable if it makes reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed."  *Enica v. Principi*, 544 F.3d 328, 339 (1st Cir. 2008) (quotation marks omitted). Put differently:

> Neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility. . . . Where the missing information is of the type that can be provided by one of the parties, failure to provide the information may be the cause of the breakdown and the party withholding the information may be found to have obstructed the process.

*Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135-36 (7th Cir. 1996).

(*See 10/27/21 Memorandum to Court*, attached hereto.)[1]

The Court declined to give this clarification, reasoning that "the case law . . . does not lend itself to a clean, clear definition of good faith specific to the Americans with Disabilities Act or the Maine Human Rights Act," and that "this is a term of common usage and its general understanding of honesty, sincerity, is—it's the type of a term which commoners can draw from

---

[1] Following the third day of trial, at the request of this Court, undersigned counsel submitted the attached memorandum as to the meaning of "good faith."  Defendant understands that this memorandum was not placed on the docket, but instead was forwarded to the Court.

their own experience in applying that term."  Tr. at 632:18 - 633:5

Respectfully, O'Reilly submits that the absence of a "clean, clear definition of good faith" did not obviate the need to provide as clear and detailed a definition as the Court could give, based on the evidence the parties had presented.   After all, the First Circuit in *Tobin*, while acknowledging that "[t]he scope of the employer's obligation in this [interactive] process is not crystal clear," was able to articulate one limit on its scope: that the employer does not have the "burden of raising and discussing every conceivable accommodation with the disabled employee." *Tobin*, 433 F.3d at 109 (quotation marks omitted). That is precisely the limitation O'Reilly asked the Court to convey, and it was important to the jury's understanding of the issues: the Plaintiff was arguing that O'Reilly should have offered Bell a variety of accommodations (working reduced hours at a reduced rate of pay; working a little bit more than 45 hours per week), and this instruction would have provided the basis for O'Reilly to explain that it did not have a duty to "raise and discuss" every possible accommodation.

The definition of good faith proffered by O'Reilly (i) was clearly supported by controlling First Circuit precedent (ii) was generated by the evidence, and (iii) bore directly on O'Reilly's "legal theory" relevant to a "controlling issue." *Sullivan*, 34 F.3d at 1107.  Accordingly, the failure to give it was error.

> D.     **O'Reilly was unfairly prejudiced by counsel's argument, without foundation, that the jury should draw an adverse inference from its failure to call the manager of the Belfast store as a witness.**

In closing argument, Plaintiff's counsel suggested for the first time that there was an important witness who had not been called to testify at trial:

> I think it's interesting that other than Brian who else would know whether this schedule, this accommodation would work? How about the Belfast store manager right now? Or – they are an O'Reilly employee. They could have brought him in. They could have put him on the stand. It would have been interesting to see what

they would have said. But O'Reilly didn't call him. *And the reason that they didn't call them is that they would have said the same thing as Brian, that this would have worked.* If they had given him a chance, Brian could have done the job.

Tr. at 646:12-22 (emphasis added).

This argument was improper and unfairly prejudicial because (1) the Plaintiff did not establish, and made no effort to demonstrate, that the manager of the Belfast store was unavailable to him; (2) the Plaintiff did not establish, and made no effort to demonstrate, that the manager of the Belfast store possessed non-cumulative information; (3) the argument implied falsely, and without a shred of factual basis, that O'Reilly made a deliberate decision not to call the manager of the Belfast store because the company knew his testimony would be harmful; and (4) in creating that false and factually-groundless impression, the argument invited the jury to surmise that O'Reilly and its counsel were withholding or concealing relevant evidence.

      i.      The status of the "uncalled witness rule" in federal civil trials

Historically, "[t]he basis for allowing either argumentative comment or a request for a missing witness instruction" has been "'the simple proposition that if a party has evidence which will illuminate questions in issue and fails to present it, it may be inferred that such evidence would be harmful to his case.'" *Steinhilber v. McCarthy,* 26 F. Supp. 2d 265, 280 (D. Mass. 1998) (quoting *United States v. Johnson,* 467 F.2d 804, 808 (1st Cir 1972)). Thus,

> three circumstances warrant an inference adverse to a party with respect to a missing witness. . . . [T]he proponents . . . bear the burden of establishing that the missing witness "would have been [(1)] 'favorably disposed' to testify in the [adversary's] behalf by virtue of his status or relationship to the parties, (2) 'peculiarly available' to the [adversary], or (3) within the [adversary's] 'exclusive control.'"

*Id.* (quoting *United States v. Welch,* 15 F.3d 1202, 1214 (1st Cir.1993)).

The First Circuit Court of Appeals has not squarely considered whether the "uncalled witness" rule, which is a relic of 19th century American law, remains relevant in 21st century civil

litigation.[2]  O'Reilly contends that it does not.  The Fifth Circuit Court of Appeals has said, and

other courts have agreed, that "the evidentiary scheme created by the Federal Rules of Evidence,

as complemented by the Federal Rules of Civil Procedure, renders the uncalled-witness rule an

anachronism," because:

> A litigant may use modern discovery procedures to ascertain the identity and
> proposed testimony of witnesses identified with her opponent. If the district court
> finds that a party is concealing the identity and location of persons with knowledge
> of discoverable matter, the court may impose an appropriate penalty. If a litigant
> wishes to call a hostile witness but the witness is unwilling to testify, the litigant
> may resort to compulsory process. When the litigant has the hostile witness on the
> stand, she may use leading questions to interrogate the witness, and if necessary
> impeach the witness under Rule 607 by any of the standard means, including use
> of the witness's prior inconsistent statements.

*Herbert v. Wal-Mart Stores, Inc.,* 911 F.2d 1044, 1048 (5th Cir. 1990); *see Allstate Ins. Co. v.*

*Shuler,* 53 F.3d 331 (6th Cir. 1995) ("We agree with the Fifth Circuit that the 'missing witness' or

'uncalled witness' rule is inapplicable in federal court."); *Dent v. Siegelbaum,* 2012 WL 718835,

at *4 (D. Md. Mar. 5, 2012) ("Plaintiff cannot make deliberate choices not to obtain discovery

from an individual, express no desire to call her as a witness, offer no evidence that the witness

refused to testify, and then contend she is unavailable.").

      ii.     Assuming the uncalled witness rule has continued vitality in civil
litigation in this Circuit, the Plaintiff failed to establish the
foundation necessary to warrant an adverse inference.

          a.     The Plaintiff did not establish that any uncalled
witness was "unavailable" to him.

As the District Court recognized in *Steinhilber,* some courts have characterized the

employer-employee relationship as "'one creating practical unavailability' due to the economic

ties of the employee to his employer."  *Steinhilber,* 26 F. Supp. at 281 (quoting *Jones v. Otis*

---

[2] *See Graves v. United States,* 150 U.S. 118, 121 (1893) ("[I]f a party has it peculiarly within his power to produce
witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that
the testimony, if produced, would be unfavorable.").

*Elevator Company,* 861 F.2d 655, 659-60 (11th Cir.1988)).  O'Reilly contends that such a rule is wrong as a general matter, and that it is even more clearly inapplicable to this case.

