## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| BRIAN BELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   1:16-cv-00501-JDL |
| | ) |
| O'REILLY AUTO ENTERPRISES, | ) |
| LLC, d/b/a O'REILLY AUTO | ) |
| PARTS, | ) |
| | ) |
| Defendant. | ) |

## ORDER ON DEFENDANT'S MOTION FOR A NEW TRIAL OR REMITTITUR

As the manager at the O'Reilly Auto Parts store in Belfast, Brian Bell began to work additional hours after two relatively senior employees unexpectedly quit. After several weeks, he experienced on June 4, 2015, what his psychiatric nurse practitioner described as a "meltdown." Bell had previously been diagnosed with major depressive disorder, Tourette syndrome, and attention-deficit/hyperactivity disorder. After his mental-health crisis, Bell proposed to O'Reilly Auto a scheduling accommodation described in a note from his psychiatric nurse practitioner that would have limited his weekly scheduled hours. O'Reilly Auto ultimately prevented Bell from returning to work, declined Bell's accommodation request, and terminated his employment. Bell then brought this action (ECF No. 4), asserting claims of disability discrimination under the Americans with Disabilities Act ("ADA") and the Maine Human Rights Act ("MHRA").

At the July 2018 trial, the jury found (ECF No. 101) in favor of O'Reilly Auto on Bell's claims of disability discrimination, failure to accommodate, and unlawful retaliation.  On appeal, the First Circuit remanded for a new trial solely on the failure-to-accommodate claim due to an instructional error.  *Bell v. O'Reilly Auto Enters.*, 972 F.3d 21, 24-25 (1st Cir. 2020).  The second trial in October 2021 consisted of two phases.  At the end of the first phase, which focused on liability, backpay, and compensatory damages, the jury found (ECF No. 234) that O'Reilly Auto had violated Bell's right to a reasonable accommodation under both the ADA and MHRA, and it awarded $42,000 in backpay and $75,000 in compensatory damages.  At the conclusion of the second phase, which focused on punitive damages, the jury found (ECF No. 235) that O'Reilly Auto had violated the ADA and MHRA with malice or reckless indifference, and it awarded Bell an additional $750,000.

O'Reilly Auto moves (ECF No. 262) for a new trial or, in the alternative, for a reduction of the punitive award on common-law or constitutional grounds. *See* Fed. R. Civ. P. 59.  For the reasons that follow, I deny the motion.

## I.  LEGAL ANALYSIS

### A.    Jury Instructions

O'Reilly Auto contends that the jury instructions contained three errors. First, the jury should have been instructed not to second-guess O'Reilly Auto's business judgments.  Second, the instructions should have stated that an unpredictable work schedule is not a reasonable accommodation.  Third, the phrase "good faith" should have been defined in keeping with case law cited by

O'Reilly Auto.  After reviewing the relevant legal standards, I conclude that none of these purported errors merit a new trial.

### 1. Standards

Federal Rule of Civil Procedure 59(a) "authorizes a district court to override a jury verdict and order a new trial 'if the verdict is against the law, against the weight of the credible evidence, or tantamount to a miscarriage of justice.'" *Teixeira v. Town of Coventry ex rel. Przybyla*, 882 F.3d 13, 16 (1st Cir. 2018) (quoting *Casillas-Díaz v. Palau*, 463 F.3d 77, 81 (1st Cir. 2006)).  "A verdict that results from prejudicial error in jury instructions is a verdict that is against the law . . . ." *Id.*

"Where 'a party assigns error to the failure to give a requested instruction, the threshold inquiry is whether the requested instruction was correct as a matter of law.'" *Franchina v. City of Providence*, 881 F.3d 32, 55 (1st Cir. 2018) (quoting *Shervin v. Partners Healthcare Sys., Inc.*, 804 F.3d 23, 47 (1st Cir. 2015)).  "If that threshold is met, the challenger must make two subsequent showings: first that the proposed instruction is 'not substantially incorporated into the charge as rendered' and second that it is 'integral to an important point in the case.'" *Id.* at 55-56 (quoting *White v. N.H. Dep't of Corr.*, 221 F.3d 254, 263 (1st Cir. 2000)).

However, a trial court's "choice of language is largely a matter of discretion" if that language sufficiently covers a litigant's theory of the case. *United States v. DeStefano*, 59 F.3d 1, 2 (1st Cir. 1995).  "[T]rial courts must be accorded substantial latitude about how to distill complicated legal concepts

into language that jurors will understand." *Shervin*, 804 F.3d at 48. The wording selected by a court will not require a new trial if "the instruction 'adequately illuminated the law applicable to the controverted issues in the case without unduly complicating matters or misleading the jury.'" *Id.* at 47 (alteration omitted) (quoting *Testa v. Wal-Mart Stores, Inc.*, 144 F.3d 173, 175 (1st Cir. 1998)). Trial courts also have discretion over whether to define words contained in jury instructions. *Ciolino v. Gikas*, 861 F.3d 296, 301 (1st Cir. 2017).

Unpreserved claims of instructional error are reviewed for plain error. *Rodríguez-Valentin v. Drs.' Ctr. Hosp. (Manati), Inc.*, 27 F.4th 14, 23 (1st Cir. 2022); *see also* Fed. R. Civ. P. 51(d)(2) ("A court may consider a plain error in the instructions that has not been preserved as required by Rule 51(d)(1) if the error affects substantial rights."). "To demonstrate plain error, the party advancing the claim of error must establish '(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings.'" *Lestage v. Coloplast Corp.*, 982 F.3d 37, 45 (1st Cir. 2020) (quoting *Teixeira*, 882 F.3d at 18). The plain-error hurdle is high, and "[n]owhere is this hurdle higher than in instances in which an appellant relies on a claim of instructional error." *Teixeira*, 882 F.3d at 18.

### 2. Instruction on Deference to Employer's Judgment

O'Reilly Auto asserts that the jury should have been instructed not to question O'Reilly Auto's business judgments when deciding the essential

functions of the store manager position.  More specifically, O'Reilly Auto assigns error to my decision not to instruct the jury as follows:

> The inquiry into essential functions is not intended to second-guess an employer's business judgment with regard to production standards.  An employer is not required to make an accommodation which would have the effect of lowering its standards, insofar as the quality and quantity of the work of its employees is concerned.

ECF No. 209 at 5 (O'Reilly Auto's Proposed Jury Instructions).

I declined to provide that instruction, concluding that it was "adequately covered" by other instructions that I would give and that "this additional commentary is not needed and would add unnecessary complexity."  ECF No. 254 at 3:15-18.  In particular, the existing instructions substantially covered these points by inviting the jury to consider O'Reilly Auto's stated judgment along with other evidence illuminating whether that stated judgment was sincerely grounded in the realities of the workplace:

> To decide what the essential functions of a job are, you may consider the following factors: (1) The employer's judgment as to which functions of the job are essential; (2) written job descriptions; (3) the amount of time spent on the job performing the function in question; (4) consequences of not requiring the person to perform the function; (5) the work experience of people who have held the job; (6) the current work experience of people in similar jobs; (7) whether the reason the position exists is to perform the function; (8) whether there are a limited number of employees available among whom the performance of the function can be distributed; and (9) whether the function is highly specialized and the individual in the position was hired for his or her expertise or ability to perform the function.  No one factor is necessarily controlling.  You should consider all of the evidence in deciding whether a job function is essential.

The First Circuit has observed that courts "generally give substantial weight to the employer's view of job requirements in the absence of evidence of discriminatory animus," *Ward v. Mass. Health Rsch. Inst., Inc.*, 209 F.3d 29, 34 (1st Cir. 2000), and that a court's "inquiry into essential functions 'is not intended to second guess the employer or to require the employer to lower company standards,'" *Mulloy v. Acushnet Co.*, 460 F.3d 141, 147 (1st Cir. 2006) (quoting *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004)). Further, the Equal Employment Opportunity Commission's ("EEOC") interpretive guidance provides: "It is important to note that the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards, whether qualitative or quantitative, nor to require employers to lower such standards." 29 C.F.R. pt. 1630, app. (2022).

Yet the First Circuit has also cautioned that an employer's views are "only one factor in the analysis" and that other "fact-intensive considerations" matter, including "written job descriptions, consequences of not requiring the function, work experience of past incumbents, and work experience of current incumbents." *Ward*, 209 F.3d at 34 (citing 29 C.F.R. § 1630.2(n)(3) (1999)). Those additional factors are taken from an EEOC regulation, which also lists "[t]he amount of time spent on the job performing the function." 29 C.F.R. § 1630.2(n)(3)(iii) (2022). These further considerations "are not meant 'to enable courts to second-guess legitimate business judgments, but, rather, to ensure that an employer's asserted requirements are solidly anchored in the

realities of the workplace, not constructed out of whole cloth.'" *Sepúlveda-Vargas v. Caribbean Rests., LLC*, 888 F.3d 549, 553 (1st Cir. 2018) (quoting *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 25 (1st Cir. 2002)).  In other words, it is not "second-guessing an employer's legitimate business judgment" to apply these other factors to check whether an employer is "merely pay[ing] . . . lip service" to requirements "during litigation." *Benson v. Wal-Mart Stores E., L.P.*, 14 F.4th 13, 27 (1st Cir. 2021).

Deference to O'Reilly Auto's legitimate business judgments was thus substantially incorporated into the jury instructions as given because the jury was told to consider "[t]he employer's judgment as to which functions of the job are essential" along with the eight additional factors mentioned in the block quotation above.  The first five of the additional factors appear in the EEOC's list of relevant factors, *see* 29 C.F.R. § 1630.2(n)(3)(ii)-(iv), (vi)-(vii), and these factors help to elucidate an employer's legitimate business judgments without second-guessing them, *Sepúlveda-Vargas*, 888 F.3d at 553.  The final additional three factors are qualitatively similar to the previous five, and they were specifically requested by O'Reilly Auto in its Proposed Jury Instructions.  Indeed, O'Reilly Auto requested that the jury be instructed as to all the additional factors, none of which invited the jury to second-guess O'Reilly Auto's business judgment.

Given the evidence that the jury was asked to consider, the jury was sufficiently instructed on deference to O'Reilly Auto's legitimate business judgment.  And, because this point was substantially covered, excluding the

proposed instruction was an appropriate exercise of discretion over wording.

Again, O'Reilly Auto's proposed instruction was:

> The inquiry into essential functions is not intended to second-guess an employer's business judgment with regard to production standards. An employer is not required to make an accommodation which would have the effect of lowering its standards, insofar as the quality and quantity of the work of its employees is concerned.

ECF No. 209 at 5. The first sentence risked confusing the jury because it is phrased in terms of "production standards," but this case concerned Bell's attendance and availability–not his ability to satisfy a production standard. *See* 29 C.F.R. pt. 1630, app. (providing examples of production standards including typing 75 words per minute and cleaning 16 rooms per day). The second sentence was potentially confusing as well. It does not mention essential functions but rather states that an employer is not required to make "accommodation[s]" that lower standards. That statement makes sense only if one understands that accommodations that require employers to alter essential functions are not reasonable. *See Benson*, 14 F.4th at 27-28. Although that point was covered elsewhere in the instructions, this sentence could have confused the jury by skipping over an intermediate concept. The second sentence also assumed, without making clear, that the production standards at issue had already been determined to be an essential function.

### 3. Instruction on Unpredictable Schedules

O'Reilly Auto contends that I erred when I declined to instruct the jury that modified schedules are per se unreasonable when the employee's

attendance would be unpredictable.  The instruction at issue appeared in O'Reilly Auto's Proposed Jury Instructions:

> Under some circumstances, a reasonable accommodation may include a part-time or modified work schedule.  A change to an employee's work schedule may be a reasonable accommodation if it is specific and well-defined.  However, a scheduling modification which makes an employee's attendance at work erratic and unpredictable is not a reasonable accommodation.

ECF No. 209 at 4.  I instead instructed the jury that, "[b]y way of illustration, under federal and Maine law, a 'reasonable accommodation' may include . . . part-time or modified work schedules."

As Bell correctly argues and O'Reilly Auto does not dispute, this issue is subject to plain-error review because O'Reilly Auto did not object on the record and I did not provide a definitive ruling on the record.  *See* Fed. R. Civ. P. 51(d)(1)(B), (2).

O'Reilly Auto cites out-of-circuit authority in support of its proposed instruction and claims that no contrary First Circuit authority exists.  *See, e.g.*, *Crowell v. Denver Health and Hosp. Auth.*, 572 Fed. App'x 650, 659 (10th Cir. 2014) (unpublished) ("Although the ADA provides for part-time or modified work schedules as a reasonable accommodation, an unpredictable, flexible schedule that would permit [the employee] to leave work whenever she has a medical episode is unreasonable as a matter of law." (citations omitted)).  Bell responds that the proposed instruction is legally erroneous in light of the First Circuit's decision in *Ward*, 209 F.3d at 36.

In *Ward*, the First Circuit reversed a trial court's grant of summary judgment against an employee who had requested the accommodation of being

allowed to arrive late whenever his arthritis was flaring up.  209 F.3d at 31-32,
36.  The First Circuit observed that "[t]he ADA explicitly states that 'job
restructuring' and 'part-time or modified work schedules' are potential
reasonable accommodations."  *Id.* at 36 (quoting 42 U.S.C. § 12111(9) (2000)).
Because "[n]othing in that explicit language implies that a modified schedule
must be regular or predictable," the First Circuit rejected the employer's
argument that "as a matter of law, open-ended 'work when able' schedules are
not reasonable accommodations" and "decline[d] to hold that the flexible
schedule [the employee] proposes is per se unreasonable."  *Id.* at 36 & n.6.