Here, there was nothing to prevent the Plaintiff from deposing any employee of O'Reilly. Indeed, during the course of discovery the Plaintiff deposed five O'Reilly employees, in three states, without objection.[3] There was never a request to depose the manager of the Belfast store. Had that person's deposition been requested, there would have been no impediment to it.  In no practical sense, therefore, was the manager of the Belfast store either "peculiarly available" to O'Reilly or within the company's "exclusive control." *Steinhilber,* 26 F. Supp. 2d at 280 (because plaintiffs could have subpoenaed witnesses and taken their depositions, they "failed to show that the missing witnesses were peculiarly available to [the defendant] or within his exclusive control").

> b.      The Plaintiff did not establish that any uncalled witness possessed non-cumulative information.

"Separate and apart from establishing favorable disposition, an adverse inference is not permissible 'where the unpresented evidence would be merely cumulative.'" *Steinhilber*, 26 F. Supp. 2d at 281 (quoting *Johnson,* 467 F.2d at 808).  This part of the foundation for an uncalled witness argument was likewise absent at trial.

O'Reilly presented evidence from several witnesses (Chris Watters, Nick Thomas, and Don Beck) detailing the demands of the store manager's position. Presenting yet another witness to echo their testimony would have accomplished nothing.  Indeed, before trial the Plaintiff himself actually argued that more testimony on this point would have been cumulative and "unnecessary": his request to exclude one of O'Reilly's witnesses (Amanda Hall) was based in part on the ground that "Defendant already has multiple witnesses that it identified in discovery who can testify about

---

[3] Chris Watters was deposed in Maine.  Nick Thomas, who was then headquartered in Massachusetts, was deposed there.  Sherri Jones, Allison Rush, and Don Beck were deposed in Missouri.

the essential functions of the Store Manager position at the time in question."  ECF 186 at #3031.
It was disingenuous to say, on the one hand, that any more testimony about "the essential functions
of the Store Manager position" would have been cumulative, and on the other hand that O'Reilly
should be penalized because it failed to produce another (unnamed) witness whose testimony
would have been crucial to the jury's understanding of the case.  There is simply no evidence that
O'Reilly failed to call any witness who possessed non-cumulative information.[4]

Furthermore, calling "the Belfast store manager right now" likely would have been
misleading, since it is reasonable to assume that business conditions during the COVID pandemic
were and are different from the conditions that existed in 2014 and 2015, when Brian Bell was
with O'Reilly.  The Plaintiff has switched positions on this point as well.  Before trial, he advanced
another reason to exclude Amanda Hall's testimony—that the expectations of a store manager in
2021 were irrelevant to what was expected of him in 2015.  ECF186 at #3031 ("What Defendant
currently requires is irrelevant; only the essential functions at the time Plaintiff requested his
accommodation are relevant.").  At trial, though, his counsel invited the jury to infer that a manager
working in 2021 was best suited to comment on what was "essential" at the Belfast store in 2015.

Essentially, the Plaintiff's theory, which the Court approved, seems to have been that an
adverse inference is warranted whenever a party fails to call *anyone* who *might* have information
about the case, whether or not that person possesses information that is both relevant *and* non-
cumulative.  Yet even the Eleventh Circuit, despite having adopted the view (which we contend is
wrong) that all employees are "practically unavailable" to their employers' adversaries, has
acknowledged that "[a] party need not account for every witness cognizant of the facts with whom

---

[4] To the contrary: in response to O'Reilly's objection to this line of argument, Plaintiff's counsel conceded that
"the defendant at no point indicated that the current store manager or any store manager of the Belfast store would be
a witness or was a person with relevant information during discovery or after discovery."  Tr. at 660:3-8.

he shares a peculiar relationship. Rather, the potential testimony must be superior to that relied on at trial." *Jones,* 861 F.2d at 660.  Here, the Plaintiff presented no foundational evidence about the tenure of the Belfast store manager—whether he (or she) had worked there for a week, a year, or longer—and how that person's familiarity with the needs of the store compared to the knowledge of Watters and Thomas.  For this additional reason, the Plaintiff's closing argument was improper.

    iii.  The uncalled witness argument was unfairly prejudicial.

  O'Reilly was seriously prejudiced by the Plaintiff's uncalled witness argument, and the prejudice was unfair.

  First, as the Court is aware, Bell vigorously opposed O'Reilly's efforts to introduce *any* evidence that had not been produced in discovery, which closed in July of 2017. ECF 21 (extending discovery deadline).  As discussed above, the Plaintiff objected to O'Reilly's plan to call at the second trial a witness, Amanda Hall, who had not been called at the first trial.  He argued that he would be prejudiced by her testimony because he did not have the opportunity to depose her or to explore her knowledge through written discovery.  ECF 186 at #3031-#3032.  He also objected to O'Reilly's efforts to introduce documents it had produced at the first trial, *three years earlier.* ECF 202, 223.  The Court eventually ruled that Ms. Rush could testify, because (1) she assumed the duties of Donald Beck, who had testified at the first trial but had since left the company, (2) it was unclear whether Mr. Beck would ultimately make himself available to testify, and (3) as soon as it became apparent that Beck might not be available, Plaintiff's counsel was offered the opportunity to depose Ms. Hall.[5]  Tr. at 496:4-501:17.  On the second point, though, Bell's argument was successful.  Tr. at 12:4-22.  The Court's rationale for excluding those documents was, in part, that the Plaintiff had not had an opportunity to conduct discovery with respect to them

---

  [5] As events transpired, Mr. Beck did appear, so it was unnecessary to call Ms. Hall.

during the discovery period.  Having succeeded in opposing the admission of evidence that was not produced in discovery, Bell should not have been permitted to reverse course and take a diametrically opposed position—that the jury ought to draw an adverse inference from the fact that O'Reilly did not try to add a completely new witness, who may or may not have been employed by the company while discovery was still being conducted.

Second, and more fundamentally, the argument was categorically improper because it invited the jury to speculate that O'Reilly made a deliberate decision not to call a witness whose testimony, it knew, would support Bell's claim.  There is absolutely no evidence that that happened (and, in fact, it did not).  Lawyers are permitted to argue that a jury should draw *only* those inferences that are supported by evidence.  *United States v. de Leon Davis,* 914 F.2d 340, 345 (1st Cir. 1990); *see Whittenburg v. Werner Enterprises Inc.,* 561 F.3d 1122, 1128-29 (10th Cir. 2009) ("Counsel's argument . . . violated the cardinal rule of closing argument: that counsel must confine comments to evidence in the record and to reasonable inferences from that evidence.") (citing Model Rules of Prof. Conduct R. 3.4, which provides: "A lawyer shall not . . . in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence."). There was no evidence whatsoever to support the argument that O'Reilly, or its counsel, was concealing a witness who could undermine its defense.  Thus, O'Reilly had no reason to expect that the Plaintiff would suggest that the jury should draw such a factually-groundless inference.