Thus, O'Reilly Auto's proposed instruction, which was phrased without
qualification, was legally incorrect.  The decision not to give O'Reilly Auto's
proposed instruction that unpredictable schedules are always unreasonable
was not error, let alone plain error.

### 4.  Definition of "Good Faith"

O'Reilly Auto contends that I should have provided the jury with a
definition of the phrase "good faith" when I delineated the parties' obligations
to participate in the interactive process.  During the trial and well after the
deadline for the submission of proposed instructions, O'Reilly Auto proposed in
an email to the Court that the jury be instructed on the meaning of "good faith,"
explaining:

> First, the First Circuit has made clear that "[o]nce an
> accommodation is properly requested, the responsibility for
> fashioning a reasonable accommodation is shared between the
> employee and employer.["]  *Jacques v. Clean-Up Group, Inc.*, 96
> F.3d 506, 514 (1st Cir. 1996).  As such, the "interactive process is

triggered only after [the] employer makes [the] threshold determination that [the] disabled employee may be accommodated." *Id.* (citing *White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir. 1995)).  Once the employer has determined that the disabled employee may be accommodated, the "employee's request for reasonable accommodation requires a great deal of communication." *Tobin v. L[i]berty Mutual Ins. Co.*, 433 F.3d 100, 109 (1st Cir. 2005).

However, "this does not mean that the employer has the unreasonable burden of raising and discussing every conceivable accommodation with the disabled employee." *Id.* Rather, the interactive process "requires open communication by both parties, and an employer will not be held liable if it makes reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed." *Enica v. Principi*, 544 F.3d 328, 339 (1st Cir. 2008) (quotation marks omitted).  Put differently:

> Neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability.  Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary.  A party that obstructs or delays the interactive process is not acting in good faith.  A party that fails to communicate, by way of initiation or response, may also be acting in bad faith.  In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility. . . .  Where the missing information is of the type that can be provided by one of the parties, failure to provide the information may be the cause of the breakdown and the party withholding the information may be found to have obstructed the process.[]

*Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135-36 (7th Cir. 1996).

ECF No. 262-1.  I declined to instruct the jury as to the definition of "good faith" because no clear definition existed in the First Circuit's case law on the

interactive process and it "is a term of common usage."  ECF No. 254 at 6:1.

O'Reilly Auto then specifically objected to the instruction's failure to define

"good faith" for the jury using the language from *Enica v. Principi*, 544 F.3d

328, 339 (1st Cir. 2008), and *Beck v. University of Wisconsin Board of Regents*,

75 F.3d 1130, 1135-36 (7th Cir. 1996), that was provided in the email.

O'Reilly Auto now argues I should have provided the jury with as clear

and detailed of a definition as possible.  Bell counters that it would have been

impractical to define "good faith" because the term is subjective.

A trial court "permissibly exercise[s] its discretion by declining to provide

a definition" of words or phrases that are not "outside of an ordinary juror's

understanding."  *Ciolino*, 861 F.3d at 301 (alteration omitted) (quoting *United

States v. Fulmer*, 108 F.3d 1486, 1495 (1st Cir. 1997)) (concluding there was no

abuse of discretion in declining to define "incited"); *accord United States v.

Sabetta*, 373 F.3d 75, 81-82 (1st Cir. 2004) ("[T]his circuit has generally held

that terms a reasonable jury can understand do not need further definition. . . .

The term 'knowingly,' as it was used in this jury instruction, could reasonably

have been understood by a lay jury and further definition of the term was

unnecessary."); *United States v. Rule Indus., Inc.*, 878 F.2d 535, 544 (1st Cir.

1989) ("[W]ords familiar to persons of ordinary intelligence do not require

definition." (quoting 9C Charles Alan Wright & Arthur R. Miller, *Federal

Practice and Procedure* § 2556 (1971))).

"Good faith" is a common phrase that an ordinary juror would

understand to mean "honesty or lawfulness of purpose."  *Good faith*, Merriam-

Webster            Dictionary            Online,            https://www.merriam-
webster.com/dictionary/good%20faith (last visited September 2, 2022).  Jurors
can reasonably be expected to understand the meaning of "good faith."
Providing the gloss on that phrase that O'Reilly Auto requested would have
been counterproductive because "attempts to clarify inherently nebulous
concepts can do more harm than good."  *United States v. Prigmore*, 243 F.3d 1,
17 (1st Cir. 2001).  Additionally, O'Reilly Auto never provided a concrete
definition of "good faith"; instead, it offered three paragraphs of quotations.
"[W]hen the instruction offered by the lawyer is manifestly overbroad, the
district judge may reject without assuming the burden of editing it down to save
some small portion that may be viable."  *Parker v. City of Nashua*, 76 F.3d 9, 12
(1st Cir. 1996); *see also* 9C Charles Alan Wright & Arthur R. Miller, *Federal
Practice and Procedure* § 2556 (3d ed. 2022) ("[I]t generally is not helpful to take
quotations from the opinions of appellate courts, never intended to be used as
instructions to juries, and make these a part of the charge.").

## B.    Improper Argument

O'Reilly Auto next submits that Bell's attorney made three arguments
that each merit a new trial.  First, during the closing arguments for phase 1 of
the trial, Bell's attorney made a "missing-witness" argument, asserting that
O'Reilly Auto did not call the current manager of the Belfast store because that
individual would have said that Bell's requested accommodation was
reasonable.  Second, at the end of phase 2 of the trial, Bell's attorney told the
jury that O'Reilly Auto's litigation efforts were evidence of the absence of good

faith. Third, during the closing arguments for phase 1, Bell's attorney made a statement that was inconsistent with the evidence. After reviewing the relevant legal standards, I conclude that none of these arguments merit a new trial. Finally, I address O'Reilly Auto's theory that the cumulative effect of these arguments necessitates a new trial. The purported errors, viewed individually or cumulatively, do not merit a new trial.

### 1. Standard

Again, Rule 59(a) authorizes a district court to override a jury verdict and order a new trial if the verdict is against the law, against the weight of the credible evidence, or tantamount to a miscarriage of justice. *Teixeira*, 882 F.3d at 16. Improper argument warrants a new trial if the complaining party was prejudiced, *see Fonten Corp. v. Ocean Spray Cranberries, Inc.*, 469 F.3d 18, 22 (1st Cir. 2006), which depends on "the effect of counsel's comment" under the totality of the circumstances, *Burnett v. Ocean Props., Ltd.*, 987 F.3d 57, 75 (1st Cir. 2021). Factors relevant to the totality of the circumstances include: "(1) the nature of the comments; (2) their frequency; (3) their possible relevance to the real issues before the jury; (4) the manner in which the parties and the court treated the comments; (5) the strength of the case; and (6) the verdict itself." *Granfield v. CSX Transp., Inc.*, 597 F.3d 474, 490 (1st Cir. 2010). "The district court has considerable discretion in supervising attorneys' remarks during closing argument." *Gonzalez-Marin v. Equitable Life Assurance Soc'y of U.S.*, 845 F.2d 1140, 1147 (1st Cir. 1988).

### 2. Missing-Witness Argument

During his closing argument at the end of the first phase of the trial on liability, backpay, and compensatory damages, Bell's attorney suggested that O'Reilly Auto had not called the current Belfast store manager as a witness because that individual would have agreed that Bell's proposed scheduling accommodation was reasonable:

> And I think it's interesting that other than [Bell] who else would know whether this schedule, this accommodation would work? How about the Belfast store manager right now? Or—they are an O'Reilly employee. They could have brought him in. They could have put him on the stand. It would have been interesting to see what they would have said. But O'Reilly didn't call him. And the reason that they didn't call them is that they would have said the same thing as [Bell], that this would have worked. If they had given him a chance, [Bell] could have done the job.

ECF No. 254 at 19:12-22. In response, O'Reilly Auto requested that I instruct the jury to disregard this argument. I declined to give that instruction, concluding that there was "nothing that occurred during the course of the case that would have prevented O'Reilly from calling the individual in that position" and, as such, the argument was not unfair. ECF No. 254 at 35:25-36:2.

O'Reilly Auto urges that I follow Fifth Circuit precedent, which it characterizes as holding that missing-witness arguments are improper in civil cases. *See Herbert v. Wal-Mart Stores, Inc.*, 911 F.2d 1044, 1048 (5th Cir. 1990). In the alternative, O'Reilly Auto argues that I should conclude that Bell failed to lay the necessary evidentiary foundation for a missing-witness argument. O'Reilly Auto contends that it was prejudiced by the missing-witness argument because the argument impugned the credibility of the company and its lawyers

by creating the impression that O'Reilly Auto withheld the current store manager to avoid damaging testimony. Bell responds that the missing-witness argument was appropriate under the circumstances.

As recently as 2010, the First Circuit recognized that, "[a]lthough far more common in criminal cases, a missing witness instruction may be given in a civil case as well." *Latin Am. Music Co. v. Am. Soc'y of Composers Authors & Publishers*, 593 F.3d 95, 101 (1st Cir. 2010) (footnote omitted). "The instruction informs the jury that a party's failure to produce a particular witness may justify the inference that the witness' testimony would have been unfavorable to that party." *Id.* "The instruction, however, should only be given where 'the witness is either actually unavailable to the party seeking the instruction or so obviously partial to the other side that the witness though technically available is deemed to be legally unavailable.'" *Id.* at 102 (alteration omitted) (quoting *United States v. Perez*, 299 F.3d 1, 3 (1st Cir. 2002)). "When deciding whether to issue a missing witness instruction the 'court must consider the explanation (if any) for the witness's absence and whether the witness, if called, would be likely to provide relevant, non-cumulative testimony.'" *Id.* (quoting *Perez*, 299 F.3d at 3). The same considerations apply in determining whether arguments about missing witnesses are proper. *See United States v. Aboshady*, 951 F.3d 1, 10 (1st Cir. 2020) ("[A]n 'attorney may not argue that the jury should draw an inference against an opponent where the opponent does not present witnesses that are available to both parties.'" (alterations omitted) (quoting *United States v. Jiménez-Torres*, 435 F.3d 3, 12 (1st Cir. 2006))); *Hrichak v.*

16

*Pion*, 522 F. Supp. 2d 283, 290 n.4 (D. Me. 2007); *Steinhilber v. McCarthy*, 26 F. Supp. 2d 265, 280-81 (D. Mass. 1998).

Bell is correct that "[t]he 'employer-employee relationship is recognized as one creating practical unavailability' due to the economic ties of the employee to his employer." *Steinhilber*, 26 F. Supp. 2d at 281 (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 659-660 (11th Cir. 1988)); *accord Grajales-Romero v. Am. Airlines, Inc.*, 194 F.3d 288, 298 (1st Cir. 1999) (concluding that employment status was "ample evidence" that a missing witness was favorably disposed to his employer). In addition, as Bell contends, the current store manager's testimony about the reasonableness of a proposed accommodation for that same position at the same store would not be cumulative of the testimony of the other witnesses from O'Reilly Auto, who were all human resources staff or more senior managers responsible for multiple stores. The evidence indicated that O'Reilly Auto hired a replacement for Bell several months after he left, and there was no evidence, and O'Reilly did not argue, that the Belfast store was without a manager at the time of the trial. Indeed, the opposite inference is supported by Regional Manager Nicholas Thomas's testimony that the Belfast store has become a profit center. For these reasons, Bell's missing-witness argument was proper.

Even if the missing-witness argument had been improper, the argument was not prejudicial and thus does not warrant a new trial under the totality of the circumstances. *See Burnett*, 987 F.3d at 76. "Although the nature of the comment spoke to a relevant trial issue"—the reasonableness of Bell's

requested accommodation—"the improper comment was brief" and singular.

*Id.* I instructed the jury at the start of the trial that "statements and arguments and questions by the lawyers are not evidence," ECF No. 251 at 20:19-20, and again after closing arguments that "arguments and statements by lawyers are not evidence," ECF No. 254 at 63:23-24. "[T]he . . . standard instructions that arguments by counsel are not evidence mitigated any prejudicial effect." *Burnett*, 987 F.3d at 76.

Additionally, assessing the evidence independently, the effect of the comment was minimal. As discussed in greater detail in Part II(C), there was essentially no dispute at trial as to whether the accommodation request that Bell described to the jury was reasonable; O'Reilly Auto's witnesses instead criticized the workability of different interpretations of Bell's request that he repeatedly disavowed. Thus, the missing-witness argument pertaining to the reasonableness of Bell's accommodation request very likely had no impact. Additionally, as also discussed in Part II(C), one of the ways that Bell could have succeeded on his failure-to-accommodate claim was to show that O'Reilly Auto violated a duty to engage in the interactive process in good faith, and success on this theory did not require a showing that Bell's accommodation request was reasonable, only that it would have been possible for the parties to identify a reasonable accommodation if O'Reilly Auto had engaged in good faith. The evidence in support of this alternative theory was strong, which further indicates that this missing-witness argument was not prejudicial. Finally, "the case does not appear to have been a close one in the eyes of the jury, which

returned a verdict in" less than an hour at the end of phase 1 of the trial.  *Prouty v. Thippanna*, 557 F. Supp. 3d 212, 216 (D. Mass. 2021).