Third, and most importantly, an uncalled witness argument impugns the credibility of the opposing party and its lawyer.  Credibility is, of course, critically important in every case tried to a jury.  Litigants and their lawyers want jurors to understand that they are honest, sincere, and transparent.  The whole purpose of the uncalled witness argument is to suggest that information is

being hidden, because it would hurt the party who is hiding it.  The jurors in this case, who had no

reason to know that deposing a witness was as easy as sending a notice, could easily have been

misled into believing that O'Reilly was free to conceal and withhold the testimony of the Belfast

store manager.  That was precisely the message conveyed by Plaintiff's summation.  It was not

only factually baseless; it invited the jury to conclude that O'Reilly and its counsel were engaging

in the kind of gamesmanship that makes laypersons distrust lawyers and the legal process.

<div style="margin-left: 2em;">

E.  <u>The prejudice was compounded by counsel's improper argument that O'Reilly litigated the case in bad faith, and that as a result of that bad faith Bell suffered harm during the trial.</u>

</div>

That was not the only unfair attack on the litigation conduct of O'Reilly and its counsel.

In summation on the punitive damage claim, Plaintiff's counsel told the jury this:

> [O'Reilly] did the opposite of act in good faith. After Brian filed his court case, which is -- that was *a long time ago*, O'Reilly could have looked into it, brought Brian back, tried to fix things, change their ways. They did the opposite. As you saw, *they subpoenaed his therapy records and put them up in public in a way that was not easy for Brian, but it's like this is the price you pay if you challenge us for violating your rights*. They fought him. They insisted they did nothing wrong. They brought witnesses in from all over to say that what they do is absolutely fine.
>
> Their position is that they're essentially exempt from these laws when it comes to store managers and salaried employees, that essentially for O'Reilly for these people they don't get the benefit of having these rights.
>
> And they aren't just fighting their obligation to accommodate Brian, this is *really every store manager in all of the states. And I wonder how many store managers, since Brian brought his case, have gone through the same thing because this is O'Reilly's approach to these sorts of things. And they're not just fighting Brian.* I think it's clear that this is the company's attempts to try -- they're trying to say we can do this, this is okay, and today you already told them it's not okay, it violates the law.

Tr. at 740:14-741:14 (emphasis added).  This line of argument was blatantly improper, and was

likely to have had the greatest impact on the jury.

In *Whittenburg, supra,* the Tenth Circuit Court of Appeals vacated a judgment entered on

a jury verdict after plaintiff's counsel argued in closing that the defendant "improperly took [the] case to trial," that it "spent vast sums of money to avoid responsibility," and that it "forced" and "subjected" plaintiff to a trial. 561 F.3d at 1129. As the Court observed:

> This line of argument is especially concerning. Every individual and entity has the right to mount a non-frivolous defense against allegations of negligence or other misconduct. In preparing that defense, a party can – indeed, often must – spend not inconsiderable amounts of money on both representation and experts. In this respect, the right to present a defense is materially identical to the right to pursue a lawsuit, and we would be equally troubled had counsel for [defendant] suggested [plaintiff] acted reprehensibly in bringing his suit for damages. To imply or argue that the mere act of defending oneself, or the mere act of bringing suit, is reprehensible serves no proper purpose, and for time out of mind it has been the basis for appellate courts ordering new trials.

*Id.* at 1129-30. Other courts have agreed that "[g]enerally speaking, litigation-induced emotional distress is never a compensable element of damages." *Knussman v. Maryland,* 272 F.3d 625, 642 (4th Cir. 2001); *see Soto-Lebron v. Fed. Express Corp.,* 538 F.3d 45, 60 (1st Cir. 2008) (citing *Knussman*); *Stoleson v. United States,* 708 F.2d 1217, 1223 (7th Cir.1983) ("It would be strange if stress induced by litigation could be attributed in law to the tortfeasor. An alleged tortfeasor should have the right to defend himself in court without thereby multiplying his damages. . . .").

Notably, in *Clukey v. Town of Camden*, No. 2:11-CV-372-JHR, 2016 WL 3945124, at *2 (D. Me. July 19, 2016), this Court, invoking the First Circuit's adoption (in *Soto-Lebron v. Fed. Express Corp.*) of *Knussman*, reasoned that because "[t]he plaintiff [could] not recover for the emotional distress caused by [the] litigation . . . , [he] may not testify about it." Thus, if Bell himself had tried to testify that he was emotionally distressed because he had to produce his therapy records, or because those records were exposed to the public at trial, his testimony would have been barred. His counsel circumvented that obstacle by supplying the testimony Mr. Bell could not have offered himself, representing to the jury that the disclosure "was not easy for Brian." To be charitable, there are two possibilities. One is that Plaintiff's counsel was conveying information

his client had told him.  The other is that he was expressing his own personal belief about what the evidence would have shown.  Whichever of those is true, the point conveyed by the argument— that Mr. Bell was emotionally harmed by having to prove his case—was irrelevant and inadmissible, and the way it was conveyed was improper.

> F.   The prejudice to O'Reilly was compounded still further by counsel's argument, unsupported in the trial record, that Bell had suffered, and continued to suffer, severe economic hardship.

In closing argument, Plaintiff's counsel told the jury this about Mr. Bell's economic loss:

> At O'Reilly, if he used his last salary at $827 per week, that's $118,000 that he would have earned at O'Reilly. You'll see a stipulation that the parties have agreed he actually made about $60,000 because he was working for most of that time just in lower paying jobs. So his lost wages are $57,000. Which hurt. You know, *they've maxed out credit cards and they're still digging out of that hole*, and so that's a real harm.

Tr. at 655:14-21.  Counsel for O'Reilly objected to this representation on the ground that it was not supported by the evidence.  Tr. at 659:10-23.  Plaintiff's counsel acknowledged that it was not in the record—it was "just argument."  Tr. at 661:18-21.

If there is any bedrock principle of trial conduct, though, it is that lawyers do not get to make up facts and call them "argument."  We are limited to the evidence.  *Gonzalez-Marin v. Equitable Life Assurance Soc'y of U.S.,* 845 F.2d 1140, 1147 (1st Cir. 1988); *United States v. Santana-Camacho,* 833 F.2d 371, 372-75 (1st Cir. 1987).  The Plaintiff's summation violated that bedrock principle.

This factually-baseless argument prejudiced O'Reilly in at least two ways.  Most importantly (as discussed Part G, below), it tied into the Plaintiff's argument that O'Reilly litigated in bad faith.  The jury was invited to believe that O'Reilly, through high-handed litigation tactics, had dragged out the litigation, prolonging the financial distress from which the Bells were "still

digging out."  It also created, with no support in the record, a basis for a jury to find the Plaintiff

"financially vulnerable"—a key element in the punitive damage calculus.  See *infra* page 30-31.

G. The cumulative impact of the erroneous instructions and improper argument, taken together, deprived O'Reilly of a fair trial.

Not all the improper argument was treated the same by the Court.  A curative instruction

was given concerning the most serious offense, with the Court informing the jury that every litigant

has a right to defend itself in court.  Tr. at 745:1-14.  No curative instructions were given with

respect to the others.