### 3.  Argument That O'Reilly Auto Litigated in Bad Faith

After the jury returned a verdict for Bell on liability and awarded him backpay and compensatory damages, the parties presented arguments to the jury on punitive damages.  One topic that both parties addressed was O'Reilly Auto's affirmative defense to punitive damages that it engaged in a good-faith effort in consultation with Bell to identify and make a reasonable accommodation.  *See* 42 U.S.C.A. § 1981a(a)(3) (West 2022).[1]  Bell's counsel argued to the jury that O'Reilly Auto's litigation efforts were evidence of the absence of good faith:

> They did the opposite of act in good faith.  After [Bell] filed his court case, which is—that was a long time ago, O'Reilly could have looked into it, brought [Bell] back, tried to fix things, change their ways.  They did the opposite.  As you saw, they subpoenaed his therapy records and put them up in public in a way that was not easy for [Bell], but it's like this is the price you pay if you challenge us for violating your rights.  They fought him.  They insisted they did nothing wrong.  They brought witnesses in from all over to say that what they do is absolutely fine.

> Their position is that they're essentially exempt from these laws when it comes to store managers and salaried employees, that essentially for O'Reilly for these people they don't get the benefit of having these rights.

> And they aren't just fighting their obligation to accommodate [Bell], this is really every store manager in all of the states.  And I wonder how many store managers, since [Bell] brought his case, have gone through the same thing because this is O'Reilly's approach to these sorts of things.  And they're not just fighting [Bell].  I think it's clear that this is the company's

---

[1] That affirmative defense can apply to both punitive and compensatory damages, 42 U.S.C.A. § 1981a(a)(3), (b), but O'Reilly Auto pleaded it as to punitive damages only.

attempts to try—they're trying to say we can do this, this is okay, and today you already told them it's not okay, it violates the law.

ECF No. 254 at 113:14-114:14.

O'Reilly Auto objected to the suggestion that Bell should be awarded punitive damages for O'Reilly Auto's courtroom conduct or decision to litigate and conduct discovery. O'Reilly Auto requested a curative instruction informing the jury that it "has a perfect right to defend itself, and that nothing that happened in this courtroom was inappropriate or deserving of punitive damages." ECF No. 254 at 116:13-19.

I informed the parties that I would instruct the jury "that a party has a right to subpoena medical records in a case such as this, and to defend itself, and those acts—the defense of this case in the courtroom—should not be considered in determining punitive damage in this case." ECF No. 254 at 117:13-17. I asked O'Reilly Auto whether it had any problem with such an instruction, to which it responded, "No, that's fine, Your Honor." ECF No. 254 at 117:20. I then provided the following curative instruction:

> Members of the jury, it was just mentioned that—as part of the argument that there was reference made to the fact that Mr. Bell's medical records were subpoenaed and brought into court, and I want to instruct you that a party, including O'Reilly Auto in this case, a party has a right to subpoena medical records in preparation for its defense in a case such as this, and it has a right to come into court and defend itself, and so nothing that happened here in court as part of the trial should factor or be considered by–factored in or considered by you in determining whether to award punitive damages and, if so, in what amount, and that is my instruction to you.

ECF No. 254 at 118:1-14. O'Reilly Auto did not further object.

Notwithstanding the unobjected-to curative instruction, O'Reilly Auto now argues that Bell's counsel improperly conveyed to the jury that punitive damages should be awarded for the emotional harm that Bell suffered from having to litigate this case.   Bell argues that O'Reilly Auto waived any argument on this issue by acquiescing to the curative instruction and that, in any event, the curative instruction was sufficient.   Bell also emphasizes (and O'Reilly Auto does not dispute) that O'Reilly Auto's argument on this point must be construed as a request for a new trial solely on the question of punitive damages because liability, backpay, and compensatory damages had already been determined by the jury at the end of the first phase of the trial.

When an issue is "unmistakably on the table" and a party "'signif[ies] agreement that there was nothing objectionable,' the issue is waived."  *United States v. Simon*, 12 F.4th 1, 60 (1st Cir. 2021) (quoting *United States v. Soto*, 799 F.3d 68, 96 (1st Cir. 2015)).  "One application of this rule occurs when 'the district court informed the parties exactly how it was planning to instruct the jury' and 'sought their feedback,' with the result that a party's counsel 'affirmatively stated there was no objection' or 'remained silent.'"  *Id.* (alteration omitted) (quoting *Soto*, 799 F.3d at 96).  In such a case, "[a]ny claim that the instructions are inadequate is deemed waived."  *Id.*; *see also United States v. Charriez-Rolón*, 923 F.3d 45, 50, 53 (1st Cir. 2019) (holding that, when a party agreed to a curative instruction and then did not object before the jury deliberations, "[t]hat is waiver, pure and simple" on the issue of improper argument); *Goulet v. New Penn Motor Express, Inc.*, 512 F.3d 34, 40, 44 (1st Cir.

2008) (holding that a party had affirmatively waived any objection when counsel sought a supplementary jury instruction and then indicated it was satisfactory). Accordingly, O'Reilly Auto waived this issue when I informed O'Reilly Auto of the type of curative instruction I was inclined to provide, it approved, I delivered that instruction, and O'Reilly Auto remained silent.

Regardless, even under the standard of review for preserved objections, O'Reilly Auto was not prejudiced under the totality of the circumstances. The improper argument was of moderate length. But recall that O'Reilly Auto's theory is that this argument increased the punitive damages award. Although the argument did bear somewhat on reprehensibility and thus the amount of punitive damages the jury should award, it was primarily aimed at the separate issue of whether O'Reilly Auto had proven its affirmative defense of good-faith engagement in the interactive process. *See* 42 U.S.C.A. § 1981a(a)(3). Even the relevance to this affirmative defense was somewhat attenuated because O'Reilly Auto's good faith in choosing to litigate is a step removed from how it acted during the interactive process. Additionally, I provided a curative instruction that instructed the jury not to consider O'Reilly Auto's decision to litigate this case, exactly as O'Reilly Auto requested. The jury was specifically informed that O'Reilly Auto was within its rights to subpoena Bell's medical records. "The normal presumption is that a jury will follow a court's curative instruction." *Hatfield-Bermudez v. Aldanondo-Rivera*, 496 F.3d 51, 64 (1st Cir. 2007).

Under the totality of the circumstances, even if O'Reilly Auto's objection had not been waived, the curative instruction erased any prejudice to O'Reilly Auto.

### 4. Misstatement of the Evidence

During his closing argument at the end of the first phase of the trial, Bell's counsel told the jury that Bell and his wife "maxed out credit cards and they're still digging out of that hole" as a result of O'Reilly Auto's misconduct.[2] ECF No. 254 at 28:20-21.  O'Reilly Auto requested an instruction telling the jury to disregard the comment about the credit cards.  O'Reilly Auto argued that there had not been any testimony that Bell and his wife had maxed out their credit cards.  Bell conceded that there had been no evidence on this point.[3]

---

[2] Bell's attorney argued:

> So last I want to talk about [Bell's] harms and losses, which is really the reason we're here.  O'Reilly broke the law, they hurt somebody, and they need to be held accountable.  So, you'll see on the jury verdict form that if when you check yes that they violated [Bell's] rights they'll ask what do you award for lost wages?  Well, here is what—this isn't in dispute.  [Bell] was unemployed or underemployed for 143 weeks, from June of 2015 to March of 2018 when he finally got a job that paid as well.  At O'Reilly, if he used his last salary at $827 per week, that's $118,000 that he would have earned at O'Reilly.  You'll see a stipulation that the parties have agreed he actually made about $60,000 because he was working for most of that time just in lower paying jobs.  So his lost wages are $57,000.  Which hurt.  You know, they've maxed out credit cards and they're still digging out of that hole, and so that's a real harm.

ECF No. 254 at 28:4-21.

[3] O'Reilly Auto also asserted that the argument was improper because I had ruled that O'Reilly Auto could not introduce mitigating evidence about Bell's financial condition (i.e., the fact that Bell had received disability insurance benefits) unless Bell opened the door by putting his financial distress at issue.  On this second point, Bell correctly responded that I had subsequently ruled that Bell had opened the door.  Bell had also testified during his direct examination that he had received disability insurance benefits.

I denied O'Reilly Auto's request for a curative instruction because O'Reilly Auto would soon have the opportunity to respond to Bell's closing argument and it could rebut the arguments that Bell had made that were not supported by the trial evidence.

O'Reilly Auto argues that the credit card comment at the end of phase 1 prejudiced it in two ways that both manifested during the second phase of the trial on punitive damages. First, O'Reilly Auto contends that the credit card comment later amplified the harm from the argument (from phase 2) that O'Reilly Auto litigated this action in bad faith because, together, the two remarks suggest that O'Reilly Auto was using litigation tactics to prolong Bell's financial distress. Second, O'Reilly Auto argues that there was no other support in the record for the idea that Bell was financially vulnerable, a consideration that the jury was instructed to weigh when calculating punitive damages. Bell responds that the general instructions told the jury that lawyers' arguments are not evidence; O'Reilly Auto passed up the opportunity in its closing argument to remind the jury that there was no evidence that the Bells had maxed out their credit cards; and, overall, O'Reilly Auto was not prejudiced because there was other substantial evidence in the record establishing Bell's financial vulnerability.

Contrary to O'Reilly Auto's argument, the credit card comment was not prejudicial under the totality of the circumstances. The misstatement of the evidence by Bell's attorney constituted one sentence of a closing argument that spans twenty-two pages of the transcript. O'Reilly Auto had the opportunity to

respond to the argument by pointing out to the jury that there had been no testimony on maxing out credit cards, but it failed to do so. *See SEC v. Happ*, 392 F.3d 12, 27 (1st Cir. 2004) (noting that a factor weighing against prejudice is that a party's "counsel could have pointed out the error to the jury in the course of his own later closing argument, which he did not do"); *Correa-Carrillo v. Grupo HIMA San Pablo-Fajardo Inc.*, CIVIL NO. 17-2253, 2022 WL 939383, at *8 (D.P.R. Mar. 29, 2022) ("'[T]rials are adversarial processes in which things may be said which the other side regards as incorrect and sometimes offensive.' Though courts should 'intervene in instances of unfairness and impropriety,' such instances are usually dealt with 'through rebuttal by the opposing side.'" (alteration omitted) (citation omitted) (quoting *Mitchell v. Weaver*, 806 F.2d 300, 302 (1st Cir. 1986))).  Further, the jury was twice instructed that the attorneys' arguments are not evidence.  *See Burnett*, 987 F.3d at 76; *Wilson v. Town of Mendon*, 294 F.3d 1, 16 (1st Cir. 2002) ("Moreover, we are confident, that if there was any prejudice, it was cured by the court's admonition to the jury, both in its preliminary and concluding instructions, that the lawyers' statements and arguments were not to be considered as evidence.").

In addition, there was evidence presented at trial that Bell was financially vulnerable because he had few resources and little leverage or earning power in the employment market.  Bell testified that, once he lost his disability insurance benefits, "I had to pay for my health insurance completely out of pocket at that point" and "it was financially trying."  ECF No. 252 at 174:15-17.  The evidence established that Bell was willing to accept a $13-per-

hour assistant manager position at the Belfast store—a steep reduction from his annual manager's salary of approximately $42,000—but O'Reilly Auto refused to hire him at that rate. The parties stipulated that Bell did not surpass his O'Reilly Auto salary until March 2018, approximately two and a half years after he was fired by O'Reilly Auto. To the extent that any prejudice is grounded, as O'Reilly Auto asserts, in the interaction between the credit card comment and the argument that O'Reilly Auto was litigating in bad faith, I have already concluded that any objection on the second point has been waived and that the curative instruction on that point was sufficient. For these reasons, Bell's counsel's argument that Bell's credit cards had been maxed out does not merit a new trial.

### 5. Cumulative Error

O'Reilly Auto next argues that the three aforementioned arguments by Bell's counsel, when viewed cumulatively, resulted in an unfair trial. In particular, O'Reilly Auto asserts that improper comments were made in summation, meaning they were among the last points that the jury heard before deliberating and that O'Reilly Auto did not have an opportunity to respond with additional evidence. Furthermore, O'Reilly Auto contends that the three improper comments all relate to the single theme that O'Reilly Auto's litigation tactics harmed Bell and, as such, the curative instruction that I gave on O'Reilly Auto's right to litigate this case was ineffective.

"To deploy [the cumulative-error doctrine] successfully, . . . a party must establish that individual miscues, while insufficient in themselves to warrant a

new trial, have an aggregate effect that impugns the fairness of the proceedings and thus undermines the trustworthiness of the verdict." *Williams v. Drake*, 146 F.3d 44, 49 (1st Cir. 1998).  "In other words, [courts] will order a new trial on the basis of cumulative error only if multiple errors synergistically achieve 'the critical mass necessary to cast a shadow upon the integrity of the verdict.'" *Id.* (quoting *United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir. 1993)).  "If the verdict is to stand, the court must be able to say with a fair degree of assurance that the error(s) did not skew the verdict." *Gomez v. Rivera Rodriguez*, 344 F.3d 103, 118 (1st Cir. 2003).  When evaluating a cumulative-error claim, a court "must consider each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts); and the strength of the . . . case." *Sepulveda*, 15 F.3d at 1196.

I have already concluded that O'Reilly Auto waived any claim of error related to the argument that O'Reilly Auto was litigating in bad faith when it ratified my proposed curative instruction and then failed to further object. There was also no error related to this issue because any prejudice was eliminated by the curative instruction. *See Granfield*, 597 F.3d at 491, 492 n.14 (rejecting a cumulative error claim where the court "sufficiently neutralized" improper arguments with a curative instruction and thus "the district court committed no errors").