Although it is ordinarily presumed that curative instructions remedy the prejudice inflicted

by improper evidence or argument, that presumption may be overcome where "it appears probable

that, in a particular case, responsible jurors will not be able to put the [matter] to one side, and,

moreover, that [it] will likely be seriously prejudicial to the aggrieved party."  *United States v.*

*Sepulveda,* 15 F.3d 1161, 1185 (1st Cir. 1993).  This is such a case.

First, all the offending statements were made in summation.  It is widely believed that

jurors, like everyone else, tend to remember relatively vividly that which they have heard most

recently.  Silverglate, *Closing Argument,* TRIAL ADVOC. Q., at 28, 29 (Summer 2016) ("The

laws of primacy and recency tell us that people best remember what they hear first and last.").

Furthermore, because the offending statements came after the evidence was closed,

O'Reilly had no opportunity to present evidence refuting what counsel had argued.  And even if

there had been an opportunity to respond to the "bad faith" argument, how could O'Reilly have

replied?  In response to the Plaintiff's argument that O'Reilly's misconduct had occurred "a long

time ago," with the accompanying suggestion that the company's decision to "fight Brian" had

caused the case to drag on for years—even while the Bells were relentlessly "digging out of [the

financial] "hole" caused by Brian's termination—the logical response might have been to explain

that the case had already gone to trial once, and that O'Reilly had prevailed.  Such a response theoretically might have diluted the claim of "bad faith," but the parties had agreed, with the Court's blessing, not to mention the earlier trial.  Tr. at 11:12-15.  It would have been equally challenging to respond to the claim that Mr. Bell was harmed by having his therapy records "subpoenaed," and having to see them "put up in public."  That argument put O'Reilly's counsel in the impossible position of having to defend his handling of the litigation—presumably by trying to explain (without any basis whatsoever in the trial record) how disability discrimination lawsuits invariably are litigated, including the fact that the disclosure of private medical and mental health records is unavoidable in every such case.

Finally, the prejudice to O'Reilly was compounded by the fact that all three improper arguments were calculated to focus the jury's attention not on what happened during Bell's employment, but instead on how O'Reilly litigated the case, and the ways that supposedly harmed the Plaintiff.  All told, Plaintiff's summation conveyed to the jury (1) that O'Reilly had deliberately withheld the evidence possessed by a witness whose testimony would harm the company; (2) that O'Reilly had litigated in bad faith, unreasonably demanding that Bell produce confidential therapy records and then callously embarrassing him in a public forum; and (3) that O'Reilly had caused the case to drag on for years, while the Bells continued to suffer the long-term financial consequences of Brian's separation.  None of these arguments went to the merits of the case.  They were all aimed at painting O'Reilly as a villain in a David vs. Goliath battle. Because the improper arguments were intertwined, giving a curative instruction as to one could not cure the aggregate prejudice produced by all three.

H.     The jury's award of punitive damages is against the weight of the evidence

i.     The legal standard

The First Circuit has explained that in an action under the ADA or the MHRA, the behavior that must be proved to support a punitive damage claim is identical: "[M]alice and reckless indifference concern, not the employer's awareness that it is discriminating, but the employer's knowledge that it is acting in violation of federal law." *Burnett v. Ocean Properties, Ltd.*, 987 F.3d 57, 69 (1st Cir. 2021) (quotation marks omitted)).   A plaintiff must prove that a person in the "upper management" of a corporate defendant knew of and approved discriminatory conduct "in the face of a perceived risk that its actions will violate federal law." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999)). "Punitive damages depend not on the egregiousness of the defendant's misconduct, or its callousness in denying reasonable accommodation, but instead run from a culpable state of mind regarding whether that denial of accommodation violates federal law." *Gile v. United Airlines, Inc.*, 213 F.3d 365, 375 (7th Cir. 2000).

Proof that an employer misunderstood its legal obligations will not satisfy this standard. In *Gile*, *supra,* the Court reversed an award of punitive damages based on an employer's failure to accommodate an employee who suffered from chronic depression, insomnia, and anxiety, which her therapist linked to her work on the night shift.  Her employer's in-house doctor characterized her illness as "nonoccupational" (ignoring conversations with and letters from her doctor, who was clear about the fact that the illnesses were "directly related to . . . working the night shift"), told her she should "resign and stay home" if she was unhappy, and took no action to assist her in her efforts to find a suitable accommodation consistent with her disabilities, all of which resulted in her being placed on unpaid leave.  At trial, a jury awarded $200,000 in compensatory damages and $500,000 in punitive damages.  The Court of Appeals affirmed the compensatory award, but

reversed the punitive award, reasoning that "United's failure to accommodate Gile's disability amounted to negligence because it misunderstood Gile's difficulties, did not regard her condition a disability and neglected to pursue Gile in developing an alternative accommodation." *Id.* at 375-76. The Court concluded: "Although United wrongly believed that Gile was not disabled under the ADA and did not adequately address her accommodation request, United did not exhibit the requisite reckless state of mind regarding whether its treatment of Gile violated the ADA." *Id.* at 376; *see E.E.O.C. v. Mid-Continent Sec. Agency, Inc.,* 2000 WL 1793084, at *8 (N.D. Ill. Dec. 5, 2000) ("Negligence is not sufficient to entitle a plaintiff to punitive damages.").

> ii.     The weight of the evidence

There was not substantial evidence adduced at trial supporting the proposition that O'Reilly violated Bell's rights with malice or reckless indifference. The evidence demonstrates, instead, honest disagreements about (1) what Bell's job required, and (2) who was responsible for eliciting information about Bell's health, in carrying out the interactive process.

The jury could have found O'Reilly liable on two theories. They might have concluded: (1) that the scheduling expectation O'Reilly had of all its store managers was an essential function, but it was an expectation Bell would have been able to fulfill with a reasonable accommodation, and O'Reilly was wrong to believe otherwise; or that (2) that the scheduling expectation was not an essential function of Bell's position, and O'Reilly's failure to engage in good faith in the interactive process—specifically, its insistence on having a revised Fitness for Duty Form[6]—

---

[6] Christopher Watters agreed with the proposition that "the whole store manager position ultimately just came down to he didn't get a note." Tr. at 169:3-8. Sherri Jones testified that she understood Plaintiff "was going to provide another doctor's note, and then my understanding is that the decision was made for him not to return." (Tr. at 317:6-8.) Specifically, Ms. Jones recalled her conversation with Plaintiff in which "[h]e stated that he would go back to his doctor . . . and will provide a new Fitness for Duty Form and try to get specifics on the amount of time that he needs off during the day." Tr. at 333:9-12. Nicholas Thomas testified that he was "waiting to get an updated form that we may or may not be able to accommodate at that point in time . . . . So we would not have filled [the Store Manager] position while that process was still going on." Tr. at 597:11-13, 17-18.

prevented the parties from finding a reasonable accommodation that was preferable to the one the company actually offered (a job as an assistant manager, at a rate of pay Bell found inadequate).