27

O'Reilly Auto asserts that the instruction was ineffective given the relationship between the bad-faith-litigation argument and the other assertedly improper comments, but the connection is overstated.  Bell's missing-witness argument did not malign O'Reilly Auto's litigation tactics so much as it asked the jury to infer that O'Reilly Auto's decision not to call the current Belfast store manager implied that this individual would have testified that Bell's requested scheduling accommodation was reasonable.  And the comment about the credit card was a misstatement of the evidence, not an attack on how O'Reilly Auto litigated this case.  Thus, the curative instruction was effective and, for purposes of evaluating the effect of cumulative error, there was no error related to the bad-faith-litigation argument.  *See United States v. Stokes*, 124 F.3d 39, 43 (1st Cir. 1997) ("By definition, cumulative-error analysis is inappropriate when a party complains of the cumulative effect of non-errors.").  Similarly, I have already concluded that Bell's missing-witness argument was proper and the failure to provide a curative instruction on the credit card comment was harmless, so these cannot factor into the cumulative-error analysis either.

Even if the missing-witness argument is treated as improper, that comment combined with the absence of a curative instruction on the credit card comment would not have synergistically achieved a critical mass of prejudice that casts a shadow on the integrity of the jury's verdict.  This was a hard-fought trial, and the claimed errors are few.  Neither was prejudicial for the reasons already stated, including the expectation that the jury followed my instructions that attorney argument is not evidence.  Each argument was brief

and singular in nature.  There was no symbiotic effect across the two arguments because the missing-witness argument bolstered Bell's contention that his requested accommodation was reasonable, whereas the credit card comment pertained to the separate issue of Bell's damages.  Additionally, while both arguments happened during phase 1 of the trial, O'Reilly Auto's theory is that the prejudice from the credit card comment did not manifest until phase 2, which further suggests an absence of synergy.

## C.    Weight of the Evidence

O'Reilly Auto also argues that a new trial is appropriate because the jury's award of punitive damages was against the weight of the evidence. O'Reilly Auto does not challenge the weight of the evidence supporting the liability verdict.  Because punitive damages were addressed in the second phase of the trial, I treat O'Reilly Auto as requesting a new trial limited to punitive damages.

After rehearsing the standard of review for weight-of-the-evidence challenges and the standard for awarding punitive damages under the ADA and MHRA, I recount the relevant evidence.  I then evaluate whether a finding of punitive liability was within the weight of that evidence for each of Bell's two theories as to how O'Reilly Auto violated his right to a reasonable accommodation.  The first theory is that O'Reilly Auto failed to accommodate Bell when it rejected his proposed accommodation.  The second is that O'Reilly Auto failed to reasonably accommodate Bell by violating its duty to engage in the interactive process in good faith.  I evaluate the availability of punitive

damages for each theory because the jury did not differentiate between the two when it found that O'Reilly Auto had violated the ADA and MHRA or when it found that O'Reilly Auto had satisfied the standard for punitive damages. The jury's decision to award punitive damages must stand if the weight of the evidence supports the availability of punitive damages under either of Bell's theories of liability.

### 1. Standard for Weight-of-the-Evidence Challenges

"[A] district court 'may set aside a jury's verdict and order a new trial only if the verdict is so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice.'" *Sailor Inc. F/V v. City of Rockland*, 428 F.3d 348, 351 (1st Cir. 2005) (quoting *Rivera Castillo v. Autokirey, Inc.*, 379 F.3d 4, 13 (1st Cir. 2004)). "Unlike its consideration of a motion for judgment as a matter of law, which requires the district court to construe the evidence in the light most favorable to the verdict, 'a district court is free to independently weigh the evidence' when assessing whether to grant a motion for a new trial.'" *Sánchez v. Foley*, 972 F.3d 1, 16 (1st Cir. 2020) (quoting *Jennings v. Jones*, 587 F.3d 430, 436 (1st Cir. 2009)). However, "[t]he mere fact that a contrary verdict may have been equally—or even more easily—supportable furnishes no cognizable ground for granting a new trial." *Luson Int'l Distribs., Inc. v. Fabricating & Prod. Mach., Inc.*, 966 F.2d 9, 12 (1st Cir. 1992) (quoting *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1333-34 (1st Cir. 1988)). "If the weight of the evidence is not grotesquely lopsided, it is irrelevant that the judge, were she

sitting jury-waived, would likely have found the other way." *Id.* (alteration omitted) (quoting *Freeman*, 865 F.2d at 1334).

## 2. Standard for Punitive Damages

Punitive damages were available if Bell demonstrated that O'Reilly Auto "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to [his] federally protected rights." 42 U.S.C.A. § 1981a(b)(1); *see also* 5 M.R.S.A. § 4613(2)(B)(8)(c) (West 2022) (equivalent for rights protected under the MHRA); *Burnett*, 987 F.3d at 69 (recognizing the parallel standards for punitive damages under the ADA and the MHRA). Under the ADA, this showing must be by the preponderance of the evidence, and, under the MHRA, clear and convincing evidence is required. *Burnett*, 987 F.3d at 69.

"Malice and reckless indifference concern, not the employer's awareness that it is discriminating, but the employer's knowledge that it is acting in violation of federal law." *Id.* (alteration omitted) (quoting *McDonough v. City of Quincy*, 452 F.3d 8, 24 (1st Cir. 2006)). This is a subjective inquiry, *Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 41 (1st Cir. 2003), and "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages," *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999). Applying that standard, punitive damages are not available "when the employer is unaware of the federal law prohibiting discrimination, when the employer believes he can lawfully discriminate, when the underlying theory of discrimination is novel or poorly recognized, or when

the employer believes its discrimination falls within a statutory exception." *Che*, 342 F.3d at 42.

"[P]roof of a defendant's awareness of the risk of violating federal law may be circumstantial." *Méndez-Matos v. Mun. of Guaynabo*, 557 F.3d 36, 49 (1st Cir. 2009). "[I]f a defendant's conduct is 'egregious or outrageous,' it may suggest an awareness of its illegality." *Id.* (quoting *Powell v. Alexander*, 391 F.3d 1, 19 (1st Cir. 2004)). "The existence of an extensive body of federal law on a particular issue also may suggest that the defendant must have been aware of the risk of violating that law." *Id.* A person's occupation may also be evidence that "she must have been aware that her conduct risked violating the plaintiff's . . . rights." *Id.*; *see also, e.g.*, *Perry v. Roy*, Civil Action No. 10-10769, 2016 WL 1948823, at *4 (D. Mass. May 3, 2016) ("As nurses employed in a prison facility, both . . . were surely aware that prisoners had a right to receive treatment for their serious medical needs.").

### 3. Weight-of-the-Evidence Analysis

According to O'Reilly Auto, the evidence reflects that the company's conduct was negligent at worst. In response, Bell argues that (1) O'Reilly Auto should not be permitted to assert this argument because too many of its citations to the record in its memorandum of law appear in footnotes and (2) because the argument is impermissibly similar to other, hypothetical arguments, such as the argument that the jury should not have been instructed on punitive damages or that the evidence in support of punitive liability was

insufficient as a matter of law.  Bell also responds that the punitive damages verdict was supported by the weight of the evidence.

I address the merits of O'Reilly Auto's argument because O'Reilly Auto's motion for a new trial sufficiently raises the weight-of-the-evidence issue.  Bell does not cite to any authority for the idea that a weight-of-the-evidence argument is precluded by the availability of other arguments that O'Reilly Auto does not pursue.  For reasons that I will explain, I conclude that a finding of reckless indifference was supported by the weight of the evidence for both of Bell's theories of liability.

### a.  Evidence Regarding Bell's Accommodation Request and the Interactive Process

At trial, there was agreement among Bell, his immediate supervisor District Manager Chris Watters, and Watters's supervisor Regional Manager Nicholas Thomas that a store manager works both scheduled and unscheduled hours.  Bell's scheduled hours, like the scheduled hours of other store employees, were set every Wednesday for the following week.  Beyond those scheduled shifts, Bell's off-schedule work included filling in for employees who were late or sick, responding to the store's alarm, and completing paperwork that he did not have time to finish during his scheduled hours.

Bell testified that his requested accommodation was a cap on his weekly scheduled hours and that he had not requested restrictions on his unscheduled hours.  According to Bell, his requested accommodation would have worked like this:  When the store's staffing was being planned on Wednesdays for the

following week, Bell would be scheduled for only 45 hours of shifts, and, if something went awry with the expected schedule, he would work as necessary on an ad hoc basis beyond his scheduled hours.  To that end, Bell testified that, under the proposed accommodation, he "could be scheduled during any day of the week any time of the day, and that in the event that something was needed from me that would obviously be off of the schedule and therefore not covered by this restriction."  ECF No. 252 at 154:16-20.

The testimony of Judy Weitzel, Bell's psychiatric nurse practitioner, was somewhat ambiguous as to what accommodation she thought Bell needed.  On the one hand, at times she seemed to suggest that she thought Bell should be able to pick and choose which of his unscheduled hours to perform.  On the other hand, when she completed O'Reilly Auto's Fitness for Duty Form, she informed O'Reilly Auto that Bell needed a cap on his scheduled hours:  "Mr. Bell because of his mental health issues should not be scheduled for more than 9 hours 5 days a week."  Exhibit 2.  As will be discussed in greater detail below, she testified that she refused to alter that language later because "I felt that as I had written things that was adequate."  ECF No. 252 at 18:17-18.  She also testified that she and Bell had "mutually agreed" on the requested accommodation.  ECF No. 252 at 20:2.  Bell testified that Weitzel phrased Bell's accommodation request as a cap on his scheduled hours because he told her that he needed to have flexibility to address unforeseen circumstances.

Despite the phrasing Weitzel employed in the Fitness for Duty Form— "Mr. Bell because of his mental health issues should not be scheduled for more

than 9 hours 5 days a week."—O'Reilly Auto interpreted Bell's accommodation request to mean that he was seeking a 45-hour weekly cap on his scheduled *and* unscheduled hours. Sherri Jones, O'Reilly Auto's Leave of Absence Coordinator, asked District Manager Watters via email for his opinion as to whether such a restriction would be feasible, and he responded that it would not work and that it would be better to transfer Bell to a less-demanding position. Jones responded that she and her supervisor, Leave of Absence Lead Allison Rush, agreed that Bell should be accommodated through reassignment.

None of the witnesses recalled any efforts by anyone at O'Reilly Auto to generate or discuss with Bell any alternative accommodations that would have kept Bell in his store manager role. Bell testified that he would have considered alternative accommodations, including increasing his maximum number of scheduled hours. For her part, Weitzel testified that she is "not a very rigid person in terms of saying this is the maximum" and that she had previously allowed Bell to talk her up from eight to nine scheduled hours per day. ECF No. 252 at 17:23-24.

According to Leave of Absence Coordinator Jones, the only steps she customarily took between receiving a determination from a manager like Watters and responding with her agreement or disagreement was discussing that determination with Leave of Absence Lead Rush and occasionally checking the job description. She testified that the ultimate decision as to whether to grant an accommodation request was made together between the Leave of Absence Team and O'Reilly Auto's operations-focused employees (e.g., store

managers, district managers), who were asked by her team to evaluate the practicality of requested accommodations.   Jones stated that she could not remember an occasion in which the Leave of Absence Team had disagreed with the operations-focused employees about whether a requested accommodation was workable.   Rush similarly testified that neither she nor her supervisor, Team Member Relations and Leave of Absence Manager Donald Beck, had ever overruled a determination by a manager in the field that an accommodation request should be denied.   Regional Manager Thomas testified that he, not District Manager Watters, had the final say as to whether Bell's scheduling accommodation would work. However, the evidence indicates that Jones received only Watters's perspective before she and Rush concluded that Watters and Thomas needed to deny the requested accommodation and instead find another position to which Bell could be reassigned.

Regarding Watters's response to Jones about the feasibility of Bell's proposed accommodation, Watters acknowledged at trial that he had previously stated that he had viewed himself as "combatting" what Weitzel had written on the Fitness for Duty Form.[4]   Watters testified that this had been a poor choice

---

[4] Watters was asked:

> Well, do you remember being asked under oath about whether or not when you got that note from Ms. Weitzel that—that you thought that you were supposed to be looking at that question in terms of can the company do these accommodations and saying that I understood it was—I was combating Ms. Weitzel's note; do you recall that—that sworn testimony?

ECF No. 251 at 132:23-133:4.  He responded: "I recall—yes, I recall the vocabulary." ECF No. 251 at 133:5.

of words, that he did not have a combative attitude toward the Fitness for Duty Form, and that what he had meant to communicate was that he did not feel qualified to dispute Weitzel's representations about Bell's disabilities and what type of reasonable accommodation Bell required.  Bell testified that he and Watters had a rocky relationship, that Watters had previously and unfairly accused him of time theft, and that Watters had once cursed at him.  Watters testified that he did not remember swearing at Bell but that he had been upset with him at the time and had expressed that.

When Watters responded to Jones by email, he cited several reasons for opposing the accommodation requested by Bell which, as previously noted, he interpreted as a 45-hour cap on both scheduled and unscheduled hours. Watters wrote that the accommodation would not work because store managers are required to be on call for unscheduled duties.  At trial, Watters explained that the store manager is the contact person when a store alarm goes off and that if hourly employees miss work, the store manager should report to cover some of those hours.  However, Watters also testified that if an alarm went off or an employee was absent, there were other people who could be called to respond or provide the coverage if the store manager did not answer the phone or was unavailable.  Watters acknowledged that store managers did not need to tell him in advance if they would be unreachable during times they were not scheduled to work and that he had never disciplined a store manager for not answering a call related to an alarm.