If the jury found for the Plaintiff on the first ground, then the relevant question, for purposes of the punitive damages calculus, is whether O'Reilly's belief that Bell could not do the job with the accommodation he asked for was so clearly and unmistakably wrong that the company must have known it was wrong, but proceeded anyway "in the face of a perceived risk that its actions will violate [state or] federal law."  If the jury found for the Plaintiff on the second ground, then the relevant question becomes whether O'Reilly "perceived [a] risk" that its insistence on having a revised Fitness for Duty Form violated state or federal law.

The answer to both questions is no.  It is hard to conceive of a situation where an employer could be said to have "perceived [a] risk that its actions will violate [state or] federal law," where it has done nothing more than insist a manager do what it has always required all its managers to do, in every store throughout the country.  That is especially true in light of First Circuit precedent, which tells us that "an employer's determination that a job requirement is essential, while not definitive, is afforded 'substantial weight.'" *Ward*, 209 F. 3d at 34.

Furthermore, the fact that the first trial ended in a defense verdict provides powerful support for the notion that O'Reilly had a good faith basis for believing that its conduct comported with the ADA and the MHRA.  How can an employer's conduct be benign enough to warrant a defense verdict in 2018, and so pernicious that it warrants an award of punitive damages in 2021?  After all, the conduct revealed at trial was the same – the only thing that changed was a jury instruction.

Insofar as the interactive process is concerned, it is routine for employers to require, and rely on, healthcare professionals' *documentation* of their employees' specific disabilities and their needs for accommodation. As Chris Watters explained, documentation is requested "[t]o keep it

from an HR standpoint to keep in his employee file. Tr. at 168:18-169:2. Nor is there anything wrong with insisting that an employee clarify an ambiguous doctor's note. *See Steffes v. Stepan Co.,* 144 F.3d 1070, 1071-73 (7th Cir. 1998) (where doctor's note supplied by employee said "[s]he has been advised to avoid chemical exposure [and] continue with bronchodilators and inhalant steroids," employer could insist on "a more comprehensive . . . letter" which "address[ed] the exposure issues [it had] legitimately raised," and employee's "fail[ure] to hold up her end of the interactive process by clarifying the extent of her medical restrictions" was fatal to her claim).

Perhaps the jury concluded that O'Reilly acted unreasonably by insisting that Bell provide a revised note from Judy Weitzel. They may have thought O'Reilly should have been content to have someone call her on the phone. But *if* that was the jury's basis for a finding that the ADA and MHRA were violated, it was hardly a conclusion so inevitable that O'Reilly must have "perceived [a] risk that its actions [would] violate federal law." There is *no* law that explicitly tells employers how to deal with this sort of impasse—where the employer asks for a note, and the employee says "call my doctor." If O'Reilly misjudged its obligation, it did so innocently, or at worst negligently.[7] In either case, the evidence does not support a finding of either malice or reckless indifference.[8]

---

[7] Again, the jury in the first trial found no flaw in the interactive process. The evidence on that issue, and the jury instruction, were the same at both trials.

[8] In closing argument, Plaintiff's counsel appeared to concede that Defendant's liability for punitive damages was not based on "intentional malice," but rather, a failure by its Human Resources Department to act proactively once it deemed Judy Weitzel's note insufficient: that although Christopher Watters would have agreed with a revised accommodation stating that Plaintiff could work more than 45 scheduled hours per week, he was "waiting on a [new] note" to that effect" (Tr. at 648:20-22); that after Plaintiff informed Sherri Jones that she should talk to Ms. Weitzel about his proposed accommodation if she had concerns, Ms. Jones simply failed to do so (Tr. at 649:16-19); and that after Plaintiff emailed Nick Thomas that he could work more than 45 scheduled hours, Mr. Thomas forwarded that email to Allison Rush and "no one did anything. No one called him. And that the sense I was getting is like, no, we're just waiting for a note. We don't have to do that, that's not part of our job is to just call Ms. Weitzel and have a five-minute phone conference" (Tr. at 650:8-14).

**Motion for Remittitur**

Finally, and in the alternative, the jury's punitive damage award is excessive and should be reduced. As a preliminary matter, O'Reilly observes that—in light of the First Circuit's decision in *Sony BMG Music Entertainment v. Tenenbaum*—it is unclear whether O'Reilly is entitled to assert *only* that the jury's punitive damage award was unconstitutionally excessive, or whether it must also contend that the punitive damage award violated state and federal common law.  660 F.3d 487, 489-90 (1st Cir. 2011) ("[T]he doctrine of constitutional avoidance requires consideration of common law remittitur before consideration of [the appellant's] due process challenge to the jury's award.").[9]  Nonetheless, as set forth below, remittitur of the punitive damage award is appropriate under either standard, as it is excessive both in violation of the Due Process Clause of the Fourteenth Amendment, and under state and federal common law.

A.     The punitive damage award is unconstitutionally excessive, in violation of the Due Process Clause

The Due Process Clause of the Fourteenth Amendment "prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 409 (2003).  In reviewing a jury's punitive damage award, a court "should presume[] that a plaintiff has been made whole by compensatory damages," and that punitive damages are proper only where the defendant's "culpability is so reprehensible to warrant the imposition of

---

[9] O'Reilly reads the First Circuit's opinion in *Sony* as limited to the discrete procedural posture of that case, rather than as a pronouncement that common law excessiveness claims must be brought alongside—and considered prior to—every due process claim.  *See Mercado-Berrios v. Cancel-Alegria*, 611 F.3d 18, 30 (1st Cir. 2010) ("Courts rarely apply the common law excessiveness standard to punitive damages awards these days, since aggrieved defendants now commonly invoke the arguably stricter due process standard.").  Nevertheless, to the extent this Court determines that the doctrine of constitutional avoidance requires a determination of the common law excessiveness issue, that issue is analyzed below.  Furthermore, although—analytically—*Sony*'s holding could be construed to require the common law excessiveness issue be addressed *first*, O'Reilly will first address its due process claim, as the common law excessiveness standard is largely "coextensive" with the due process standard.  *See Harris v. Soley*, 2000 ME 150, ¶ 35, 756 A.2d 499; *see also Mercado-Berrios*, 611 F.3d at 29-30 (in federal common law excessiveness analysis, generally applying the due process factors articulated below).

further sanctions to achieve punishment or deterrence." *Id.* "Fundamental to the due process analysis is whether the defendant received fair notice that the conduct in question was prohibited and what the potential penalty for engaging in that conduct could be." *Romano v. U-Haul Intern.*, 233 F.3d 655, 673 (1st Cir. 2000) (*citing BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996)).

In determining whether a defendant had requisite notice of a punitive damages award, the Supreme Court in *Gore* provided three "guideposts": (1) the degree of reprehensibility of the defendant's conduct; (2) "the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award"; and (3) the difference between the punitive damages award and any civil penalties authorized or imposed in comparable cases. *Gore*, 517 U.S. at 574-75. Here, the $750,000 punitive damage award—reviewed in light of these guideposts—is excessive, as the record demonstrates that the Defendant's conduct was not "reprehensible," and the award was disproportionate both to Plaintiff's harm and similar awards in other cases.

i.     The Degree of Reprehensibility

"Reprehensibility" has been described as the single most important factor in the punitive damages calculus. *State Farm*, 538 U.S. at 419 (citing *Gore*, 517 U.S. at 575). In considering the reprehensibility of a defendant's conduct, the Supreme Court has identified the following five factors as relevant: (1) whether the harm caused was physical, versus economic; (2) whether the defendant's conduct "evinced an indifference to or a reckless disregard of the health and safety of others"; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct involved repeated actions or was merely an isolated incident; and (5) whether the harm resulted from "intentional malice, trickery, or deceit, or mere accident." *State Farm*, 538 U.S. at 419. Here, most of the five factors are absent.