After receiving the message from Leave of Absence Coordinator Jones that she and Leave of Absence Lead Rush agreed with Watters that Bell's accommodation request should be denied, Watters called Bell on June 10, 2015, and told him that store managers must have open availability for unscheduled work.  Bell told Watters that the accommodation request articulated on the Fitness for Duty Form was limited to his scheduled hours.  The situation became in effect a standoff, with O'Reilly Auto insisting that it could accommodate Bell only through transferring him from the manager's position unless he obtained a revised Fitness for Duty Form more clearly articulating Weitzel's support for Bell's framing of his accommodation request.  Bell tried to obtain a revised Fitness for Duty Form from Weitzel but ultimately reported back to Watters around June 18 that Weitzel had refused to provide one because, as Bell put it, "she felt that she was very specific about it being scheduled hours" and did not see the need to revise the accommodation.  ECF No. 252 at 156:13-14.  Notably, Watters testified that Bell had communicated Weitzel's viewpoint to him.

On June 18, 2015, Watters relayed that Weitzel would not revise the Fitness for Duty Form to Regional Manager Thomas and others.   Jones responded the next day that Bell had told her the same thing and that he had mentioned that Weitzel agreed with what she had already written on the form. Bell repeatedly invited O'Reilly Auto to contact Weitzel so that she could confirm Bell's interpretation of the Fitness for Duty Form.  No one from O'Reilly Auto contacted her even though Leave of Absence Lead Rush testified that the

Leave of Absence Team had previously contacted other medical providers for additional information that O'Reilly Auto thought it needed for other employees.

Not having heard further from O'Reilly Auto regarding his proposed accommodation, Bell emailed Watters, Jones, and Thomas on July 13, 2015, to reiterate that, "according to Ms. Weitzel, [i]f necessary for me to work some hours beyond the scheduled 45 hours on occasion that that would be ok so long as my scheduled hours are limited to 45 hours per week" and that O'Reilly Auto should "[f]eel free to contact me or Ms. Weitzel to discuss my need for accommodation further."

Beck, the Team Member Relations and Leave of Absence Manager, who was Rush's supervisor, agreed at trial that "initially it was understood by O'Reilly that Mr. Bell was asking for a very specific nine-hour-a-day, five-day-a-week restriction" but then "that evolved—or at least O'Reilly's understanding of it evolved over time so that the request was for nine hours a day, five days a week, but possibly some additional work if he felt up to it."  ECF No. 253 at 68:14-22.  Beck also testified that, as a result of that evolved understanding, he was sure he would have asked Watters for an updated evaluation of whether that proposal was reasonable.  But there is no record of any such request or reevaluation, something that Beck testified would normally be written down. Regional Manager Thomas similarly testified that he agreed that O'Reilly Auto's understanding of Bell's restrictions "changed over time" and that he was "made aware" that "Bell's psychiatric nurse practitioner was not telling him

that he was strictly limited to nine hours a day, five days a week, but that that should be his schedule but he might be able to work some additional time if he felt up to it." ECF No. 253 at 98:8-12, 99:23-100:6.

Bell testified that his proposed accommodation would have been reasonable because it was "approximately what I was working at the time as far as scheduled hours go"; he was able to complete his managerial duties "[t]he vast majority of the time" within his scheduled hours; and, when he could not, he would make up the difference during relatively short unscheduled periods.[5] ECF No. 252 at 127:23, 149:2-3. According to Bell, those relatively short unscheduled periods consisted of approximately two hours per month of additional work. Importantly, District Manager Watters, who was Bell's immediate supervisor, testified that an accommodation in which Bell's scheduled hours were capped and Bell worked occasional unscheduled hours would have worked.

Notwithstanding Bell's position that he had sought a 45-hour cap on his scheduled hours only, the evidence at trial against the workability of Bell's request focused on whether it would have been reasonable to cap Bell's scheduled and unscheduled hours at 45 or to cap Bell's scheduled hours at 45 and to let Bell decide in the moment whether to fulfill his unscheduled duties

---

[5] Bell testified that his typical schedule was from between 6:00 and 6:30 a.m. to between 4:30 and 5 p.m. Watters testified that Bell worked alternating weeks of (1) Monday through Friday 6:30 a.m. to 5:00 p.m. and (2) Monday through Saturday 6:30 a.m. to 5:00 p.m. with a half-day somewhere in the week. According to Watters, Bell had a half hour for lunch and discretion to take other breaks. Bell testified that he had an hour for lunch and took two other fifteen-minute breaks and that this was reflected in the schedule. Bell agreed that when he worked Saturdays, he would take a half-day off during the week.

depending on how he was feeling psychologically.  However, as Bell reiterated when he was asked whether it would have been within his rights to decline to work unscheduled hours if the store were unexpectedly short-staffed, "unscheduled hours" were "not covered by the accommodation that [he] was requesting."  ECF No. 252 at 229:12-14.  Although there was ample testimony that store managers are expected to work more than 45 scheduled hours per week, there was no specific testimony about why it would have been unreasonable to cap Bell's scheduled hours at 45 if his availability for unscheduled work was unchanged.

While Bell, Watters, and Jones were at an impasse over Bell's accommodation request, Bell and Watters discussed other possible positions, all of which were, in effect, demotions from Bell's store manager position.  The first possibility they discussed was a retail service specialist position at $10 per hour at another store.  When Watters called Bell with this offer on June 10, 2015, Bell declined because it was not financially feasible given the low pay, the distance from his home, and the fact that he drives his wife back and forth from her work.  Bell testified that accepting this position would have led to him making less than $21,000 per year, down from the approximately $42,000 he was making as a store manager.  Bell also declined a July 7, 2015 offer for the same role at the same $10-per-hour rate but at the Belfast store.

Bell testified that he later discovered an online advertisement that O'Reilly Auto was seeking to hire an assistant manager at the Belfast store, and he mentioned the possibility of him stepping down to that role in his July

13 email to Watters, Jones, and Thomas.  Watters testified that he then spoke to Bell and offered him the assistant manager position in Belfast at $12 per hour, at which point Bell said he would do it for $13 per hour.  Bell testified that Watters said he would get back to him on whether $13 per hour was workable but that Bell never heard back.  The conversation about the $12-per-hour offer was the last communication Bell received from O'Reilly Auto.  A little over a month later, Bell received a COBRA insurance letter in the mail that contained a termination date, which indicated to him that he had been fired.

Watters testified that he did not have the authority alone to offer Bell $13 per hour for the assistant manager position and, when asked whether he had communicated Bell's $13 proposal to anyone else, he responded that others had seen Bell's email.  However, Bell's email does not mention the $13-per-hour figure or any other hourly rate for the assistant manager job.  Watters also testified that, based on that email, he thought that an internal conversation would have happened between himself and others about the prospect of paying Bell $13 per hour as the Belfast assistant manager, but he could not specifically remember such a discussion.

Regarding the $12-per-hour offer, Watters testified that it was high for the Belfast location given the economics of that store, even though he had previously authorized Bell to hire an assistant manager for the same location at $13.50 per hour.  According to Watters, $13.50 per hour was an appropriate offer for the prior candidate but $13 per hour was too high for Bell because the other candidate could have brought business with him and because the store

had begun to perform worse since the $13.50 hourly rate was authorized. Bell testified that the store's financial position was better when he was offered $12 than when the prior candidate had been offered $13.50.

Regional Manager Thomas testified that there is a potential for conflict when former store managers are placed as assistant managers at the same stores in which they had been working and, for that reason, he prefers to locate store-managers-turned-assistant-managers at different stores. Nonetheless, Bell was offered the assistant manager role in Belfast at $12 per hour. Bell testified that he would have been a good choice for the assistant manager role because of his experience in the industry and as a store manager there, his certifications, and because of his relationships with local customers.[6]

Leave of Absence Coordinator Jones and Leave of Absence Lead Rush testified that they had attended trainings on the ADA. Rush recalled that she had been trained "in general that the company needed to accommodate and look at accommodations for anybody . . . unless it was an undue hardship." ECF No. 253 at 13:6-8. Rush also stated at trial that she had no reason to doubt her previous testimony that she had been trained that reassignment is an accommodation of last resort to be offered only if an employee cannot be otherwise reasonably accommodated. Rush also testified that she agreed that the ADA "requires an interactive process between the employer and the

---

[6] O'Reilly Auto eventually hired an assistant manager for a more-successful Bangor store at more than $12 per hour and had him fill-in at times as an assistant manager at the Belfast store. This individual had prior experience working for O'Reilly Auto in a similar capacity and was described by Watters as a potential future store manager.

employee" and is "more than just an employee asking for something and an employer just saying no." ECF No. 253 at 42:14-22. She also agreed that the interactive process "could mean responding and providing alternatives" and "saying well maybe if we tweak it or if we adjust this we can make it work." ECF No. 253 at 42:18-43:1. Rush acknowledged that O'Reilly Auto did not maintain a written policy outlining the steps required after an employee submits a request for an accommodation.

As district manager, Watters was at one point responsible for 14 O'Reilly Auto stores in Maine. He had been trained on O'Reilly Auto's protocols regarding accommodation requests and acted as Bell's primary point of contact with O'Reilly Auto as the parties discussed the requested accommodation and possible demotions. He testified that he knew he was supposed to treat Bell's accommodation request in a fair, reasonable, and objective manner.

### b. Analysis of the Weight of the Evidence Regarding Punitive Damages for Bell's First Theory of Liability

Bell's first theory at trial was that O'Reilly Auto violated his right to a reasonable accommodation when it declined his request for a scheduling accommodation, because his proposed accommodation was reasonable and O'Reilly Auto did not offer any other reasonable accommodation that would have kept Bell in his role as a store manager. *See Bell*, 972 F.3d at 24 ("[T]o make out a failure to accommodate claim, a plaintiff need only show that: '(1) he is a handicapped person within the meaning of the Act; (2) he is nonetheless qualified to perform the essential functions of the job (with or without

44

reasonable accommodation); and (3) the employer knew of the disability but declined to reasonably accommodate it upon request.'" (quoting *Sepúlveda-Vargas*, 888 F.3d at 553)); *Williams v. HealthReach Network*, No. Civ. 99-0030-B, 2000 WL 760742, at *12 n.12 (D. Me. Feb. 22, 2000) ("Reassignment is the reasonable accommodation of last resort and is required only after it has been determined that . . . there are no effective accommodations that will enable the employee to perform the essential functions of his/her current position." (alteration omitted) (quoting EEOC, *Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the ADA*, No. 915.002, 2002 WL 31994335, at *20 (Oct. 17, 2002))).

The facts here are somewhat analogous to those of *Burnett v. Ocean Properties, Ltd.*, 987 F.3d 57.  In *Burnett*, the First Circuit held, in the context of a motion for judgment as a matter of law, that there was sufficient evidence that an employer acted with reckless indifference to a perceived legal risk when the employer repeatedly "failed to follow up" with the employee after receiving an accommodation request.  *Id.* at 64, 70.  The employee had emailed his request for a push-button, automatic door; did not hear back; injured himself on the door he was seeking to modify; and still did not hear back after that incident was reported or after he filed a complaint with the Maine Human Rights Commission.  *Id.* at 61-62.

The weight of the evidence established that O'Reilly Auto refused to heed Bell's repeated warnings that it was ignoring his true accommodation request, which was sufficiently reflected in the plain language of the Fitness for Duty

Form: "Mr. Bell because of his mental health issues should not be scheduled for more than 9 hours 5 days a week." The distinction between a store manager's scheduled and unscheduled duties was well understood at O'Reilly Auto. Bell repeatedly clarified his request and told O'Reilly Auto that Weitzel agreed with his characterization of the Fitness for Duty Form. The jury could reasonably have interpreted Beck's and Thomas's testimony to mean O'Reilly Auto eventually realized that it was misinterpreting the Fitness for Duty Form but did not take any steps to re-evaluate its position that Bell's requested accommodation was unreasonable. In short, the weight of the evidence supported a finding that O'Reilly Auto failed to assess or respond to any version of Bell's request other than a proposed 45-hour cap on all scheduled and unscheduled hours, an interpretation that Bell repeatedly disavowed.

Given the training that Leave of Absence Coordinator Jones and Leave of Absence Lead Rush received on accommodation requests and their key roles in O'Reilly Auto's consensus-driven process between the Leave of Absence Team and managers in the field, the weight of the evidence supports the conclusion that O'Reilly Auto perceived a risk that refusing to evaluate Bell's true accommodation request (and insisting on a revised Fitness for Duty Form when the original was sufficiently clear under the circumstances) violated Bell's right to a reasonable accommodation. *See Burnett v. Ocean Properties, Ltd.*, 422 F. Supp. 3d 369, 386 (D. Me. 2019) ("[T]he record shows that two individuals in the corporate office of a large hotel company, one of whom works in the human resources department, were aware of [the plaintiff's accommodation] request

46

[but did not respond], which supports a reasonable jury finding that the organization knew their actions were in violation of federal law."); *cf. McDonough*, 452 F.3d at 23 ("In light of the important role that Title VII plays in modern personnel management, we cannot conclude on this record that a reasonable jury would be compelled to find that these [high-ranking department officials involved in personnel management] were unaware that retaliating against an employee for assisting with another employee's sexual harassment claim violates federal law.").

Additionally, it would have been within the weight of the evidence for the jury to conclude that O'Reilly Auto's insistence on evaluating and rejecting an interpretation of a disabled employee's accommodation request that he had repeatedly disavowed was egregious misconduct and thus O'Reilly Auto recognized the risk that its conduct would violate the law.  *See Kolstad*, 527 U.S. at 539 ("[P]ointing to evidence of an employer's egregious behavior would provide one means of satisfying the plaintiff's burden to 'demonstrate' that the employer acted with the requisite 'malice or reckless indifference.'" (alterations omitted) (quoting 42 U.S.C.A. § 1981a(b)(1))); *cf. Burnett*, 422 F. Supp. 3d at 386 ("[R]epeatedly ignoring a paraplegic employee's request for an accommodation to allow him to more easily access his workplace could be viewed by a jury as the type of egregious misconduct that shows [the defendant] was aware it risked violating [the plaintiff's] rights in failing to accommodate him.").