<u>Factors One and Two</u>

With respect to the first two factors, O'Reilly's conduct "did not result in physical injury to [Bell], nor did it evince an indifference to or reckless disregard for the health and safety of others." *See Thomas v. iStar Financial, Inc.*, 652 F.3d 141, 148 (2d Cir. 2011) (affirming remittitur of $1.6 million punitive damage award to $190,000, based in part on those grounds). O'Reilly's failure to accommodate Bell caused him no physical injury, and there is no evidence that his emotional distress "manifested itself in physical symptoms." *Compare Williams v. First Advantage LNS Screening Solutions Inc.*, 947 F.3d 735, 751 (11th Cir. 2020) (weighing the physical harm factor in plaintiff's favor because emotional distress caused "diminished appetite, insomnia, and headaches").

Indeed, emotional injury is generally insufficient to support a finding as to this first element. *See MacMillan v. Millenium Broadway Hotel*, 873 F. Supp. 2d 546, 566 (S.D.N.Y. 2012) (race discrimination: remitting $1 million award to $100,000 because the employer's conduct "did not result in physical injury to [the plaintiff or] evince an indifference to or reckless disregard for the health and safety of others"); *DeCurtis v. Upward Bound Intern., Inc.*, 2011 WL 4549412 at * 6 (S.D.N.Y. 2011) (sex discrimination and retaliation: award of more than $75,000 was not warranted because the plaintiff "did not suffer physical violence"); *Williams*, 947 F.3d at 751 (although the defendant credit reporting agency wrongfully identified the plaintiff as a criminal and the plaintiff "understandably suffered emotional distress," this fell "well short of proof that Defendant's conduct revealed an indifference to or reckless disregard for health and safety").

<u>Factors Three and Four</u>

As discussed above, although there is some record evidence that the Plaintiff was "financially vulnerable," Tr. at 412:10-17, the extent of that vulnerability was exaggerated in

closing argument.  The unsubstantiated assertion that the Bells "maxed out" their credit cards, and that they were still (six years later) "digging out" of a financial hole created by O'Reilly, is likely to have skewed the jury's assessment of the punitive damage calculus.

Furthermore, the fourth factor—whether the conduct involved repeated actions or was merely an isolated incident—weighs squarely in Defendant's favor.  Although the jury found that that O'Reilly failed to provide Bell with a reasonable accommodation in this instance, there is no evidence whatsoever to support a finding that this was anything more than an isolated incident. *See Mercado-Berrios v. Cancel-Alegria*, 611 F.3d 18, 30 (1st Cir. 2010) ("No other speech-based employment actions were taken against [the plaintiff], and there is no evidence that [the defendant] acted similarly against other employees."); *Wallace v. Poulos*, 861 F. Supp. 2d 587, 604 (D. Md. 2012) ("There is no evidence that [the defendants] had acted similarly on a prior occasion, making this an 'isolated incident,' a consideration that other courts have found highly persuasive when considering whether a punitive damages award violates due process.").

 Notably, though, there is reason to be concerned that the jury may have awarded the damages it did in order to punish O'Reilly for conduct that was not part of this case—and that was not based on any evidence whatsoever.  As explained above, Plaintiff's counsel argued that the jury should punish O'Reilly not just because it failed to accommodate Bell, but because it was taking a position that would, or could, harm "every store manager in all of the states."  Counsel invited the jury to "wonder," along with him, "how many store managers, since Brian brought this case, have gone through the same thing because this is O'Reilly's approach to these sorts of things."  Tr. at 741:5-14.

There is *no* record evidence to support Bell's claim that O'Reilly unlawfully denied a reasonable accommodation to "every store manager in all of the states"—or even *one* other store

manager.  And even if there had been such evidence, it would have been improper to refer to it—indeed, the suggestion that the jury should consider hypothetical cases of discrimination effectively circumvented the Court's pretrial order, ECF 224, deferring ruling on O'Reilly's Motion *in Limine* to exclude evidence of other complaints of employment discrimination.  In *State Farm, supra*, the plaintiff brought an action against his insurance company after it failed to settle a lawsuit brought against him by a third-party, and alleged that its decision to do so "was a result of a national scheme to meet corporate fiscal goals by capping payouts on claims company wide."  *Id.* at 413-15.  In concluding that the trial court improperly relied upon such out-of-state conduct in awarding punitive damages, the Court reasoned that "[a] defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business. Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of a reprehensibility analysis."  *Id.* at 422-23.  *See Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 797 (8th Cir. 2004) ("[I]t is crucial that a court focus on the conduct related to the plaintiff's claim rather than the conduct of the defendant in general. . . . Tying punitive damages to the harm actually suffered by the plaintiff prevents punishing defendants repeatedly for the same conduct: If a jury fails to confine its deliberations with respect to punitive damages to the specific harm suffered by the plaintiff and instead focuses on the conduct of the defendant in general, it may award exemplary damages for conduct that could be the subject of an independent lawsuit, resulting in a duplicative punitive damages award.").

Likewise here, by arguing that O'Reilly should be punished for "fighting [its] obligation to reasonably accommodate . . . every store manager in all of the states," Tr. at 741:5-6, Plaintiff's counsel invited the jury to "adjudicate the merits of [those other managers'] hypothetical [reasonable accommodation] claims against [O'Reilly] under the guise" of a punitive damages

award.  As in *State Farm*, the jury was invited to "award[ ] punitive damages to punish and deter conduct that bore no relation to [Plaintiff's] harm."  The punitive damages award should be remitted on that basis alone.  *See id.* at 422; *see also Gore*, 517 U.S. at 584-85 ("[I]n the absence of a . . . history of noncompliance with known statutory requirements, there is no basis for assuming that a more modest sanction would not have been sufficient.").

<u>The Fifth Factor</u>

Finally, the record demonstrates that Plaintiff's alleged harm did not result from "intentional malice, trickery, or deceit."  *Id.* at 419.  The evidence on this point is set forth above, at pages 25-27.  In brief, the record makes clear that O'Reilly's wrongdoing, as found by the jury, consisted of nothing other than (1) enforcing a job requirement it has uniformly applied to store managers throughout the country, or (2) insisting on a clear doctor's note.