The foregoing conclusions are not altered by the somewhat ambiguous phrasing of Bell's accommodation request contained within his final email to

O'Reilly Auto.  Given the wording of the Fitness for Duty Form and Bell's testimony that he repeatedly described his accommodation request to O'Reilly Auto as a cap on his scheduled hours without any limitations on his ability to perform his unscheduled duties, the evidence is not grotesquely lopsided against finding (1) that O'Reilly Auto was sufficiently on notice of the accommodation request that Bell described at trial and (2) that O'Reilly Auto perceived a risk that it was violating Bell's right to a reasonable accommodation by insisting that Bell obtain a revised Fitness for Duty Form when the original was sufficiently clear.  *See Luson*, 966 F.2d at 12 ("If the weight of the evidence is not grotesquely lopsided, it is irrelevant that the judge, were she sitting jury-waived, would likely have found the other way." (alteration omitted) (quoting *Freeman*, 865 F.2d at 1334)).

Nor is the preceding analysis disturbed by Weitzel's trial testimony that she believed that Bell should pick and choose his unscheduled duties depending on how he was feeling.  O'Reilly Auto did not communicate with Weitzel prior to Bell's termination and did not directly seek or receive her opinion regarding Bell's unscheduled hours.  Additionally, the jury could have reasonably accepted Bell's testimony over Weitzel's as to what the two of them agreed to or interpreted Weitzel's testimony as consistent with Bell's.  Thus, Weitzel's trial testimony does not undermine the conclusion that, at the point in time that Bell was terminated, it was within the weight of the evidence for O'Reilly Auto to

have perceived the risk that it was operating in violation of the ADA and MHRA.[7]

### c. Analysis of the Weight of the Evidence Regarding Punitive Damages for Bell's Second Theory of Liability

Bell's second theory as to how O'Reilly Auto violated his right to a reasonable accommodation is that O'Reilly Auto violated its duty to engage in the interactive process in good faith and that a reasonable accommodation could have been identified if only O'Reilly Auto had acted in good faith.

An employer violates the right to a reasonable accommodation if it has a duty to engage in an interactive process with an employee who requests an accommodation and the employer fails to engage in good faith. *See EEOC v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 132 (1st Cir. 2014) ("[A]n employee's request for accommodation sometimes creates 'a duty on the part of the employer to engage in an interactive process.' . . . We must emphasize that it is imperative that both the employer and the employee have a duty to engage in good faith . . . ." (footnote omitted) (quoting *Enica*, 544 F.3d at 338)); *Jacques v. Clean-Up Grp., Inc.*, 96 F.3d 506, 515 (1st Cir. 1996) ("There may well be

---

[7] O'Reilly Auto does not challenge the weight of the evidence as to liability; however, to the extent that it is logically necessary to address that issue as to Bell's first theory of liability in order to conclude that punitive liability was within the weight of the evidence for this theory of liability, I conclude as follows. It would have been within the weight of the evidence for the jury to find that O'Reilly Auto failed to reasonably accommodate Bell when it insisted on a revised Fitness for Duty Form because the evidence was not grotesquely lopsided against a finding that the requested accommodation was reasonable and had been communicated with sufficient clarity. *See Tobin v. Liberty Mut. Ins.*, 553 F.3d 121, 129 (1st Cir. 2009) (noting that an accommodation request must be sufficiently direct and specific to provide notice to the employer); EEOC, *Enforcement Guidance*, 2002 WL 31994335, at *8 ("An employer cannot ask for documentation when . . . the individual has already provided the employer with sufficient information to substantiate that s/he has an ADA disability and needs the reasonable accommodation requested.").

situations in which the employer's failure to engage in an informal interactive process would constitute a failure to provide reasonable accommodation that amounts to a violation of the ADA.").  The touchstone of the "case-by-case" analysis, *Kohl's*, 774 F.3d at 132 n.5 (quoting *Kvorjak v. Maine*, 259 F.3d 48, 52 (1st Cir. 2001)), as to whether an employer has a duty to engage in the interactive process in good faith is what a reasonable employer would have done, *see Jacques*, 96 F.3d at 515 ("[C]ases involving reasonable accommodation turn heavily upon their facts and an appraisal of the reasonableness of the parties' behavior."); *Calero-Cerezo v. U.S. Dep't of Just.*, 355 F.3d 6, 24-25 (1st Cir. 2004) ("In sum, the record offers sufficient evidence from which a factfinder could conclude that the defendants, being aware of plaintiff's disability and of her request for accommodation, failed to make a reasonable response."); 29 C.F.R. pt. 1630, app. ("Once an individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation.").  "[L]iability for failure to engage in an interactive process depends on a finding that the parties could have discovered and implemented a reasonable accommodation through good faith efforts."  *Trahan v. Wayfair Me., LLC*, 957 F.3d 54, 67 (1st Cir. 2020).

The trial evidence supports a finding that O'Reilly Auto perceived and was recklessly indifferent to the risk that it was violating its duty to engage in the interactive process in good faith.  Both Jones and Rush were trained on the ADA, and Rush specifically testified that she understood the need to engage in

an interactive process.  Despite Bell's repeated clarifications, O'Reilly Auto insisted on evaluating Bell's accommodation request as if he were seeking a 45-hour cap on both scheduled and unscheduled hours.  There is no evidence that O'Reilly Auto ever re-evaluated Bell's request after the company's understanding of the request evolved.  Although O'Reilly Auto had contacted medical providers to obtain additional information about other employees' accommodation requests, it did not do this for Bell despite numerous invitations.  After O'Reilly Auto decided that its version of Bell's accommodation request was unworkable, there were no efforts internally or with Bell to develop an alternative accommodation that would have allowed him to continue as the store manager in Belfast.  The jury could have reasonably found that the first reassignment that O'Reilly Auto offered Bell—a two-step demotion with more than a 50% pay cut—was not a serious offer and that O'Reilly Auto continued in this vein when it later offered Bell $12 per hour to be the assistant manager in Belfast.  Further, Bell was the one who had to raise with O'Reilly Auto the fact that the company was hiring an assistant manager at the Belfast location. It was within the weight of the evidence for the jury to have found that O'Reilly Auto received Bell's $13-per-hour counteroffer but never responded.  Finally, Bell learned that the interactive process had ended only when he received his COBRA notice in the mail indicating to him that he had been fired.[8]

---

[8] O'Reilly Auto does not challenge the weight of the evidence as to liability; however, to the extent that it is logically necessary to address that issue as to Bell's second theory of liability in order to conclude that punitive liability was within the weight of the evidence for this theory of liability, I conclude as follows.  It would have been within the weight of the evidence for the jury to find that O'Reilly Auto had a duty under the circumstances to engage in the interactive

Thus, the weight of the evidence supports a finding that O'Reilly Auto perceived but recklessly disregarded its duty to engage in the interactive process in good faith even without considering the conduct of District Manager Watters.   Moreover, although the evidence may be subject to other interpretations, it is not against the weight of the evidence to conclude that Watters "combat[ted]" Bell's accommodation request by mischaracterizing the scope of Bell's unscheduled duties to the Leave of Absence Team.   It would also be within the weight of the evidence to conclude that Watters never communicated Bell's $13-per-hour counteroffer to anyone else at O'Reilly Auto.

Citing *Kolstad*, 527 U.S. 526, O'Reilly Auto argues that Watters's conduct cannot be considered when deciding whether punitive damages were available because he was not a member of O'Reilly Auto's upper management.   But *Kolstad* did not announce such a standard.   It is enough that the employee "act[] in a managerial capacity," *Romano v. U-Haul Int'l*, 233 F.3d 655, 669 (1st Cir. 2000) (citing *Kolstad*, 527 U.S. at 542-43), which calls for a fact-intensive inquiry focused on the employee's type of authority and amount of discretion, *Kolstad*, 527 U.S. at 543.   The employee must be "important" but "perhaps need not be the employer's 'top management, officers, or directors,' to be acting 'in a managerial capacity.'"   *Id.* (quoting Schlueter & K. Redden, *Punitive Damages* § 4.4(B)(2)(a) (3d ed. 1995)).

---

process and failed to do so in good faith.   It is also within the weight of the evidence to conclude that the parties could have identified the reasonable accommodation of a 45-hour cap on Bell's scheduled hours with no restrictions on his unscheduled hours, or the reasonable accommodation of a higher cap on Bell's scheduled hours with no restrictions on his unscheduled hours.

The evidence supports a finding that District Manager Watters was acting in a managerial capacity with respect to Bell's accommodation request. He was Bell's immediate supervisor and, as a practical matter, his determination that Bell's requested accommodation was unworkable was conclusive. He was also Bell's primary contact at O'Reilly Auto during the interactive process. Nor is the evidence grotesquely lopsided against a finding that Watters perceived a risk that he was violating the duty to engage in the interactive process in good faith. He oversaw many stores as district manager; he testified that he understood that he was supposed to review Bell's accommodation request in a fair, reasonable, and objective manner; he had been trained on O'Reilly Auto's protocols for handling accommodation requests; and O'Reilly Auto had essentially delegated to him responsibility for conducting the interactive process. Finally, the jury could have fairly concluded that it is egregious behavior for a supervisor to adopt a combative approach to a disabled employee's accommodation request, which is additional evidence that Watters perceived the risk that his conduct might violate the ADA and MHRA.

Thus, Watters's conduct, while not essential to my conclusion that it was within the weight of the evidence for the jury to find that O'Reilly Auto acted in the face of a perceived risk that its conduct would violate the duty to engage in the interactive process in good faith, supports the same conclusion. So long as the evidence in support of the jury's verdict is not "grotesquely lopsided," it must

be affirmed.[9] *Luson*, 966 F.2d at 12 (quoting *Freeman*, 865 F.2d at 1334).  For the reasons I have explained, that standard is met here.

## D.   Excessive Punitive Damages

Lastly, O'Reilly Auto argues that the jury's $750,000 punitive damages award violates federal and Maine common law and constitutional due process.[10] Under the common-law standard, "a district court will not disturb the jury's compensatory or punitive damages award unless the award is "'grossly excessive," "inordinate," "shocking to the conscience of the court," or "so high that it would be a denial of justice to permit it to stand."'" *Mercado-Berrios v. Cancel-Alegría*, 611 F.3d 18, 28 (1st Cir. 2010) (quoting *Wagenmann v. Adams*, 829 F.2d 196, 215-16 (1st Cir. 1987)).  In contrast, due process considerations prohibit "grossly excessive or arbitrary punishments," and courts must at least consider the following "guideposts": "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 416, 418 (2003).  The First Circuit has examined at

---

[9] In reaching my conclusions regarding the weight of the evidence for both of Bell's theories of liability, I have taken into account the clear-and-convincing-evidence standard for punitive liability under the MHRA.  *See Burnett*, 987 F.3d at 69.

[10] Courts must analyze the remittitur of damages for state-law claims in accordance with state-law standards when those standards depart substantively from the federal common-law remittitur standard.  *Suero-Algarín v. CMT Hosp. Hima San Pablo Caguas*, 957 F.3d 30, 40, 45 (1st Cir. 2020).  At the hearing on July 20, 2022, the parties agreed that the Maine common-law standard for remittitur is the same as the federal common-law standard, so I apply only the federal common-law remittitur standard.

least the first and third guideposts of the due process analysis when applying the federal common-law test. *Mercado-Berrios*, 611 F.3d at 30. "When evaluating a motion for a new trial on damages, or for remittitur, the court considers the evidence in the light most favorable to the prevailing party." *Rodríguez-Valentin*, 27 F.4th at 22. The same is true for a due process challenge. *Romano*, 233 F.3d at 673; *see also Rodríguez-Marín v. Rivera-González*, 438 F.3d 72, 84-85 (1st Cir. 2006) ("A punitive damages award will stand unless we find it 'certain that the amount in question exceeds that necessary to punish and deter the alleged misconduct.'" (quoting *Romano*, 233 F.3d at 672)).

When a defendant raises both common-law and due process arguments that an award is excessive, a court must evaluate the common-law argument first. *Sony BMG Music Ent. v. Tenenbaum*, 660 F.3d 487, 490 (1st Cir. 2011). However, O'Reilly Auto's motion presents its due process arguments first and then incorporates those arguments into its common-law argument by reference. Bell does the same. Because the parties have organized their discussions around the due process guideposts, I begin by recapping their arguments and by evaluating the merits of their disputes on each sub-issue. Then I apply the federal-common law standard. Because I conclude that remittitur is inappropriate, I next apply the constitutional standard. I conclude that the punitive damages do not violate due process.

### 1. The Parties' Arguments

#### a. Reprehensibility

In the context of due process challenges, the Supreme Court has advised that "[t]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *State Farm*, 538 U.S. at 419 (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)). The parties' briefing tracks the five factors that the Supreme Court has identified as relevant when evaluating reprehensibility: whether "[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id.*

#### i. Physical Harm

O'Reilly Auto contends that its conduct resulted in no more than emotional harm to Bell that did not manifest as physical symptoms. However, the trial record, viewed most favorably to Bell, reveals that Bell was physically harmed because his Tourette syndrome tics are painful (notwithstanding pain-reducing medications) and they increase in frequency with stress and sleep deprivation. Dr. Robinson (a psychologist and Bell's expert witness) testified

that O'Reilly Auto's decision not to let Bell return to work as a store manager caused Bell's symptoms to spiral and interfered with Bell's sleep. Although O'Reilly Auto's conduct was nonviolent, the jury could have reasonably concluded that O'Reilly Auto's failure to accommodate Bell increased the frequency of his painful tics. *See Williams v. First Advantage LNS Screening Sols. Inc*, 947 F.3d 735, 751 (11th Cir. 2020) (concluding that this factor weighed in favor of the plaintiff when "emotional distress manifested itself in physical symptoms"; namely, "diminished appetite, insomnia, and headaches").