Even if the jury was justified in finding that the handling of Plaintiff's accommodation request by Defendant's Human Resources Department was "recklessly indifferent" to his rights under the ADA and the MHRA—an assumption which, for the reasons set forth above, O'Reilly disputes—there is no evidence that anyone with decision-making authority "harbored [an] evil motive . . . or engaged in trickery or deceit."  Thus, although an argument can be made that O'Reilly's human resources procedures, as they existed in 2015, should "not be held up as a model for other employers," there is no basis for a finding that its conduct "[rose] to the level of maliciousness needed to justify" a punitive damage award approaching $750,000.  *Hines v. Grand Casino of Louisiana, L.L.C. – Tunica-Biloxi Indians*, 358 F. Supp. 2d 533, 552 (W.D. La. 2005).[10] In fact, on the discrete issue of reprehensibility, the first jury's finding that O'Reilly was not guilty

---

[10] In *Hines*, the Court found that an employer's failure to act on complaints of sexual harassment, and termination of the complaining employee for "neglect" of her job after she did not return to work, amounted to "reckless indifference," but did not warrant a punitive award of $170,000.

of disparate treatment or retaliation, ECF 101, should be treated as the law of the case, foreclosing any argument that it had a discriminatory motive for failing to accommodate Bell. *See White v. Ford Motor Co.*, 500 F.3d 963, 975 (9th Cir. 2007) (jury's factual finding in first trial was law of the case in second trial).

ii.   The Ratio Between Compensatory Damages and Punitive Damages

As set forth above, the second "guidepost" in determining whether a defendant had requisite notice of a punitive damage award is "the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award." *Gore*, 517 U.S. at 575. Although the Supreme Court first articulated this standard in its 1996 decision, *BMW of North America v. Gore*, the Court expanded upon it seven years later in *State Farm*, observing that "few awards exceeding a single-digit ratio between compensatory damages, to a significant degree, will satisfy due process. . . . Single-digit multipliers are more likely to comport with due process, while still achieving the . . . goals of deterrence and retribution, than awards with ratios in the range of 500 to 1."[11]  538 U.S. at 425.

Although the Court has "dismissed any simple, mathematical formula in favor of general inquiry into reasonableness," conduct that is "'particularly egregious'" and that "results in relatively low actual damages can support a higher ratio than conduct that is less reprehensible." *Romano*, 233 F.3d at 673. "[W]here the compensatory award is substantial, a ratio of punitive-to-compensatory damages larger than one-to-one may be unreasonable." *Mendez-Matos v. Municipality of Guaynabo*, 557 F.3d 36, 55 (1st Cir. 2009). For purposes of this analysis, both the

---

[11]  Accordingly, although the First Circuit deemed 19:1 and 10:1 compensatory-to-punitive damage ratios acceptable in *Romano v. U-Haul Int'l*, 233 F.3d 655, 673 (1st Cir. 2000) and *Davis v. Rennie*, 264 F.3d 86, 117 (1st Cir. 2001), respectively, it bears emphasis that both decisions were issued prior to the Supreme Court's clarification that "few awards exceeding a single-digit ratio between compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 425.

First and Fifth Circuits have characterized compensatory damage awards equal to or exceeding $35,000 and $50,000, respectively, as "substantial." *See id.* ("In this case, although [the plaintiff's $35,000] compensatory damages award was not excessive, it did amply compensate him . . . ."); *see also Bains LLC v. Arco Products Co., Div. of Atlantic Ridgefield Co.*, 405 F.3d 764, 776 (9th Cir. 2005) ("This is not a 'small amount' case because the economic damages were substantial— $50,000. The controlling Supreme Court authority therefore implies a punitive damages ceiling in this case of, at most, $450,000 (nine times the compensatory damages) . . . .")

On these grounds, without more, remittitur would be necessary here. Because the jury's compensatory damage award of $75,000 is not an "insubstantial" or "small" amount, a punitive damage award of more than $75,000—a one-to-one-ratio—is unreasonable. *See Mendez-Matos*, 557 F.3d at 55. This is especially true given that, as set out above, the reprehensibility analysis weighs heavily in Defendant's favor.

### iii. Sanctions for Comparable Conduct

Finally, "the difference between [Plaintiff's punitive damages award] and the civil penalties authorize or imposed in comparable cases" establish that Defendant did not have adequate notice it could face a $750,000 punitive damage award for the conduct at issue here. *Gore*, 517 U.S. at 575. In assessing this guidepost, the Supreme Court has requested reviewing courts to (A) "accord deference to legislative judgment about the appropriate sanction for the conduct at issue"; and (B) compare the award at issue with awards permitted in similar suits, Mendez-*Matos*, 557 F.3d at 55. Each category is addressed in turn.

<u>Legislative Judgments as to Appropriate Sanctions</u>

To determine the legislature's judgment as to the appropriate sanction in a given case, courts look to both statutory civil penalties as well as statutory damage caps. *See Romano*, 233

F.3d at 673 (a "punitive damages award that comports with a statutory cap provides strong evidence that a defendant's due process rights have not been violated"); *Bains*, 405 F.3d at 777 ("Comparing the award to the civil penalty authorized in Title VII for comparable harm suggests that Congress regards $300,000 as the highest appropriate amount in somewhat comparable cases.").

Here, the applicable statutory caps did not provide Defendant with adequate notice of the risk that it could be subject to a $750,000 punitive damage award.  As O'Reilly has argued, ECF 246 & 248, the aggregation of statutory caps is inconsistent with the policies articulated by Congress and the Maine Legislature, in enacting the ADA and the MHRA.  Where, as here, there was just a single course of conduct implicating essentially identical state and federal laws, O'Reilly could not have had notice that the sum of Plaintiff's compensatory and punitive damages might exceed a single statutory cap.

<u>Analogous Case Law</u>

Finally, a comparison between Defendant's conduct in this case and the conduct of defendants in similar cases demonstrate that the jury's $750,000 punitive damages award was excessive. *See Mendez-Matos*, 557 F.3d at 54 ("Although the [defendant's] conduct was reprehensible, it was not 'particularly egregious' in comparison to defendants' conduct in other cases supporting substantial punitive awards."); *see also Geuss*, 971 F. Supp. at 177 (in a reasonable accommodation case with notable factual similarities to the one at hand, reasoning that "[a] comparison with other employment discrimination cases in which $150,000 or more in punitive damages was awarded reveals that the defendants' conduct in those instances was far more reprehensible than was the situation here").

As the Southern District of New York recently observed, "In employment discrimination

cases, cases upholding punitive damages of $200,000 or more generally involve discriminatory or retaliatory termination resulting in severe financial vulnerability to plaintiff, repeated incidents of misconduct over a significant period of time, repeated failures to address complaints of discrimination, and/or deceit." *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 329 (S.D.N.Y. 2018) (quotation marks omitted).