### ii. Indifference to Health or Safety

O'Reilly Auto states without explanation that it did not exhibit indifference to Bell's health or safety. Bell asserts that O'Reilly Auto knew that Bell suffered from depression, Tourette syndrome, and attention-deficit/hyperactivity disorder and required an accommodation but declined to reasonably accommodate him, causing his symptoms to worsen. Bell points to testimony that he began to experience suicidal ideation after O'Reilly Auto prevented him from returning to work.

I have already decided that it is within the weight of the evidence to conclude that O'Reilly Auto exhibited reckless indifference toward the risk that the company was violating Bell's right to a reasonable accommodation, which amounted to indifference to his health. Additionally, given that O'Reilly Auto understood that Bell experienced depression, the evidence viewed most favorably to Bell supports the inference that O'Reilly Auto acted with indifference to Bell's health and safety by recklessly flouting federal and state

disability-discrimination laws when it was foreseeable that doing so would harm Bell's mental health.

### iii.  Financial Vulnerability

O'Reilly Auto concedes there is "some" evidence that Bell was financially vulnerable but contends that Bell's counsel exaggerated that evidence when he stated that Bell had maxed out his credit cards and was still dealing with lingering credit card debt.  ECF No. 262 at 30.  I have already addressed that argument and concluded that this misstatement of the evidence was not prejudicial.  At this point, the proper inquiry is whether the evidence viewed most favorably to Bell indicated that he was financially vulnerable.

Bell points to his testimony that it was financially trying when his disability insurance benefits expired and he had to pay for his health insurance out of pocket.  Bell would have accepted a pay cut from his store manager salary of around $42,000 to a $13-per-hour assistant manager position to stay employed at the Belfast store.  O'Reilly Auto did not budge from its offer of $12 per hour.  The jury could reasonably infer that Bell's willingness to accept a reduction in pay reflected that his financial circumstances were dire.  The parties also stipulated that Bell did not surpass his O'Reilly Auto salary of $42,000 until March 2018, two and a half years after he was terminated.  Viewed most favorably to Bell, the evidence established that Bell was financially vulnerable because he had few financial resources and little negotiating leverage or earning power in the employment market.

### iv.  Repetition

O'Reilly Auto argues that there is no record evidence that its failure to accommodate Bell was anything other than an isolated incident.  Bell responds that Rush's testimony established that the Leave of Absence Team was insufficiently trained and failed to properly review the determinations about the reasonableness of proposed accommodations that it solicited from managers in the field.

Regardless of what the evidence revealed about the competency of the Leave of Absence Team, there was no evidence that O'Reilly Auto inappropriately rejected any accommodation request other than Bell's or failed to appropriately engage in the interactive process with other employees.  Any inference that O'Reilly Auto failed to accommodate other employees is pure speculation.

### v.  Malice, Trickery, or Deceit

O'Reilly Auto argues that, even if its conduct were viewed as recklessly indifferent, that does not amount to malice or intent to deceive.  Bell insists that there was substantial trickery or deceit by Watters in the form of false information that he provided to the Leave of Absence Team about Bell's duties and the manner in which Watters negotiated with Bell over possible demotions.

Viewed in the light most favorable to Bell, the evidence showed that Watters's actions constitute malice, trickery, or deceit.  In particular, the jury could have supportably found that Watters viewed himself as "combatting" Bell's accommodation request, and that he did combat it by (1) exaggerating

Bell's unscheduled duties and (2) by telling Bell that he would get back to him about the $13-per-hour counteroffer but then failing to raise the issue with anyone else within O'Reilly Auto and failing to respond to Bell.

Taking all five reprehensibility factors together, they weigh against remittitur. I now turn to the second guidepost.

### b. Disparity Between Punitive Damages and Actual Harm

O'Reilly Auto argues that anything more than a 1 to 1 ratio between Bell's punitive and compensatory damages is unreasonable because Bell's compensatory award was substantial. Bell responds that the ratio between his punitive damages and his compensatory damages plus his backpay is presumptively constitutional because it is in the single digits and that his compensatory award was relatively low.

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Gore*, 517 U.S. at 580. The actual harm inflicted on Bell is the sum of his compensatory damages and backpay, which together reflect the jury's judgment of the award necessary to make him whole.[11]

---

[11] *See Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274, 314 (S.D.N.Y. 2008) ("*Gore* instructs that the Court should first consider the ratio of the punitive damages award to compensatory damages, including back pay."); *Chopra v. Gen. Elec. Co.*, 527 F. Supp. 2d 230, 245 (D. Conn. 2007) ("The Court finds that plaintiff's harm constitutes his emotional harm and his economic loss as reflected in his front pay and back pay awards."); *Baker v. John Morrell & Co.*, 266 F. Supp. 2d 909, 962 (N.D. Iowa 2003) (comparing punitive damages to compensatory damages plus backpay).

The Supreme Court has "been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." *State Farm*, 538 U.S. at 424. However, "few awards exceeding a single-digit ratio between punitive and compensatory damages[] to a significant degree"—in other words, punitive damage awards significantly more than ten times greater than the plaintiff's actual harm—"will satisfy due process." *Id.* at 425. Indeed, "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Id.* (citing *Pac. Mut. Life Ins. v. Haslip*, 499 U.S. 1, 23-24 (1991)). The First Circuit has noted that a 3 to 1 ratio does not approach an impermissible punitive award, *Tapalian v. Tusino*, 377 F.3d 1, 8-9 (1st Cir. 2004), and, in one instance, approved of a 19 to 1 ratio, *Romano*, 233 F.3d at 672.

Relatively large punitive awards are more tolerable when "a particularly egregious act has resulted in only a small amount of economic damages." *State Farm*, 538 U.S. at 425 (quoting *Gore*, 517 U.S. at 582). Conversely, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.*

The ratio of punitive damages to Bell's actual harm is 6.41 to 1. That ratio is, of course, not significantly greater than 10 to 1. However, it is above 4 to 1, the threshold that the Supreme Court has described as close to the line of constitutional impropriety. The award of $117,000 in compensatory damages

plus backpay is neither especially small in relation to the egregiousness of O'Reilly Auto's conduct nor substantial enough to suggest that a 1 to 1 ratio is the appropriate benchmark. For these reasons, the ratio of 6.41 to 1 places Bell's punitive damage award on the higher end of what is permissible but not dramatically so.

### c. Notice of Possible Civil Penalties

"Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." *Gore*, 517 U.S. at 583. Under this guidepost, courts must "accord 'substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue." *Id.* (quoting *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 301 (1989) (O'Connor, J., concurring in part and dissenting in part)). "Decided cases are relevant, but positive law—statutes and regulations—are even more critical." *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 83 (1st Cir. 2001). "[T]he most prudent choice would be to follow the judgments embedded in the text of the statute upon which the suit is founded." *Id.* "Accordingly, a punitive damages award that comports with a statutory cap provides strong evidence that a defendant's due process rights have not been violated." *Romano*, 233 F.3d at 673. "Moreover, a reviewing court should search for comparisons solely to determine whether a particular defendant was given fair notice as to its potential liability for particular misconduct, not to determine an acceptable range into which an award might fall." *Zimmerman*, 262 F.3d at 83.

O'Reilly Auto contends that it did not have notice that a jury might award $750,000 in punitive damages. More specifically, O'Reilly Auto cites to the applicable $300,000 cap for combined compensatory and punitive damages from the ADA and the applicable $500,000 cap on combined compensatory and punitive damages from the MHRA.[12] *See* 42 U.S.C.A. § 1981a(b)(3)(D); 5 M.R.S.A. § 4613(2)(B)(8)(e)(iv). I previously ruled that O'Reilly Auto had waived these statutory damage caps by failing to plead them as affirmative defenses. *See Bell v. O'Reilly Auto Enters.*, No. 1:16-cv-00501, 2022 WL 782784, at *4 (D. Me. Mar. 15, 2022). Nonetheless, O'Reilly Auto contends that the existence of these caps weighs in favor of reducing the jury's verdict because they are relevant to the issue of notice: O'Reilly Auto had notice that the combined total recovery of compensatory and punitive damages would not exceed $500,000 (i.e., the higher of the two caps) because the caps do not stack. Bell responds that the two caps do stack and thus Bell's punitive award is smaller than the $800,000 combined cap, meaning that O'Reilly Auto had sufficient notice of the possibility of a $750,000 punitive award.

O'Reilly Auto raises this issue in a short paragraph in its memorandum of law with no citations except to two of its prior briefs. O'Reilly Auto previously raised the issue of how the ADA's and the MHRA's caps interact when it moved to reduce the verdict to the statutory maximum, but I did not reach that issue because I concluded that these affirmative defenses had been waived. *Id.* I

---

[12] I note for clarity that the ADA's and MHRA's caps do not include backpay. *See* 42 U.S.C.A. § 1981a(b)(2); 5 M.R.S.A. § 4613(2)(B)(8)(d).

address the issue now because it was previously fully briefed and is relevant to the excessiveness analysis.

O'Reilly Auto focuses on the fact that, if Bell were permitted to recover $300,000 under the ADA and $500,000 under the MHRA, it would be impossible to allocate the $750,000 in punitive damages without assigning some punitive damages to each claim. Citing the rule against double *recovery*, O'Reilly Auto argues it would be an impermissible double *punishment* if Bell were awarded punitive damages under the ADA and the MHRA for the same misconduct. For this point, O'Reilly Auto relies on out-of-circuit authority. *See, e.g., Mason v. Okla. Tpk. Auth.*, 115 F.3d 1442, 1459 (10th Cir. 1997) ("Although the rule against double recovery arises most often in the context of compensatory damages, it applies to punitive damages as well." (footnote omitted)), *overruled on other grounds by TW Telecom Holdings Inc. v. Carolina Internet Ltd.*, 661 F.3d 495, 497 (10th Cir. 2011).

"[T]he law abhors duplicative recoveries." *Dopp v. HTP Corp.*, 947 F.2d 506, 517 (1st Cir. 1991). "That is to say, a plaintiff who is injured by reason of a defendant's behavior is, for the most part, entitled to be made whole—not to be enriched." *Id.* In *Sanchez v. Puerto Rico Oil Co.*, 37 F.3d 712, 725 (1st Cir. 1994), the First Circuit stated, however, that "the considerations that operate to bar multiple recoveries are conceptually and legally inapplicable to punitive damages." That is because "[p]unitive damages are directed at deterring and punishing *defendants*; they are not designed to compensate plaintiffs for losses." *Id.* Thus, the First Circuit held that it was permissible to punish a defendant

for the same conduct twice: once with punitive liquidated damages under a federal statute and again by applying a statutory doubling provision to compensatory damages under a Puerto Rican statute. *Id.*

O'Reilly Auto argues that this portion of *Sanchez* is dicta because the First Circuit suspected that the doubling mechanism was compensatory rather than punitive. But the court explicitly avoided deciding that issue of Puerto Rican law and instead approved the award because the award was acceptable even if the doubling had been punitive (and thus the defendant had been punished twice for the same misconduct). *Id.* The First Circuit has since described *Sanchez* as having "held" that there is no freestanding prohibition against double punishment. *Rodriguez-Torres v. Caribbean Forms Mfr., Inc.*, 399 F.3d 52, 67 (1st Cir. 2005).

Given *Sanchez*, allocating some of the jury's punitive damage award to Bell's ADA claim and some to his MHRA claim does not constitute an impermissible double punishment because such a prohibition does not exist in this circuit. Indeed, a court in this district rebuffed a double-punishment argument about these same two statutes. *Burnett*, 422 F. Supp. 3d at 429-30 (rejecting the argument after holding that the issue had been waived).

O'Reilly Auto attempts to distinguish *Sanchez* by arguing that the statutes at issue here evince legislative intent to prohibit double punishment. In *Sanchez*, the court observed that "legislative intent" and "statute . . . considerations" may limit punitive damages. 37 F.3d at 725. The First Circuit has since reiterated that "statutory construction considerations" may prevent

double punishment.  *Rodriguez-Torres*, 399 F.3d at 67.  According to O'Reilly Auto, such statutory-construction considerations exist here because Congress and the Maine State Legislature enacted the caps in order to limit employers' exposure to large damage awards.

O'Reilly Auto's statutory argument is untethered from the text of the ADA and MHRA.  The ADA's cap limits only damages "awarded under this section."  42 U.S.C.A. § 1981a(b)(3).  The MHRA's cap applies to damages awarded "under this subparagraph" and "under this section."  5 M.R.S.A. § 4613(2)(B)(8)(e).  Neither statute (1) conditions the award of punitive damages on what punishments are imposed under other statutes or (2) limits punitive damages from other sources.  Moreover, the First Circuit has in effect already concluded that § 1981a(b)(3) contains neither of those limitations with respect to compensatory damages.  399 F.3d at 65-66.  In *Rodriguez-Torres*, the court held that it was appropriate to divide the entirety of a $250,000 compensatory damages award between parallel federal and state claims notwithstanding the applicability of a $200,000 cap on damages under § 1981a(b)(3).  *Id*.  There was no suggestion that the federal cap meant that the award under the federal claim needed to shrink to offset the award under the state claim or vice versa.[13]

---

[13] The meaning of the ADA's damage-cap provision is especially important because, although O'Reilly Auto does not specify which statute should bow to the other in order to achieve the proposed reduction to $500,000, O'Reilly Auto is likely making an argument about the interpretation of § 1981a(b)(3); namely, that the ADA award shrinks to $0 in reaction to a $500,000 award under the MHRA.  If O'Reilly Auto were instead arguing that that the MHRA award shrinks to $200,000 to accommodate a federal award of $300,000 (or that a $300,000 award under the ADA requires an MHRA award of $200,000), that would not solve O'Reilly Auto's specific objection: the award of punitive damages under two statutes for the same misconduct.