Here, recognizing that reference to analogous cases is not always instructive "due to either differing factual circumstances or the existence of a statutory damages cap not present here," *see Thomas*, 652 F.3d at 149, review of other employment discrimination cases involving sizable punitive damage awards involve *significantly* more severe conduct than that of this case: *see, e.g Arrieta-Colon v. Wal-Mart Puerto Rico, Inc.*, 434 F.3d 75 (1st Cir. 2006) ($170,000 award of punitive damages was appropriate where plaintiff had penile implant that left him "with the appearance of a constant semi-erection" and he became the constant source of harassment and ridicule by his coworkers and supervisors, including a manager calling him "Viagra man," another manager made jokes about him over a warehouse intercom, and when he asked a third manager for a schedule shift, that manager mockingly told him "we are not here to make accommodations for anyone"); *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1 (1st Cir. 1999) ($420,000 award of punitive damages was reasonable where the plaintiff was diagnosed with carpal tunnel syndrome and her supervisor became "upset" by that diagnosis and its effect on the company's "spotless workers' compensation record"; "stridently" asserted that the plaintiff was malingering; "exerted pressure" on the plaintiff's doctor to alter his diagnosis; and "produced a videotape which misleadingly understated [plaintiff's] job-duty requirements"); *Dichner v. Liberty Travel*, 141 F.3d 24 (1st Cir. 1998) (where the plaintiff suffered from encephalopathic seizures and was denied employment when the defendant told her "I've seen your type before, and I have to tell you, I'm not sure this

isn't going to be a problem," such conduct "reflect[ed] egregious conduct, worthy of condemnation and crying out for deterrence," warranting a $75,000 award of punitive damages); *Toro Cotto v. LIga Puertorriquena Contra El Cancer*, 2007 WL 527661 (D.P.R. 2007) (holding that a $200,000 award of punitive damages was appropriate where the plaintiff, who suffered from fibromyalgia, chronic fatigue syndrome, and major depression, told her supervisor of that condition and their relationship "suddenly deteriorated"; her supervisor dismissed her condition as "silliness" and mocked her pain; and plaintiff was transferred with no explanation to a separate part of the building where she had to "climb stairs, carry heavy records, walk back and forth between departments, and push a cart to the library"); *Sprague v. United Airlines, Inc.*, 2002 WL 1803733 (D. Ma. 2002) (awarding $200,000 in punitive damages where the defendant offered the plaintiff a job as a line mechanic at Logan Airport and then withdrew the offer upon learning that the plaintiff was deaf);[12] *EEOC v. Autozone, Inc.*, 707 F.3d 824, 839 (7th Cir. 2013) (approving punitive damage award of $200,000—which the trial court had already remitted from $500,000—where the defendant's failure to accommodate caused the plaintiff "severe, and ultimately disabling, pain"; the defendant was "aware that [the plaintiff] suffered from a back injury but did not adequately accommodate his disability and required him to mop the floors anyway"; and the defendant's "dismissiveness of [the plaintiff's] health concerns occurred on multiple occasions and was not an isolated incident).

Given that, as described above, Plaintiff's theory of the case (as made plain by his closing argument) was that Defendant failed to provide him a reasonable accommodation and/or failed to engage in the interactive process because his request slipped through the company's cracks and

---

[12] Notably, the plaintiff's theory of relief in *Sprague* largely reflects Plaintiff's theory in this case: that United Airlines "refus[ed] to engage [him] in a genuine interactive process or to entertain with any degree of seriousness the possibility of reasonable accommodations to his disability." 2002 WL 1803733 at *23.  Thus, in this case, even crediting "[P]laintiff's version of events," as the Court must, *Casillas-Diaz v. Palau*, 463 F.3d 77, 85 (1st Cir. 2006), Defendant respectfully submits that even a $200,000 punitive damage award as entered in *Sprague* is more appropriate than the $750,000 award entered here.

"no one did anything," review of the these "similar cases" demonstrates that the punitive damage award here was "grossly excessive," in violation of the Due Process Clause.

> **B.**      The punitive damage award is excessive under state and federal common law

Finally, should this Court determine that it must adhere to the doctrine of constitutional avoidance and address O'Reilly's excessiveness claim under the federal and state common law, such an analysis would lead to the same conclusion set out above: that the jury's $750,000 punitive damage award was "grossly excessive."  Because jurisdiction in this case is based on diversity of citizenship and federal question—and because the jury awarded punitive damages after finding that O'Reilly violated both state and federal law—the propriety of that award is an issue of both state and federal common law.  *See Shannon v. Sasseville*, 684 F. Supp. 2d 169, 173 (D. Me. 2010); *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278 (1989); *Mercado-Berrios*, 611 F.3d at 28.

Pursuant to Maine law, a fact-finder "must weigh 'all relevant aggravating and mitigating factors' presented by the parties, including the egregiousness of the defendants' conduct, the ability of the defendant to pay such an award, and any criminal punishment imposed by the conduction in question."  *Tuttle v. Raymond*, 494 A.2d 1353, 1359 (Me. 1985).  "If the fact finder awards punitive damages that are excessive in light of the relevant factors," a court may intervene.  *Id.*  As the Law Court has observed, "several of those factors are coextensive" with the *BMW* guideposts. *Harris v. Soley*, 2000 ME 150, ¶ 35, 756 A.2d 499.  Likewise, under federal common law, a punitive damage award must be reduced or set aside where it is "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand."  *Mercado-Berrios*, 611 F.3d at 29 (cleaned up).  In applying this standard, the First Circuit in *Mercado-Berrios* (*Lipez, J.*) applied several of the *BMW* "guideposts."  *See id.* at 30.

As with the due process standard,[13] O'Reilly respectfully submits that the jury's $750,000 punitive damage award violates the state and federal common law excessiveness standard.  As set out above, there is no evidence that this was more than an "isolated incident," *id.*, nor that O'Reilly's actions reflected "intentional malice, trickery, or deceit." Rather, the evidence—both viewed as a whole and as reflected by the closing argument by Plaintiff's counsel—demonstrated that O'Reilly's liability was based merely upon its failure to act proactively once it deemed Judy Weitzel's note insufficient.  (Tr. at 648:20-22, 649:16-19, 650:8-14.)  Because O'Reilly's conduct is therefore insufficiently "egregious" to justify this "grossly excessive"| punitive damage award, such that it would be a "denial of justice to permit it to stand," *Tuttle*, 494 A.2d at 1359; *Mercado-Berrios*, 611 F.3d at 29, undersigned counsel respectfully requests that the punitive damage award be set aside or, in the alternative, significantly reduced.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that this Court order a new trial or, in the alternative, set aside or reduce the jury's punitive damage award.

DATED at Portland, Maine this 12th day of April, 2022.

/s/ Christopher C. Taintor
Christopher C. Taintor, Esq.
Trevor D. Savage, Esq.
*Attorneys for Defendant O'Reilly Auto Enterprises,*
*LLC d/b/a O'Reilly Auto Parts*

Norman, Hanson & DeTroy, LLC
Two Canal Plaza
P.O. Box 4600
Portland, ME   04112-4600
207.774.7000
ctaintor@nhdlaw.com
tsavage@nhdlaw.com

---

[13] O'Reilly hereby incorporates the arguments made regarding the due process standard on pages 28-39, above, as equally applicable to the instant state and federal common law analysis.

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2022, I electronically filed the above Motion for New Trial or for Remittitur with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Trevor D. Savage
*Attorney for Defendant O'Reilly Auto Enterprises,*
*LLC d/b/a O'Reilly Auto Parts*

Norman, Hanson & DeTroy, LLC
Two Canal Plaza
P.O. Box 4600
Portland, ME   04112-4600
207.774.7000
tsavage@nhdlaw.com