Additionally, the ADA's savings clause provides that "[n]othing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of . . . any State or political subdivision of any State or jurisdiction that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter."  42 U.S.C.A. § 12201(b) (West 2022).  That provision reveals Congress's intent to allow awards in excess of the ADA's caps, notwithstanding the congressional goal of limiting employers' exposure to large awards.  Finally, although the Fifth Circuit held that the cap imposed by a Texas statute was coextensive with the ADA's cap, rather than additive, that result was implied by the fact that the state and federal cap provisions were "identical."  *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 492 (5th Cir. 2001).  The MHRA is distinguishable because the Maine Legislature imposed a $500,000 cap instead of duplicating the ADA's $300,000 limit, evincing legislative intent to do more than enshrine the ADA in state law.  Accordingly, statutory-construction considerations do not foreclose allocating some of the jury's punitive-damage award to each of Bell's claims.

Indeed, First Circuit case law suggests exactly the opposite: that a district court *should* allocate punitive damages across parallel federal and state claims to maximize a plaintiff's recovery.  In *Rodriguez-Torres*, a $200,000 cap under § 1981a(b)(3)(c) applied to the plaintiff's federal claim, while a parallel Puerto Rican claim had no cap.  399 F.3d at 65.  The jury had awarded $250,000 in compensatory damages without specifying how that amount was to be distributed across the parallel federal and commonwealth claims, plus another

$250,000 in punitive damages under the federal claim. *Id.* The district court had maximized the plaintiff's recovery by allocating $1 in compensatory damages and $199,999 in punitive damages to the federal claim and allocating the other $249,999 in compensatory damages to the commonwealth claim. *Id.* Affirming that allocation, the First Circuit held that a district court must "consider[] the unspecified award as fungible between the state and federal claims and allocat[e] the award so as to maximize the plaintiff's recovery while adhering to [§ 1981a(b)(3)'s] cap." *Id.* at 66. "[W]here the jury makes an unapportioned award, there is no basis for believing that the jury favored applying the damages to the federal over the state claim," and "the most plausible reading of the jury's verdict in such circumstances is that the jury wanted the specified sum awarded to the plaintiff no matter the count to which the award was eventually assigned." *Id.* "Allocating damages in this fashion is thus consistent with the district court's general obligation to preserve lawful jury awards to the extent possible." *Id.* The same logic applies to punitive damages with greater force because "[p]unitive damages are directed at deterring and punishing *defendants*; they are not designed to compensate plaintiffs for losses."[14] *Sanchez*, 37 F.3d at 725.

---

[14] *Rodriguez-Torres* also suggests that, even if the First Circuit had recognized a rule against double punishment, it would not be violated by allocating a single award of punitive damages across parallel federal and state claims. Because the allocation in *Rodriguez-Torres* did not violate the rule against double recoveries, the First Circuit must have conceptualized the compensatory damages in that case as a singular but piecemeal recovery that made the plaintiff whole without enriching her. *See Johnson v. Howard*, 24 F. App'x 480, 485 (6th Cir. 2001) (unpublished) ("Although a double recovery may not be had, the jury is not prohibited from allocating a total damages award between different theories of recovery."). Accordingly, dividing an unallocated punitive-damages award effects a singular but piecemeal punishment,

O'Reilly Auto argues that this case is distinguishable because it involves parallel claims that are both capped, rather than one capped claim and one uncapped claim. Again, there is no textual support in either the ADA or MHRA for reducing punitive-damage awards to offset punishments imposed by other means. O'Reilly Auto's argument also runs counter to a recent decision within this district applying *Rodriguez-Torres* and involving the caps from the ADA and MHRA. *See Burnett*, 422 F. Supp. 3d at 427-28. In *Burnett*, the jury awarded $200,000 in punitive damages under the ADA, $300,000 in punitive damages under the MHRA, and $150,000 in unallocated compensatory damages. *Id.* at 405-06. The ADA's $300,000 cap and the MHRA's $500,000 cap applied. *Id.* at 427. Citing *Rodriguez-Torres*, the court allocated the compensatory damages equally across the parallel federal and state claims, thereby preserving the jury's entire award despite the existence of the two caps. *Id.* at 427-28. For the reasons already discussed, the Fifth Circuit's analysis of a capped Texas law with an "identical" cap provision to the ADA is distinguishable. *See Giles*, 245 F.3d at 492. Finally, it is not clear that the presence of a second cap weakens the rationale of *Rodriguez-Torres*: District courts must maximize a plaintiff's recovery despite § 1981a(b)(3)'s cap when the state cause of action allows for unlimited damages, and there is arguably less

---

not multiple punishments. Moreover, the cases in which the First Circuit has addressed potential double punishment involved facts distinguishable from those here because those cases involved both a punitive damages award and another form of punishment (i.e., a statutory mechanism that doubled the compensatory award), not the division of a single award of punitive damages across parallel claims. *See Sanchez,* 37 F.3d at 725; *Rodriguez-Torres*, 399 F.3d at 66-67.

tension between § 1981a(b)(3) and the First Circuit's maximization rule when the total damages are constrained by a second cap.

In sum, O'Reilly was on notice that the combined maximum compensatory and punitive award across the ADA and MHRA is $800,000, not $500,000. Thus, Bell's combined compensatory and punitive damage award of $825,000 would slightly exceed the combined $800,000 cap if these affirmative defenses had not been waived.[15]  Nonetheless, a punitive damage award of $750,000 is possible under the caps and thus O'Reilly Auto had notice of the possibility, which is the ultimate question under this third guidepost.  That result is supported by the district court's decision in *Burnett*, where the court reasoned that the fact that a $350,000 punitive damage award "falls within the statutory maximums" under the ADA and the MHRA is strong evidence that the award did not violate due process.[16]  422 F. Supp. 3d at 432.

---

[15] Again, the ADA's and MHRA's caps do not include backpay and thus Bell's $42,000 backpay award does not count toward the $800,000 cap.  *See supra* note 12.

[16] *Burnett* is also the most closely analogous case, although, as already stated, compliance with a statutory cap is more meaningful under this guidepost than awards in comparable cases. As discussed above, *Burnett* involved a paraplegic employee who sought an accommodation of push-button, automatic doors and whose employer never responded to him.  *Burnett*, 987 F.3d at 61-62. He eventually injured his wrist using the doors and resigned.  *Id.*  The jury awarded $200,000 in punitive damages under the ADA, $300,000 in punitive damages under the MHRA, and $150,000 in unallocated compensatory damages.  *Burnett*, 422 F. Supp. 3d at 405-06. By stipulation of the parties, the court reduced the total punitive damages to $350,000, although the court was unclear as to the basis for the stipulation.  *Id.* at 426 & n.7.  Notwithstanding that stipulation, this case provided notice to O'Reilly Auto that a failure-to-accommodate claim could result in a jury award of at least $500,000 in punitive damages, which is less than $750,000 but does not reflect a troubling lack of notice.  *See Zimmerman*, 262 F.3d at 84 ("[A]n award of $400,000 is not so far removed from the $300,000 figure as to render the award unfair. 'Fairness' in this context is a protean concept, and we must leave room for a certain amount of play in the joints." (citation omitted)).

### 2. Applying the Common-Law Remittitur Standard

"[T]ranslating legal damage into money damages—especially in cases which involve few significant items of measurable economic loss—is a matter peculiarly within a jury's ken." *Trainor v. HEI Hosp., LLC*, 699 F.3d 19, 32 (1st Cir. 2012) (quoting *Sanchez*, 37 F.3d at 723). Accordingly, a jury's damage award is due "great deference," and "a verdict will be reduced or set aside only if it is shown to exceed any rational appraisal or estimate of the damages that could be based upon the evidence before the jury." *Loan Modification Grp., Inc. v. Reed*, 694 F.3d 145, 154 (1st Cir. 2012) (quoting *Segal v. Gilbert Color Sys., Inc.*, 746 F.2d 78, 81 (1st Cir. 1984)). Put differently, under the federal common-law test, a punitive damages award cannot be grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand. *Mercado-Berrios*, 611 F.3d at 28.

Before applying the common-law standard, I note that my analysis under this standard is not limited to the three due process guideposts. The ultimate question is whether the jury's punitive damage award is grossly excessive in light of the relevant evidence. *Sony BMG Music Ent. v. Tenenbaum*, Civil Action No. 07-11446, 2012 WL 3639053, at *2 (D. Mass. Aug. 23, 2012) (applying the federal common-law test in light of the factors articulated in the unobjected-to jury instructions). I instructed the jury as follows:

> The purpose of a punitive damage award is to punish a defendant or to deter a defendant and others from similar conduct in the future. Thus, in deciding whether to award punitive damages, you should consider whether O'Reilly Auto may be adequately punished by an award of compensatory damages only, or whether

the conduct is so malicious or reckless that compensatory damages are inadequate to punish the wrongful conduct.  The amount of punitive damages that you award must be reasonably related to the harm to Mr. Bell, including the harm caused by the reprehensibility of O'Reilly Auto's conduct.  You may consider whether punitive damages are likely to deter or prevent other persons or corporations from performing wrongful acts similar to those O'Reilly Auto is alleged to have committed.

Other factors you may consider in determining an appropriate amount of punitive damages include, but are not limited to, whether Mr. Bell was financially vulnerable; whether O'Reilly Auto's conduct involved repeated actions or was an isolated instance; and whether the harm to Mr. Bell was the result of intentional malice, trickery, deceit, or mere accident.  You may consider whether O'Reilly Auto violated its obligation to, in good faith, engage in the interactive process with Mr. Bell that I described to you earlier.  You may also consider O'Reilly Auto's net financial worth.

I then clarified that (1) my reference to "whether O'Reilly Auto may be adequately punished by an award of compensatory damages only" should have been written to refer to both the compensatory damages and backpay that the jury had already awarded to Bell and (2) the reference to "O'Reilly Auto's net financial worth" should instead be understood by the jury to mean "the number of its employees," which was stipulated to be 43,685.  ECF No. 254 at 108:15-109:10.  O'Reilly Auto did not object.

In light of the foregoing discussion of reprehensibility, the ratio between the punitive award and Bell's harm, and O'Reilly Auto's notice of possible penalties—and the fact that it would have been reasonable for the jury to infer that a company the size of O'Reilly Auto would be deterred only by a relatively large punitive damage award—I conclude that remittitur is not supported under the common-law standard.

### 3. Applying the Due Process Standard

"An award 'grossly excessive' with respect to [the interests of punishment and deterrence] violates the Due Process Clause, which requires that an individual have fair notice of the penalty to which his conduct could expose him." *Méndez-Matos*, 557 F.3d at 52 (quoting *Gore*, 517 U.S. at 574). The due process analysis is largely a matter of the three guideposts discussed above: reprehensibility, the ratio between the punitive award and actual harm, and the penalties authorized by statute or imposed in similar cases. *See id.* In light of the foregoing analysis, I conclude that the jury's $750,000 award does not offend due process.[17]

I reach that conclusion solely based on the three guideposts, but I note that the First Circuit has indicated that they are not necessarily exhaustive. *Zimmerman*, 262 F.3d at 81 ("These guideposts should [not] be treated as an analytical straitjacket . . . . Other pertinent factors may from time to time enter into the equation."). Courts have recognized that deterrence may be a relevant factor under a due process analysis. *See Allen v. Rouse*, CIVIL ACTION NO. 00-10981, 2009 WL 10729103, at *6 (D. Mass. July 17, 2009). To the extent that the size of an award necessary to adequately deter O'Reilly Auto may be considered under the due process standard, that consideration bolsters the conclusion that a total award of $750,000 in punitive damages is not unconstitutional because the depths of O'Reilly Auto's financial resources can

---

[17] For both the federal common-law remittitur analysis and the due process analysis, I would reach the same result even if Watters's conduct were not attributable to O'Reilly Auto and thus the fifth factor in the reprehensibility guidepost favored O'Reilly Auto.

be reasonably inferred from the size of its workforce of 43,685 employees. *Compare State Farm*, 538 U.S. at 427 ("The wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award."), *with id.* at 427-28 ("Wealth provides an open-ended basis for inflating awards when the defendant is wealthy. . . . That does not make its use unlawful or inappropriate; it simply means that this factor cannot make up for the failure of other factors, such as 'reprehensibility,' to constrain significantly an award that purports to punish a defendant's conduct." (alteration omitted) (quoting *Gore*, 517 U.S. at 591 (Breyer, J., concurring))), *and Romanski v. Detroit Ent., L.L.C.*, 428 F.3d 629, 648 (6th Cir. 2005) ("[W]e must take into account the [defendant's] wealth to ensure that the punitive damages award will further the interests it is designed to advance; but we must also ensure that our exacting appellate review results in an award that is not significantly higher than is necessary to further those interests.").

## II.  CONCLUSION

O'Reilly Auto's Motion for New Trial or for Remittitur (ECF No. 262) is **DENIED**.

**SO ORDERED.**

**Dated this 2nd day of September, 2022.**

_____
**/s/ Jon D. Levy**
**CHIEF U.S. DISTRICT JUDGE**